**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| PIER NIEDDU, on Behalf of Himself and Others Similarly Situated, | § § § | |
| Plaintiff, | § § | |
| vs. | § § | CIVIL ACTION NO. 4:12-cv-02726 |
| LIFE TIME FITNESS, INC., LTF CLUB MANAGEMENT CO., LLC, LTF CMBS MANAGING MEMBER, INC., and LTF CLUB OPERATIONS CO., INC., | § § § § § | |
| Defendants. | § | |

---

**DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF'S
MOTION TO CONDITIONALLY CERTIFY COLLECTIVE ACTION**

---

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ............................................................................................. iii

I. INTRODUCTION .........................................................................................................1

II. FACTUAL BACKGROUND .......................................................................................2

    A.    The Parties and the Single Opt-In Plaintiff...............................................2

    B.    LTF's Hair Stylist Employees Are Paid Differently from One Another
           Based on a Variety of Factors...................................................................3

    C.    Hair Stylist Schedules and Job Duties Vary Widely. ...............................5

    D.    The Differences Between Even Plaintiff and Hampton Demonstrate the
           Lack of a "Similarly Situated" Class Here. ..............................................9

    E.    LTF's Time Reporting and Compensation Policies and Practices
           Unequivocally Comply with the FLSA. ..................................................12

    F.    LTF's "Shop Charges" Do Not Constitute an Unlawful Deduction from
           Wages.......................................................................................................16

III. ARGUMENT..............................................................................................................17

    A.    Plaintiff Bears the Burden of Proving that Conditional Certification is
           Warranted in Light of the Facts and Evidence.......................................17

    B.    Plaintiff's Motion Should be Evaluated Under a More Demanding
           Standard Because Substantial Discovery Has Occurred.........................20

    C.    Plaintiff Cannot Establish that LTF's City Centre Hair Stylists are
           Similarly Situated with Respect to His Claims for Alleged Minimum
           Wage and/or Overtime Violations. ........................................................22

          1.    Plaintiff proffers no evidence of a common illegal policy or plan. ...........23

          2.    LTF's undisputedly proper policies weigh strongly against
                conditional certification. .........................................................................25

          3.    LTF did not know, and could not have known, that Plaintiff and
                Hampton were surreptitiously hiding their work time.............................26

          4.    Plaintiff and Hampton are not similarly situated to each other,
                much less other City Centre hair stylist employees. ...............................28

           5.    Plaintiff's reliance on LTF's Shop Charges to show that other hair
                stylists are similarly situated is a red herring..........................................30

i

D.  Conditional Certification is Further Unwarranted Because Plaintiff Has Not Established Sufficient Interest in this Lawsuit.................................................31

E.  Collective Litigation in this Case would be Unmanageable...................................32

F.  Plaintiff's Proposed Notice is Flawed in Several Respects. ...................................35

1.  LTF's proposed Notice provides neutral and balanced information regarding the lawsuit.....................................................................................35

2.  LTF's proposed Notice better advises potential plaintiffs regarding the legal effects of joining the lawsuit. ......................................................37

3.  LTF's proposed Notice accurately informs potential plaintiffs that, if they choose to opt-in and become parties to the lawsuit, they may be required to participate in discovery and/or testify at trial ............39

III.  CONCLUSION.....................................................................................................................42

# TABLE OF AUTHORITIES

**Page(s)**

### CASES

*Allen v. Marshall Field & Co.*,
  93 F.R.D. 438 (N.D. Ill. 1982) ................................................................................36

*Armstrong v. Weichert Realtors*,
  2006 WL 1455781 (D.N.J. May 19, 2006) ...............................................................20

*Ayers v. SGS Control Servs., Inc.*,
  2004 WL 297826 (S.D.N.Y. Dec. 21, 2004) ............................................................36

*Basco v. Wal–Mart Stores, Inc.*,
  2004 WL 1497709 (E.D. La. July 2, 2004) ..........................................................21, 22

*Belt v. Emcare, Inc.*,
  299 F. Supp. 2d 664, 671 (E.D. Tex. 2003) ............................................................38

*Berger v. Cleveland Clinic Found.*,
  2007 WL 2902907 (N.D. Ohio Sept. 29, 2007) .......................................................23

*Bjornson v. Daido Metal U.S.A., Inc.*,
  12 F. Supp. 2d 837 (N.D. Ill. 1998) .......................................................................23

*Bontempo v. Westwood One Broad. Servs., Inc.*,
  2002 WL 1925911 (N.D. Ill. May 3, 2002) ............................................................41

*Bouaphakeo v. Tyson Foods, Inc.*,
  564 F. Supp. 2d 870 (N.D. Iowa 2008) ...............................................................21, 22

*Bowman v. Crossmark, Inc.*,
  2010 WL 2837519 (E.D. Tenn. July 19, 2010) ............................................... passim

*Brooks v. BellSouth Telecomm., Inc.*,
  164 F.R.D. 561 (N.D. Ala. 1995), *aff'd*, 114 F.3d 1202 (11th Cir. 1997) ...............18

*Bunyan v. Spectrum Brands, Inc.*,
  2008 WL 2959932 (S.D. Ill. July 31, 2008) .......................................................21, 22

*Burkhart-Deal v. Citifinancial, Inc.*,
  2010 WL 457122 (W.D. Pa. Feb. 4, 2010) ............................................................34

*Carey v. 24 Hour Fitness USA, Inc.*,
  2012 WL 4857562 (S.D. Tex. Oct. 11, 2012) ......................................................24, 28

*Colozzi v. St. Joseph's Hosp. Health Ctr.*,
  595 F. Supp. 2d 200 (N.D.N.Y. 2009) ...................................................................19

*Comcast Corp. v. Behrend*,
   133 S. Ct. 1426, 1433 (2013) ...................................................................35

*Davis v. Novastar Mortgage, Inc*.,
   2005 WL 3662438 (W.D. Mo. Dec. 13, 2005) ......................................41

*Dooling v. Bank of the West*,
   2012 WL 2417591 (E.D. Tex. June 26, 2012) ..................................17, 31

*Dreyer v. Altchem Env'tl Servs., Inc.*,
   2007 WL 7186177 (D.N.J. Sept. 25, 2007) ............................................20

*Dybach v. Fla. Dep't of Corr.*,
   942 F.2d 1562 (11th Cir. 1991) ........................................................17, 31

*England v. New Century Fin. Corp.*,
   370 F. Supp. 2d 504 (M.D. La. 2005) .....................................................19

*Espenscheid v. DirectSat USA, LLC*,
   705 F.3d 770 (7th Cir. 2013) ..........................................20, 33, 34, 35

*Gatewood v. Koch Foods of Miss., LLC*,
   2009 WL 8642001 (S.D. Miss. Oct. 20, 2009) .......................................34

*Gjurovich v. Emmanuel's Marketplace, Inc.*,
   282 F. Supp. 2d 101 (S.D.N.Y. 2003) .....................................................38

*Gonzalez v. OfficeMax N. Am.*,
   2012 WL 5473764 (C.D. Cal. Nov. 5, 2012) ..........................................34

*Griffith v. Wells Fargo Bank, N.A.*,
   2012 WL 3985093 (S.D. Tex. Sept. 12, 2012) ............................... passim

*H & R Block, Ltd. v. Housden*,
   186 F.R.D. 399 (E.D. Tex. 1999)............................................................17

*Hadjavi v. CVS Pharm., Inc.*,
   2011 WL 3240763 (C.D. Cal. July 25, 2011) .........................................34

*Harris v. FFE Transp. Servs., Inc.*,
   2006 WL 1994586 (N.D. Tex. May 15, 2006) ...................................20, 22

*Heeg v. Adams Harris, Inc.*,
   2012 WL 5381767 (S.D. Tex. Oct. 31, 2012)..........................................18

*Hickson v. U.S. Postal Serv.*,
   2010 WL 3835887 (E.D. Tex. July 22, 2010) .....................................18, 20

*Hoffman-LaRoche, Inc. v. Sperling*,
  493 U.S. 165 (1989)............................................................................17, 35

*Horne v. United Servs. Automobile Ass'n*,
  279 F. Supp. 2d 1231 (M.D. Ala. 2003) ...........................................31

*In re Wells Fargo Wage & Hour Empl. Practices Litig. (No. III)*,
  2012 WL 3308880, at *24 (S.D. Tex. Aug. 10, 2012)...........................17

*Johnson v. TGF Precision Haircutters, Inc.*,
  2005 WL 1994286 (S.D. Tex. Aug. 17, 2005) ............................32, 33

*Long v. BDP Int'l., Inc.*,
  2013 WL 505232 (S.D. Tex. Feb. 8, 2013) ...........................................18

*Luvianos v. Gratis Cellular, Inc.*,
  2012 WL 6737498 (S.D. Tex. Dec. 10, 2012).......................................18

*Maynor v. Dow Chem. Co.*,
  671 F. Supp. 2d 902 (S.D. Tex. 2009) ............................................38, 40

*McCarragher v. Ryland Group, Inc.*,
  2012 WL 4857575 (S.D. Tex. Oct. 11, 2012).......................................18

*Miller v. Hygrade Food Prods. Corp.*,
  198 F.R.D. 638 (E.D. Pa. 2001).............................................................34

*Millington v. Morrow Cty Bd. of Comm'rs*,
  2007 WL 2908817 (S.D. Ohio Oct. 4, 2007).......................................27

*Newton v. City of Henderson*,
  47 F.3d 746 (5th Cir. 1995) ..................................................................27

*Parker v. Nutrisystem, Inc.*,
  620 F.3d 274 (3d Cir. 2010)..................................................................30

*Parker v. Rowland Express, Inc.*,
  492 F. Supp. 2d 1159 (D. Minn. 2007)................................................31

*Ponce v. Tim's Time, Inc.*,
  2004 WL 1921038 (N.D. Ill. July 8, 2004)....................................38, 41

*Ray v. Motel 6 Op. Ltd. P'ship*,
  1996 WL 938231 (D. Minn. Mar. 18, 1996) ............................... passim

*Reed v. Mobile County Sch. Sys.*,
  246 F. Supp. 2d 1227 (S.D. Ala. 2003)..........................................17, 20

*Reyes v. Texas EZpawn, L.P.*,
  2007 WL 101808 (S.D. Tex. Jan. 8, 2007) ...........................................................34

*Robinson v. Dolgencorp., Inc.*,
  2006 WL 3360944 (M.D. Fla. Nov. 13, 2006) .......................................................32

*Saleen v. Waste Mgmt., Inc.*,
  649 F. Supp. 2d 937 (D. Minn. 2009) ........................................................... passim

*Severtson v. Phillips Beverage Co.*,
  137 F.R.D. 264 (D. Minn. 1991) ............................................................................31

*TGF Precision Haircutters, Inc.*,
  2005 WL 1994286, at *6-7 .....................................................................................34

*Thiessen v. Gen. Elec. Capital Corp.*,
  996 F. Supp. 1071 (D. Kan. 1998) .........................................................................21

*Thompson v. Speedway SuperAmerica LLC*,
  2009 WL 130069 (D. Minn. Jan. 20, 2009) ...........................................................26

*Tussing v. Quality Resources, Inc.*,
  2009 WL 4350253 (M.D. Fla. Nov. 25, 2009) .......................................................19

*Updite v. Delta Beverage Group, Inc.*,
  2006 WL 3718229 (W.D. La. Dec. 15, 2006) ..................................................38, 41

*Vargas v. HEB Grocery Co.*,
  2012 WL 4098996 (W.D. Tex. Sept. 17, 2012).......................................................19

*Veliz v. Cintas Corp.*,
  2004 WL 2623909 (N.D. Cal. Nov. 12, 2004) .......................................................41

*Vogt v. Tex. Instruments, Inc.*,
  2006 WL 4660134, at *5 (N.D. Tex. Sept. 19, 2006)..............................................38

*Von Friewalde v. Boeing Aerospace Ops., Inc.*,
  2009 WL 2391400 (5th Cir. Aug. 4, 2009).............................................................27

*West v. Border Foods, Inc.*,
  2006 WL 1892527 (D. Minn. July 10, 2006) ................................................. passim

*Whitaker v. Pac. Enter. Oil Co.*,
  1992 WL 44729 (10th Cir. Mar. 9, 1992) ..............................................................23

*White v. Starbucks Corp.*,
  497 F. Supp. 2d 1080 (N.D. Cal. 2007) ................................................................23

*Wombles v. Title Max of Ala., Inc.,*
    2005 WL 3312670 (M.D. Ala. Dec. 7, 2005) ........................................................22

*Wood v. Mid-Am. Mgmt. Corp.*,
    2006 WL 2188706 (6th Cir. Aug. 1, 2006) ..........................................................23

*Zapata v. IBP, Inc.*,
    167 F.R.D. 147 (D. Kan. 1996) ............................................................................34

STATUTES

29 U.S.C. § 207(i) .........................................................................................................12

29 U.S.C. § 216(b) ............................................................................................17, 23, 37

OTHER AUTHORITIES

7B Charles Alan Wright & Arthur B. Miller, *Federal Practice & Procedure* § 1807 .................40

Fed. R. Civ. P. 23 ..........................................................................................................39

Fed. R. Civ. P. 30(b)(6) .................................................................................................21

Fed. R. Civ. P. 33 ..........................................................................................................40

Fed. R. Civ. P. 34 ..........................................................................................................40

Fed. R. Civ. P. 36 ..........................................................................................................40

Fed. R. Civ. P. 37 ..........................................................................................................40

# I. INTRODUCTION

Plaintiff Pier Nieddu ("Plaintiff") cannot carry his burden to justify conditional certification of a collective action with respect to his claims for alleged unpaid minimum wage and/or overtime – or any other alleged improper payment – under the federal Fair Labor Standards Act ("FLSA").  The factual record before the Court, *including Plaintiff's own evidence*, demonstrates that Defendants' (collectively "LTF's" or the "Company's") commissioned hair stylist employees at LTF's City Centre location are not similarly situated in numerous key respects.

As an initial matter, Plaintiff cannot demonstrate a common LTF decision, policy, or plan that requires commissioned hair stylists to perform work without proper compensation.  Plaintiff does not – and cannot – point to any corporate policy that prevented employees from reporting time spent on work activities and, in turn, prohibited proper payment in accordance with the FLSA's Section 7(i) exemption.  He does not even allege that LTF's time reporting system systematically excluded any work time.  He makes no common allegation that employees were disciplined or chastised for reporting work hours or that LTF's supervisors or managers deleted hours from employees' time reports.  Rather, Plaintiff's motion rests entirely on two individualized claims that employees allegedly were instructed by a few supervisors not to report time worked.  Such allegations – wholly unsupported by, and contrary to, the evidence – do not permit conditional certification.

By contrast, there is no dispute that LTF requires its commissioned employees to accurately report and receive proper compensation for all hours worked.  This directive is expressed throughout LTF's employment policies, and all commissioned employees are trained that they must be familiar with and comply with such policies.  Evidence further shows that commissioned employees are empowered to track their own hours and ultimately are responsible

for self-reporting all compensable work time.  Indeed, corporate policy repeatedly emphasizes that any commissioned employee's failure to fully report all time and accurately complete payroll records may result in discipline, up to and including termination of employment.

In sum, Plaintiff cannot show that his own decision not to accurately report all hours worked, in direct violation of LTF's specific policies and procedures to the contrary, was either typical or representative of the experience of other hair stylists working at varying commission levels and with varying performance expectations.  This is especially so given his admitted lack of knowledge regarding the individual practices of the employees he purports to represent.

Given these facts, it should not be surprising that there has been minimal interest in this case among LTF employees.  Plaintiff and the *single opt-in plaintiff* here were solicited by Plaintiff's counsel to participate, and even after counsel's nearly year-long effort to solicit participants, they have secured only these two individuals.  On this evidence, Plaintiff cannot carry his burden to show that LTF's City Centre commissioned hair stylist employees are similarly situated or that there is sufficient interest in this case to justify conditional certification and related notice.  No workable trial plan possibly could exist that could determine, on a collective basis with common evidence, whether and to what extent individual hair stylists chose on a daily basis to work before or after their normal workdays – or at any other time – but not to report that time.  Therefore, LTF respectfully requests that the Court deny Plaintiff's motion in its entirety.

## II.  FACTUAL BACKGROUND

### A.      The Parties and the Single Opt-In Plaintiff.

LTF operates LifeSpa salons, which offer a range of spa services, at over 80 different workplaces in over 20 states across the country.  (*See* Affidavit of Alexandra Yanez ("Yanez Aff.") ¶ 6 (attached hereto as Exhibit 1).)

Plaintiff was employed by LTF as a hair stylist at its Houston, Texas City Centre LifeSpa location from April 20, 2010 until March 15, 2012.  (*See* Pl. Dep. 15:4-18, 37:6-14 & Exs. 3 & 10.)[1]  He initiated this lawsuit, purportedly on behalf of himself and others "similarly situated," on September 11, 2012.  (*See* Compl.)

Opt-in plaintiff Rosalind Hampton ("Hampton") was employed by LTF as a hair stylist at the City Centre LifeSpa location from May 31, 2010 through February 13, 2013.  (Hampton Dep. 7:25-8:5, 21:15-22:10 & Ex. 18.)  She signed a consent form to become an opt-in plaintiff to this lawsuit on November 15, 2012.  (*Id.* at 18:21-19:6 & Ex. 16.)

**B.      LTF's Hair Stylist Employees Are Paid Differently from One Another Based on a Variety of Factors.**

Individuals employed by LTF as hair stylists receive different pay based on their job classification, skill level, and a range of other factors.  (*See* Affidavit of Liza Shiffman ("Shiffman Aff.") ¶¶ 4-8 (attached hereto as Exhibit 3).)  LTF's hair stylist employees generally are classified as either "Apprentices" or "Stylists," although the latter classification also breaks down into a number of different skill levels and areas of expertise, as discussed further below.  (*See id.* ¶¶ 5, 7; Yanez Aff. ¶ 8.)  Hair stylists typically begin their employment with LTF as Apprentices.  (*See* Shiffman Aff. ¶ 5.)  In the Company's Apprentice program, hair stylists are expected to gain on-the-job experience and build their individual client bases.[2]  (*See id.*)  As the Apprentice program is essentially a training and development period, all Apprentices are paid on an hourly, non-exempt basis for any and all time spent on work-related activities.  (*See id.*)  The

---

[1]   All cited exhibits and deposition excerpts are attached to the Affidavit of Douglas R. Christensen ("Christensen Aff.") (attached hereto as Exhibit 2).

[2]   Other factors also may apply.  For example, Hampton remained in an Apprentice role while obtaining the requisite state cosmetology license to perform full hair styling services.  (*See* Shiffman Aff. ¶ 5.)

hourly rate that each Apprentice receives, however, varies based on individual factors, such as

background and experience.  (*See id.*)  The duration of the Apprentice period also varies from

individual to individual based on experience, skill, and other factors.  (*See id.*)

In addition to their hourly rate of pay (including any applicable overtime premium due

under federal or state law), Apprentices are eligible to receive commissions on salon products

and other retail goods that they sell to customers ("Sales Commissions").  (*See id.* ¶ 6.)  Stylists

also are eligible for Sales Commissions.  (*See id.* ¶ 8)  The amount of commissions that

Apprentices and Stylists earn for retail sales varies depending upon the sales volume and the

commission plan.  (*See id.* ¶ 6)  Under LTF's 2012 stylist commission structure, for example,

Sales Commissions are calculated at a rate of 15% of the product retail sale price for total sales

per client of $7.00 to $13.99, and at a rate of 18% of the product retail sale price for total sales

per client of $14 or more.  (*See id.*)  Apprentices and Stylists may receive Sales Commissions

based on sales resulting from their efforts even if the actual transaction is completed on a day

that the person in question is not scheduled to work.  (*See id.*)  Therefore, it is possible for the

Company's records to show that compensation is due to an Apprentice or Stylist for work days

or periods when the employee did not actually work any scheduled hours.  (*See id.*)

Once employees have successfully completed the Apprentice program, they move to a

Stylist role, which is compensated primarily on a commission-based pay structure.  (*See id.* ¶ 7.)

Stylists continue to receive Sales Commissions, as described above.  (*See id.* ¶ 8.)  Stylists also

receive commissions on a portion of the price charged to clients for all salon services they

provide ("Service Commissions").  (*See id.*)  The price charged to clients for each salon service

varies based on the service in question and on the individual Stylist performing the service.  (*See

id.*)  Each Stylist works with his or her supervisor to set his or her own service rates, which vary

based on a range of factors, including the Stylist's skill level, tenure in the industry, and overall experience.  (*See id.*)  Once service rates are determined for each Stylist, "Shop Charges" and any applicable promotional or other discounts are deducted from the price of the service in question, as described in further detail below.  (*See id.*)  Service Commissions are then calculated off of this final service charge.  (*See id.*)  Stylists receive different Service Commission rates based on their individual "Pay Schedule."  (*See id.* ¶ 11.)  The Pay Schedule for each Stylist varies based on a number of factors, including the individual's skill set, revenue generation, and retention rate.  (*See id.*)

In addition to receiving Sales Commissions and Service Commissions, Stylists also receive an hourly rate – which, for employees in Texas, is $10.88 per hour – for any and all time spent attending training sessions and meetings, including any applicable travel time.  (*See id.* ¶ 7.)  The amount and timing of any such hourly pay, however, varies for each individual, as not all Stylists receive training at the same time or location.  (*See id.*)

For the period from September 11, 2009, through March 2013, LTF has employed about 27 "Apprentices" and "Stylists" with varying levels of skill and expertise at its City Centre salon.[3]  (*See* Yanez Aff. ¶¶ 6, 8 & Ex. B.)  Necessarily, the compensation paid to each individual hair stylist at this location has varied dramatically, both over time and from person to person.

### C.   Hair Stylist Schedules and Job Duties Vary Widely.

Every day is different for LTF's hair stylists.  (*See* Yanez Aff. ¶¶ 7-11.)  At each salon location, Apprentices and Stylists report to a "Department Head," the LTF term for supervisors.  (*See id.* ¶¶ 4, 7.)  Throughout his or her tenure with the Company, however, each hair stylist may

---

[3]   Plaintiff asserts that the employees at issue here are limited to LTF's commissioned hair stylists employed at the City Centre location from September 11, 2009, through the present.  (*See* Pl.'s Mem. at 2.)

report to a number of different Department Heads, as this role has a fairly high turnover rate. (*See id.* ¶ 7.)  Each Department Head is responsible for managing and operating a particular LifeSpa location as he or she sees fit based on day-to-day business needs.  (*See id.*)  Due to varying business demands, each LifeSpa location has its own unique budget, schedule, service offerings, retail line, hours of operation, and prices.  (*See id.*)  The workday schedules, as well as the duties assigned to individual hair stylists, are determined by individual Department Heads based on the foregoing operational concerns, as well as a range of other factors related to each hair stylist's skill and availability. (*See id.* ¶¶ 7-11.)

In general, hair stylists are responsible for providing various hair services and treatments to clients.  (*See id.* ¶ 5 & Ex. A.)  Hair stylists additionally are expected to develop and retain client relationships and to educate clients on LTF's products, services, and treatments.  (*See id.*)  Beyond their duties related to service and product sales and client development, hair stylists also are expected to perform various cleaning, safety, and administrative duties.  (*See id.*)  While the foregoing expectations generally apply to all hair stylists, as described above, the actual duties that each hair stylist performs on a daily basis are assigned by the individual Department Head. (*See id.* ¶¶ 7-11.)

As noted previously, hair stylists have varying service skill levels, and they occupy roles ranging from "Apprentice" to "Master" level.  (*See id.* ¶ 8.)  While all hair stylists are expected to achieve daily, weekly, and monthly goals and to meet a standard retail sales minimum, their individual goals vary based on a range of factors, including the employees' experience levels and individual service prices.  (*See id.* ¶ 11.)  Hair stylists also differ from one another in terms of expertise, as they may specialize in one or more service areas, including the following:  color, cuts, ethnic hair, up-dos and/or bridal hair, and hair extensions.  (*See id.* ¶ 8.)  Accordingly, the

services that each Department Head decides to assign to each hair stylist will in turn vary greatly depending upon the individual's skill level, related service prices, and particular areas of expertise.  (*See id.* ¶¶ 8, 11.)

In addition to the differences outlined above, hair stylists also vary greatly in their productivity levels, and Department Heads may assign different duties based on this factor as well.  (*See id.* ¶ 10.)  For example, some hair stylists are highly productive and, in turn, have clients regularly scheduled for services throughout each of their assigned shifts.  (*See id.*)  Other hair stylists, however, may not have any client services scheduled at all during their normal work hours.  (*See id.*)  In the latter circumstances, the Department Head is at liberty to decide what tasks, if any, hair stylists are expected to perform.  (*See id.*)  Hair stylists with lower productivity levels may be expected, for instance, to engage in cleaning tasks and/or promoting their services in the club.  (*See id.*)  In the alternative, Department Heads may allow or require hair stylists with low productivity to clock-out and cease work activities for the day.  (*See id.*)  As with services, hair stylists have varying skill levels regarding sales, and the sales-related tasks assigned to them may vary accordingly.  (*See id.* ¶ 11.)  For example, some Department Heads may assign certain hair stylists to assist customers at a "retail sample table" for all or part of an assigned shift.  (*See id.*)

Department Heads likewise are authorized to make similar decisions with regard to periods of "down time" between each hair stylist's scheduled service appointments during a given shift.  (*See id.* ¶ 10)  In some instances, a Department Head may require an employee to remain at the work site to assist with cleaning or other tasks or to remain available for any walk-in clients.  (*See id.*)  In other circumstances, a Department Head may allow or require a hair stylist to clock-out and use the down time for his or her personal benefit (as long as doing so is

consistent with federal and state laws governing rest breaks).  (*See id*.)  In making such decisions – in addition to considering the hair stylist's individual productivity – Department Heads also consider a range of other factors, including, but not limited to, the anticipated business needs of the salon.  (*See id*.)  These factors may vary depending on whether a particular shift, day, or season is typically busy or slow at the LifeSpa location in question.  (*See id*.)

Finally, hair stylists at a LifeSpa location hold a wide array of different work schedules, and the particular duties assigned to each may vary depending upon the individual's availability and/or scheduled work hours.  (*See id*. ¶ 9.)  A Department Head may assign different duties, for example, depending upon whether a hair stylist is scheduled to open or close the salon.  (*See id*.)  Similarly, a Department Head may assign different duties to hair stylists who are working busy as opposed to slow hours.  (*See id*.)  Department Heads generally determine schedules, hours, and related duties based upon each employee's availability and skill level as well as the business needs of the location.  (*See id*.)  On some occasions, however, a Department Head may allow a newly hired hair stylist to adopt the schedule, and perhaps various duties, he or she held with a previous employer to help accommodate the employee's existing clients when the hair stylist moves from another salon.  (*See id*.)

As noted, the turnover rate for the Department Head role is high.  (*See id.* ¶ 7.)  Accordingly, individuals who have been employed as hair stylists at LTF's City Centre location during the period from September 2009 through the present have reported to a wide array of different managers.  (*See id.*)  Indeed, Plaintiff alone reported to no less than six different individuals during his tenure with the Company.  First, Plaintiff reported to Francisco Fuentes, who held the Department Head role at City Centre from April 20, 2010 through July 31, 2011.  (*See id.*)  After Mr. Fuentez was terminated in July 2011 for misconduct, Patrick J. Fricano, who

held the title of General Manager, served as interim Department Head from August 1, 2011 through September 7, 2011.  (*See id.* ¶¶ 7, 12.)  Moniquca McKinney then stepped in as interim Department Head / Front Desk Coordinator from September 15 through September 18, 2011, and she was briefly succeeded by Glenn Walden, who served as interim Department Head from September 19, 2011 through October 31, 2011.  (*See id.*)  Merquiz Guzman took over as interim Department Head / Front Desk Coordinator for the month of November 2011, and, on December 1, 2011, Holly Dodson assumed the role of City Centre's Department Head.  (*See id.*)  Plaintiff reported to Ms. Dodson until he was terminated in March 2012 for misconduct, which included working for a competitor in violation of both a salon agreement he entered when he began his employment and his general duty of loyalty to LTF.  (*See id.* ¶ 12.)

Hampton similarly reported to a wide range of managers, including several different individuals who served as Department Head following Plaintiff's discharge.  (*See id.* ¶ 7.)  Beyond the individuals listed above, Hampton additionally reported to Christine "Maria" Presnell, who held the Department Head role from September 5, 2012, through October 29, 2012 Monica Bauer, who served as interim Department Head / Regional Operations Manager from October 30, 2012 through November 5, 2012; and Gracie Sanchez, who has held the Department Head role from November 5, 2012 through the present.  (*See id.*)  In total, Ms. Hampton reported to at least nine different individual managers throughout her employment.  (*See id.*)

### D. The Differences Between Even Plaintiff and Hampton Demonstrate the Lack of a "Similarly Situated" Class Here.

The employment circumstances of Plaintiff and opt-in plaintiff Hampton demonstrate the vast differences between hair stylists at LTF's City Centre spa location.  For instance, Hampton was an hourly Apprentice employee for much of her employment.  (*See* Hampton Dep. 15:24-16:5, 29:21-30:16).  Moreover, once she became a commission paid Stylist, Hampton only

worked part-time.  (*See id.* at 24:12-25:14, 54:4-25.)  Hampton testified that she was the sole

Stylist working those hours.  (*See id.* at 54:23-55:9.)  Illustratively, Plaintiff worked a completely

different schedule, Tuesday through Saturday at full-time hours.  (*See* Pl. Dep. 53:18-22.)

Hampton, unlike Plaintiff, also was absent for medical reasons during her employment.  (*See*

Hampton Dep. 106:2-16.)

      Hampton unequivocally explained how she performed many different duties than other

Stylists:

> Q  Okay.  Were job duties as a commissioned hairstylists the same, in your opinion, as the job duties of the other commissioned hairstylists in the City Centre –
>
> A  Oh, no.  They had me cleaning up all the time like I was a maid. No.
>
> Q  Okay.  So you had different duties than the other hairstylists?
>
> A  Yes.
>
> . . . .
>
> Q  And I think you told me earlier other hairstylists had different start times and different end times, and other hairstylists, some of them worked longer schedules than you did?
>
> A  Yes.
>
> . . . .
>
> A  I did the inventory, I did the towels, I did the laundry, I did the stocking, I did sweeping, dusting, mopping, everything.
>
> Q  Did other hairstylists do those things?
>
> A  No.

(*See id.* at 78:24-81:7.)  Notably, unlike Plaintiff, Hampton habitually clocked in and clocked out

for work when she was an hourly Apprentice.  (*See id.* at 111:1-20; *compare* Pl. Dep. 60:11-

61:22, 90:4-16, 96:1-97:16, 109:12-20.)

Furthermore, Plaintiff and Hampton even have different complaints against LTF in this suit.  Hampton's predominant grievances against LTF are that (i) the Company allegedly did not reimburse her for products she purchased elsewhere to use with her clients (*see* Hampton Dep. 12:1-16, 47:17-48:22), (ii) the Company purportedly did not compensate her accurately when she was an hourly Apprentice (*see id*. at 16:9-19), (iii) other employees allegedly misappropriated her commission sales (*see id*. at 61:24-62:6), and (iv) she purportedly did not always get her tips (*see id*. at 67:9-13).  On the other hand, Plaintiff has made no such complaints.  In fact, unlike Hampton, one of Plaintiff's main concerns was that he felt clients were not fairly distributed amongst hair stylists at the spa.  (Pl. Dep. 44:18-24.)

Moreover, Plaintiff admits that he does not have any knowledge of the key circumstances regarding other hair stylists at the City Centre location:

> Q  Sure.  Do you know -- do you have any knowledge about what Life Time Fitness told other stylists about the commission structure?
>
> A  I have no knowledge about it.
>
> Q  Do you know what Life Time Fitness told other stylists about how shop charges would work?
>
> MR. PRIETO:  Objection; speculation.
>
> Q  (By Mr. Christensen)  You can answer.
>
> A  I'm not sure.
>
> Q  You're not sure what Life Time Fitness would have told other stylists?
>
> A  I don't know.  I'm not sure.

(*See id*. 25:22-26:8.)

> Q  Did any of the other hairstylists ever tell you what [supervisor] Francisco Fuentes told them about whether they needed to punch in or not?

       A  No.

(*See id.* at 78:10-13.)

       Q  And you don't know how often other stylists would or wouldn't
       punch in; is that fair?

       A  No, because, you know -- I don't know that.

(*See id.* at 95:23-25; *see also id.* at 27:6-24 (admitting he does not know if other hair stylists

attended LTF training regarding compensation); *id.* at 28:21-24, 30:23-31:13 (admitting he does

not know if other hair stylists received written material explaining compensation); *id.* at 58:19-24

("Do you know how the scheduling worked with other stylists?  A  No, not particularly."); *id.* at

87:20-88:9 (admitting he does not know the schedules for other hair stylists).)

    **E.**    **LTF's Time Reporting and Compensation Policies and Practices
        Unequivocally Comply with the FLSA.**

       The FLSA's Section 7(i) exemption provides that, to qualify for exempt status,

commissioned employees' earnings for a given pay period must equal at least one and a half

times the applicable minimum wage based on the number of hours worked.  *See* 29 U.S.C.

§ 207(i).  LTF's commissioned Stylists receive a "draw" or "minimum wage adjustment" where

their earnings in a given pay period are insufficient to meet the foregoing Section 7(i)

requirement.  (*See* Shiffman Aff. ¶ 12.)  The draw "is a payment which, along with any

commissions earned during the pay period in question, will render the employee's pay equal to

the applicable minimum rate multiplied by the hours worked in the pay period, minus any

available tip credit authorized under federal and applicable state law."  (*Id.*)  In Houston, Texas,

the applicable minimum rate to satisfy the Section 7(i) exemption is $10.88 per hour.  (*See id.*)

       LTF has promulgated a number of policies and adopted various systems and practices

designed to ensure that all commissioned Stylists receive a draw and other compensation as

appropriate.  (*See id.* ¶ 13.)  Significantly, the Company's Timekeeping policy requires both

hourly and commissioned employees to accurately and completely record all hours worked in the Company's electronic timekeeping system, KRONOS.  (*See id.*; *see also* Affidavit of Brianna Weber ("Weber Aff.") ¶ 6 (attached hereto as Exhibit 4).)  LTF's Timekeeping policy specifically provides that accurate recordkeeping of all time worked is the responsibility of each hourly and commissioned employee, emphasizing that "[f]ederal and state laws require an accurate record of time worked by hourly and commissioned [employees] in order to appropriately calculate pay and benefits."  (*See* Weber Aff. ¶ 5 & Ex. A.)

The Timekeeping policy clarifies that all hourly and commissioned employees must accurately record the time they begin and end all work – including the beginning and end of any split shifts, departures from work for personal reasons, or unpaid meal breaks – by punching in and out of the KRONOS system.  (*See id.* ¶ 6 & Ex. A.)  Hair stylists additionally are responsible for entering into KRONOS all time spent on training and any other work-related tasks not captured in their daily punches.  (*See id.*)  The Timekeeping policy further clarifies that "time worked" includes all of the time employees actually spend performing job-related duties, as well as any paid breaks, in accordance with applicable law.  (*See id.* ¶ 8 & Ex. A.)  While stylists must record all of their own compensable work time in KRONOS, not all employees enter their time in KRONOS in the same manner.  (*See id.* ¶ 7.)  Although all LTF employees are issued a unique employee number, which they must use for entering their time, some employees also elect to utilize a fingerprint recognition mechanism to swipe in and out of the KRONOS system. (*See id.*)  Under the Timekeeping policy, if any hourly or commissioned employee fails to properly record any and all time worked, the employee may be subject to discipline, up to and including termination of employment.  (*See id.* ¶ 8 & Ex. A.)

LTF employees are responsible for ensuring the accuracy of their own time records, and, if for any reason any modifications or corrections to their time reports in KRONOS are needed, employees must immediately notify their Department Head.  (*See id.* ¶ 9 & Ex. A.)  Similarly, in the event that an employee forgets to punch in or out as required under the Timekeeping policy, the employee must immediately fill out a KRONOS Missed Punch form and provide it to the Department Head for processing.  (*See id.*)

LTF's Department Heads are subject to the Company's "KRONOS Missed Punches/Editing Punches" policy, which sets forth their supervisory responsibilities regarding timekeeping.  (*See id.* ¶ 10 & Ex. B.)  Under this policy, at least every other day, each Department Head must review the time records that each individual direct report has entered in KRONOS to look for any potential errors or inaccuracies.  (*See id.*)  If a Department Head identifies any apparent discrepancies, the Department Head must confer with the employee in question, and, if any changes to the time records need to be made, the Department Head must ensure that the employee completes a signed KRONOS Exception Sheet setting forth the actual hours worked.  (*See id.*)  A Department Head may not edit any employee's punches unless the employee has properly completed the requisite KRONOS Exception Sheet.  (*See id.*)  Any Department Head who edits an employee's time records without first obtaining a signed KRONOS Exception Report is subject to discipline, up to and including termination.  (*See id.*)

Under the Timekeeping policy, employees also may be subject to discipline, up to and including termination of employment, if they alter or falsify their time records or otherwise fail to present accurate timekeeping information.  (*Id.* ¶ 11 & Ex. A.)  The Company's "Accuracy of Company Records" policy further mandates that employees ensure all data included in LTF records are complete and accurate, emphasizing that "[r]ecording false, inaccurate or incorrect

-14-

information or data is grounds for discipline, up to and including termination."  (*See id.* ¶ 11 & Ex. C.)

In addition to providing the policies discussed above to all LTF employees and Department Heads, the Company also sends reminders to various employees from time to time regarding the importance of accurate timekeeping.  (*See id.* ¶ 12 & Ex. D.)  The Company may send such a reminder, for example, when employees' weekly hours averages fall below the minimum required to maintain various employee benefits.  (*See id.*)

Beyond the foregoing admonitions provided to all employees regarding accurate and complete timekeeping, LTF has made proper timekeeping a *specific requirement* of the Stylist job.  (*See* Yanez Aff. ¶ 5 & Ex. A.)  As LTF's Stylist Position Description emphasizes, the following specific responsibilities are applicable to all hair stylists:  "Punches in and out of Kronos" and "[a]dheres to company policies and procedures."  (*See id.*)

Once hair stylists have accurately entered their time for a given pay period in keeping with their timekeeping obligations and responsibilities, LTF uses this data to ensure that all commissioned Stylists receive proper payment under Section 7(i).  (*See* Shiffman Aff. ¶¶ 13-14.) The hours entered into KRONOS are transmitted to a program entitled Workday, as are commission data gathered through an electronic program entitled SpaBiz, or a previous version entitled ShortCuts, which are Spa Point-of-Sale systems.  (*See  id.* ¶ 13.)  Once the hours and commission data are uploaded into Workday, the Workday system automatically calculates – based on a prescribed script – whether any of the commissioned Stylists must be paid a draw for the pay period in question.  (*See id.* ¶¶ 13-14.)  For obvious reasons, whether a draw must be paid, and, if so, how much of a draw, varies dramatically from Stylist to Stylist as well as from pay period to pay period.  (*See id.* ¶ 14.)  While some commissioned Stylists regularly hit draw,

others never do so, as they generate services and sales high enough to render their earnings

sufficient to meet Section 7(i)'s requirements.  (*See id.*)

      **F.**      **LTF's "Shop Charges" Do Not Constitute an Unlawful Deduction from Wages.**

      As noted above, a Stylist's Service Commissions are calculated after "Shop Charges" are

deducted from the price of each service in question.  Shop Charges are intended to cover a range

of costs associated with providing various salon services to customers, such as the cost of using

salon products and linens, and vary depending upon the service in question.  (*See id.* ¶ 9.)

Plaintiff's assertion that he is similarly situated under the FLSA to other LTF City Centre hair

stylist employees simply because all were subject to "Shop Charges" is without merit (*see* Pl.'s

Mem. at 6, 14, 17), as he offers no evidence that such charges in any way violate the FLSA or

any other law.  Contrary to Plaintiff's implication, Shop Charges do not constitute a deduction

from hair stylists' earned wages.  (*See* Shiffman Aff. ¶ 10.)  Rather, the Shop Charges applicable

to each service are automatically calculated at the point of sale, and they are deducted from

service charges (through either the SpaBiz, or ShortCuts Point-of-Sale systems discussed above)

*prior to* the calculation of Service Commissions, as described below.  (*See id.*)  In other words, a

Stylist's Service Commissions are not even determined until after Shop Charges have been

tabulated with respect to the cost of each service.  (*See id.*)

      As with Shop Charges, any promotional or other applicable discounts offered to clients

for the cost of services are deducted prior to the calculation of Service Commissions.  (*See id.*)

After applicable discounts are deducted, SpaBiz or ShortCuts automatically calculates the service

commission rate due to the Stylist in question based on the cumulative resulting service revenue

in the given pay period (as well as the Stylist's Pay Schedule, as set forth previously).  (*See id.*

¶ 11.)  The commission rate to be applied is determined before Shop Charges have been

deducted from the cumulative resulting service revenue amount. (*See id.*)  This commission rate is then multiplied by the service revenue amount minus Shop Charges and applicable discounts, which determines the actual Service Commission dollars due to the Stylist for the given pay period. (*See id.*)

## III.  ARGUMENT

### A.    Plaintiff Bears the Burden of Proving that Conditional Certification is Warranted in Light of the Facts and Evidence.

While the Court has discretion to conditionally certify a collective action under 29 U.S.C. § 216(b), that discretion should only be exercised in "appropriate cases." *Hoffman-LaRoche, Inc. v. Sperling*, 493 U.S. 165, 169 (1989).  Plaintiff bears the burden of proving that conditional certification is warranted. *In re Wells Fargo Wage & Hour Empl. Practices Litig. (No. III)*, 2012 WL 3308880, at *24 (S.D. Tex. Aug. 10, 2012); *Dooling v. Bank of the West*, 2012 WL 2417591, at *4 (E.D. Tex. June 26, 2012); *Reed v. Mobile County Sch. Sys.*, 246 F. Supp. 2d 1227, 1232 (S.D. Ala. 2003) ("[T]he burden is on the plaintiffs to make an evidentiary showing that they and the proposed class are similarly situated, not on the defendants to disprove such similarity."); *see also* Pl.'s Mem. at 9.  To do so, Plaintiff must show not only that LTF's City Centre hair stylist employees are "similarly situated" in relevant respects in light of the claims asserted, but also that such employees want to participate in the litigation as opt-in plaintiffs.  *See In re Wells Fargo*, 2012 WL 3308880, at *19; *see also Dybach v. Fla. Dep't of Corr.*, 942 F.2d 1562, 1567-68 (11th Cir. 1991); *H & R Block, Ltd. v. Housden*, 186 F.R.D. 399, 400 (E.D. Tex. 1999) (refusing to allow notice when the plaintiffs "failed to identify potential plaintiffs, submit affidavits of potential plaintiffs or submit any other evidence that might show a widespread plan of discrimination existed").

In order to show that LTF's City Centre hair stylists are similarly situated for purposes of conditional certification, Plaintiff must demonstrate that he and others are the "victims of a single decision, policy or plan" to deny employees overtime and/or minimum wage compensation.[4] *Luvianos v. Gratis Cellular, Inc*., 2012 WL 6737498, at *8 (S.D. Tex. Dec. 10, 2012); *Griffith v. Wells Fargo Bank, N.A.*, 2012 WL 3985093, at *2 (S.D. Tex. Sept. 12, 2012) ("[W]hile a group of employees may be similarly situated with regard to their positions and responsibilities, they are dissimilar for the purposes of FLSA class treatment if the named plaintiff fails adequately to allege that their employer subjects them to uniform pay practices or policies."); *see also Saleen v. Waste Mgmt., Inc.*, 649 F. Supp. 2d 937, 940 (D. Minn. 2009); *West v. Border Foods, Inc.*, 2006 WL 1892527, at *2 (D. Minn. July 10, 2006); *Brooks v. BellSouth Telecomm., Inc.*, 164 F.R.D. 561, 567 (N.D. Ala. 1995), *aff'd*, 114 F.3d 1202 (11th Cir. 1997). "Some factual support for the complaint allegations of class-wide policy or practice must be shown to authorize notice." *Heeg v. Adams Harris, Inc*., 2012 WL 5381767, at *3 (S.D. Tex. Oct. 31, 2012). Allegations of generic similarities – such as common pay provisions, job titles, or job duties – are insufficient. *See Ray v. Motel 6 Op. Ltd. P'ship*, 1996 WL 938231, at *4-5 (D. Minn. Mar. 18, 1996) (finding that evidence showing employees worked in the same

---

[4]   Plaintiff's assertion that a single policy is not "vital" to conditional certification (*see* Pl.'s Mem. at 11-12) is contrary to the weight of the authority. *See, e.g., Long v. BDP Int'l., Inc*., 2013 WL 505232, at *2 (S.D. Tex. Feb. 8, 2013) ("Certification . . . *requires* substantial allegations that potential members were together the victims of a single decision, policy, or plan." (emphasis added & internal quotation omitted)); *Heeg v. Adams Harris, Inc*., 2012 WL 5381767, at *5 (S.D. Tex. Oct. 31, 2012); *McCarragher v. Ryland Group, Inc*., 2012 WL 4857575, at *3 (S.D. Tex. Oct. 11, 2012) ("The '*key consideration*' in determining whether the plaintiffs have satisfied this standard is that they *must* show substantial allegations that potential members were together the victims of a single decision, policy, or plan." (emphasis added & internal quotation omitted)); *Hickson v. U.S. Postal Serv*., 2010 WL 3835887, at *6-8 (E.D. Tex. July 22, 2010). Plaintiff cites only two cases regarding this issue, both of which in fact acknowledge this authority. *See* Pl.'s Mem. at 11-12.

position, under a similar management plan, does not justify conditional certification); *see also Colozzi v. St. Joseph's Hosp. Health Ctr.*, 595 F. Supp. 2d 200, 207 (N.D.N.Y. 2009) ("The similarly situated analysis, then, centers upon the features which make the particular policy or practice unlawful." (citation omitted)).

Rather, to satisfy his burden here, Plaintiff must produce evidence of a single decision, policy, or plan *in violation* of the FLSA.  *See Saleen*, 649 F. Supp. 2d at 940 ("[T]he putative class members must be harmed by an *unlawful* companywide policy." (emphasis in original)); *see also Ray*, 1996 WL 938231, at *4 (plaintiffs must show an "illegal overtime plan" that is carried out through central management); *Bowman v. Crossmark, Inc.*, 2010 WL 2837519 at *3 (E.D. Tenn. July 19, 2010); *England v. New Century Fin. Corp.*, 370 F. Supp. 2d 504, 511 (M.D. La. 2005).  "[T]he mere fact that some employees of a large corporation were [allegedly] not properly compensated under the FLSA does not provide a 'colorable basis' to infer the existence of an unlawful companywide policy."  *Saleen*, 649 F. Supp. 2d at 941.

Conclusory allegations that other employees are similarly situated, even when set forth in affidavits or declarations, are insufficient to justify conditional certification.  *See*, *e.g.*, *Vargas v. HEB Grocery Co.*, 2012 WL 4098996, at *4 (W.D. Tex. Sept. 17, 2012) ("Plaintiffs only offer conclusory statements that they are aware that other workers were denied minimum wages and/or overtime. This is insufficient . . . ."); *Tussing v. Quality Resources, Inc.*, 2009 WL 4350253 at *2-3 (M.D. Fla. Nov. 25, 2009) (denying conditional certification where "Plaintiffs' six affidavits are not substantial and detailed enough to satisfy this Court that a reasonable basis exists for conditional certification"); *West*, 2006 WL 1892527, at *2 (finding that "mere averments" insufficient to warrant conditional certification).  Instead, Plaintiff must present evidence demonstrating a *reasonable factual basis* for his claim of an illegal pay policy or plan.

*See Reed*, 246 F. Supp. 2d at 1231-32 (plaintiffs must "proffer evidence" (quoting *Dybach*, 942 F.2d at 1567)); *see also Dreyer v. Altchem Env'tl Servs., Inc.*, 2007 WL 7186177, at *3 (D.N.J. Sept. 25, 2007) ("[C]ourts have not hesitated to deny conditional certification when evidence is lacking."); *Armstrong v. Weichert Realtors*, 2006 WL 1455781, at *1 (D.N.J. May 19, 2006) ("To make a meaningful decision about whether certain people are similarly situated, this Court must have, as a factual foundation, information about who is in the potential class and the basis for inferring that the potential members are similarly situated.").

Before conditionally certifying a case, the Court also should consider whether the case may be properly managed as a collective action. *See Hickson*, 2010 WL 3835887, at *14 ("Courts have an obligation to step in at the beginning of a case to ensure that the proposed class is manageable . . . ." (citations omitted)); *West*, 2006 WL 1892527, at *3 ("As a matter of sound case management, a court should . . . make a preliminary inquiry as to whether a manageable class exists." (internal citation omitted)); *Ray*, 1996 WL 938231, at *4 ("[T]he court must . . . look to specific factual similarities or differences and manageability concerns."); *see also Espenscheid v. DirectSat USA, LLC*, 705 F.3d 770, 773-76 (7th Cir. 2013) (affirming rejection of attempted FLSA collective action where collective trial was infeasible); *Bowman*, 2010 WL 2837519, at *6.

**B.    Plaintiff's Motion Should be Evaluated Under a More Demanding Standard Because Substantial Discovery Has Occurred.**

Although district courts have discretion to evaluate motions for conditional certification under a "lenient" standard in appropriate cases, it is widely recognized that such motions should be evaluated under a heightened standard where, as here, the parties have already conducted substantial discovery. *See, e.g.*, *Harris v. FFE Transp. Servs., Inc.*, 2006 WL 1994586, at *3 (N.D. Tex. May 15, 2006); *see also Bowman*, 2010 WL 2837519 at *4-5 (applying a "more

demanding standard"); *Bunyan v. Spectrum Brands, Inc.*, 2008 WL 2959932, at *3-4 (S.D. Ill.

July 31, 2008) ("Courts also recognize that once substantial discovery has been conducted,

plaintiffs face a higher burden in proving that they and potential class members are similarly

situated."); *Bouaphakeo v. Tyson Foods, Inc.*, 564 F. Supp. 2d 870, 895 (N.D. Iowa 2008)

(emphasizing that a court "cannot overlook . . . the valuable information before [it] that is

relevant to [conditional certification]"); *Basco v. Wal–Mart Stores, Inc*., 2004 WL 1497709, at

*4 (E.D. La. July 2, 2004); *Thiessen v. Gen. Elec. Capital Corp.*, 996 F. Supp. 1071, 1081 (D.

Kan. 1998) (applying an "intermediate" approach when three months of discovery had been

conducted prior to plaintiff's motion).

    Under this heightened or "intermediate" approach, courts still decide whether a collective

action should be conditionally certified, subject to a later, second-stage analysis, as Plaintiff

suggests in his brief.  (*See* Pl.'s Mem. at 8-9.)  Courts consider, however, all of the evidence in

the record, and they impose a greater evidentiary burden on the plaintiff to prove that employees

actually are "similarly situated" for purposes of conditional certification.  *See Bowman*, 2010

WL 2837519, at *4-5; *Bunyan*, 2008 WL 2959932, at *3-4; *Bouaphakeo*, 564 F. Supp. 2d at 895.

    Here, the parties have engaged in discovery for more than three months.  (*See* Jan. 16,

2013 Scheduling Order (providing for Phase I discovery through March 23, 2013).)  LTF has

responded to Plaintiff's numerous document requests and interrogatories, and it has produced

more than 1,200 pages of documents, including payroll and time entry documents, as well as

available scheduling data, for both Plaintiff and the single opt-in plaintiff here.  (*See* Christensen

Aff. ¶ 4.)  LTF also produced a corporate representative to be deposed under Federal Rule of

Civil Procedure 30(b)(6) and prepared this witness to respond to ten separate topics.  (*See id.* ¶ 5

& Ex. C.)  Plaintiff and the single opt-in plaintiff likewise have responded to written discovery,

and Plaintiff and the opt-in plaintiff have been deposed.  (*See id.*)  Under these circumstances,

heightened scrutiny of Plaintiff's motion for conditional certification is warranted.  *See Harris*,

2006 WL 1994586, at *3; *Bowman*, 2010 WL 2837519, at *4-5; *Bunyan*, 2008 WL 2959932, at

*3-4; *Bouaphakeo*, 564 F. Supp. 2d at 895.

      Regardless of whether the standard applied is "lenient" or "intermediate," however,

courts recognize that, in evaluating a plaintiff's motion for conditional certification, they must

consider all available evidence.  *See Saleen*, 649 F. Supp. 2d at 942 ("[T]he Court is unaware of

any court that has agreed with plaintiffs' position that evidence submitted by a defendant

resisting conditional certification should be completely ignored."); *West*, 2006 WL 1892527, at

*7 ("[N]either the remedial purposes of the FLSA, nor the interests of judicial economy, would

be advanced if we were to overlook facts which generally suggest that a collective action is

improper."); *see also Wombles v. Title Max of Ala., Inc.,* 2005 WL 3312670, at *2 (M.D. Ala.

Dec. 7, 2005); *Basco*, 2004 WL 1497709, at *4.  Therefore, regardless of the standard, Plaintiff

must overcome LTF's evidence demonstrating that conditional certification is inappropriate

because there is no common decision, policy, or plan at LTF to unlawfully deny City Centre hair

stylists proper compensation.  Because Plaintiff cannot do so, conditional certification should be

denied.

    **C.**    **Plaintiff Cannot Establish that LTF's City Centre Hair Stylists are Similarly
Situated with Respect to His Claims for Alleged Minimum Wage and/or
Overtime Violations.**

      Plaintiff alleges that LTF failed to properly pay him based on time he allegedly spent on

work-related activities, but which he elected not to report in LTF's KRONOS time reporting

system.  (*See* Pl. Dep. 60:11-61:22, 90:4-16, 96:1-97:16, 109:12-20.)  The single opt-in plaintiff

here also alleges that she did not report all of her work hours and therefore was not properly

compensated.  (*See* Hampton Dep. 16:6-19, 117:12-19.)  Notwithstanding his burden under

Section 216(b), however, Plaintiff does not provide evidence of *any* corporate decision, policy, or plan by LTF that prohibited employees from accurately recording their time or from being properly paid.  Furthermore, he fails to show that he and the single opt-in are similarly situated to one another, let alone to the entire purported hair stylist class.

### 1. Plaintiff proffers no evidence of a common illegal policy or plan.

Plaintiff cannot identify any LTF corporate policy that prohibited hair stylist employees from accurately reporting all hours worked or otherwise denied them proper compensation under Section 7(i).  He does not allege that LTF's KRONOS time reporting system systematically excluded any work time or otherwise failed to allow hair stylist employees to accurately capture their hours worked.  He likewise makes no assertion that LTF's SpaBiz, ShortCuts, or Workday systems systemically failed to accurately calculate commissions or draws due to hair stylists.  He makes no common allegation that employees were disciplined or chastised in any way when they did accurately report all hours worked.

Indeed, both Plaintiff and Hampton concede that they self-reported their own payroll time.  (*See* Pl. Dep. 60:11-61:22, 109:12-19; Hampton Dep. 16:6-19, 111:1-20.)  Plaintiff cannot establish a common policy or plan by LTF to deny proper compensation when LTF undisputedly paid him and Hampton in accordance with the time each of them self-reported.  *See Griffith*, 2012 WL 3985093, at *2-5; *see also, e.g.*, *Wood v. Mid-Am. Mgmt. Corp.*, 2006 WL 2188706, at *3-4 (6th Cir. Aug. 1, 2006); *Whitaker v. Pac. Enter. Oil Co.*, 1992 WL 44729, at *1-2 (10th Cir. Mar. 9, 1992); *White v. Starbucks Corp.*, 497 F. Supp. 2d 1080, 1085 (N.D. Cal. 2007); *Berger v. Cleveland Clinic Found.*, 2007 WL 2902907, at *13 (N.D. Ohio Sept. 29, 2007); *Bjornson v. Daido Metal U.S.A., Inc.*, 12 F. Supp. 2d 837, 840 (N.D. Ill. 1998).

Plaintiff and Hampton generally make no allegation that LTF suffered or permitted any "off the clock" hours at all, except for a few individualized claims that a few employees were

instructed by their supervisors not to "worry about 'clocking in' or 'clocking out' because they were commission paid employees."  (*See* Pl.'s Mem. at 15; *see also* Pl. Dep. 88:10-89:17; Hampton Dep. 13:14-15:17.)  Apart from those allegations, neither Plaintiff nor Hampton provides any evidence to suggest that LTF knew or should have known about alleged unrecorded work time, much less on a class-wide basis or pursuant to a "single policy, plan or decision." (*See* Pl. Dep. 49:4-13, 103:4-12 (noting supervisors were "in and out" and not "tracking" the hair stylists); *id.* at 90:4-16, 109:12-19 (noting that no LTF policies prevented Plaintiff from accurately reporting his time); Hampton Dep. 78:13-23 (noting supervisors were in their office and not in the hair stylists' workspace, unless there was an issue at the salon front desk).) Plaintiff's bare allegations – unsupported by, and contrary to, the evidence – do not permit conditional certification.  In fact, in a recent similar case before this Court, conditional certification was denied because the employer's undisputed policy required employees to accurately self-report time, and the payroll system automatically correctly paid the employees for such self-reported time.  *Griffith*, 2012 WL 3985093, at *2-5 (noting that collective certification is inappropriate where an employee's choice to deviate from policy and inaccurately self-report worked time is based on individual circumstances and "office-specific experiences relating to the actions of office or division supervisors"); *see also Carey v. 24 Hour Fitness USA, Inc.*, 2012 WL 4857562, at *2 (S.D. Tex. Oct. 11, 2012) (denying motion for conditional certification where the inquiry into whether managers did not want employees to record accurate hours would "require extensive individualized analysis" because "[w]hether a Club Manager would be willing to violate the 24 Hour Fitness's written company policy against 'off-the-clock' work also requires an inquiry into the motivation and ethics of each Club Manager").

> **2.      LTF's undisputedly proper policies weigh strongly against conditional certification.**

LTF has never had a corporate policy or mandate that hair stylist employees (whether hourly Apprentice stylists or commissioned Stylists) should not report all time worked.  To the contrary, as outlined above, LTF's policies have *always* emphasized that its commissioned employees *must* record all hours worked to ensure that they receive proper payment under the FLSA.  For example, as noted above:

- LTF's Timekeeping policy specifically provides that each hourly and commissioned employee is responsible for accurately and completely reporting all time worked, emphasizing that "[f]ederal and state laws require an accurate record of time worked by hourly and commissioned [employees] in order to appropriately calculate pay and benefits."  (*See* Weber Aff. ¶ 5 & Ex. A.)

- LTF's Timekeeping policy explains that all hourly and commissioned employees must accurately record the time they begin and end all work – including the beginning and end of any split shifts, departures from work for personal reasons, or unpaid meal breaks – by punching in and out of the KRONOS system.  (*See id.* ¶ 6 & Ex. A.)

- LTF's Timekeeping policy clarifies that "time worked" includes all of the time employees actually spend performing job-related duties, as well as any paid breaks, in accordance with applicable law.  (*See id.* ¶ 8 & Ex. A.)

- LTF's Accuracy of Company Records policy mandates that employees ensure all data included in any LTF records is complete and accurate, emphasizing that "[r]ecording false, inaccurate or incorrect information or data is grounds for discipline, up to and including termination."  (*See id.* ¶ 11 & Ex. C.)

- LTF's Stylist Position Description specifically states that hair stylist responsibilities include "Punch[ing] in and out of Kronos" and "[a]dher[ing] to company policies and procedures."  (*See* Yanez Aff. ¶ 5 & Ex. A.)

All LTF employees have been trained that they must make themselves familiar with, and carefully comply with, the foregoing policies.  (*See* Weber Aff. ¶ 4.)  Indeed, Plaintiff does not dispute that these policies accurately reflect LTF's expectations concerning time reporting.  (Pl. Dep. 90:4-16, 109:12-19; *see also* Pl.'s Mem. at 16 (describing hair stylists as subject to a time keeping obligation).)

In addition to establishing appropriate time recording policies and training employees that they must comply with them, LTF also has adopted the KRONOS Missed Punches/Editing Punches policy, which provides that Department Heads must review the time records of their individual direct reports at least every other day to look for any potential errors or inaccuracies. (*See* Weber Aff. ¶ 10 & Ex. B.)

Furthermore, the evidence shows that, from time to time, LTF has sent notice to various employees reminding them of the importance of accurately and completely recording all time worked. (*See id.* ¶¶ 11-12 & Ex. D.)  Thus, not only has LTF enacted appropriate formal policies, but the evidence also demonstrates that LTF puts those policies into practice.  Where employers implement appropriate pay policies and, as here, put those policies into practice, such evidence weighs strongly against conditional certification.  *See Griffith*, 2012 WL 3985093, at *2-5; *Saleen*, 649 F. Supp. 2d at 940-41; *Thompson v. Speedway SuperAmerica LLC*, 2009 WL 130069, at *1, 9, 12 (D. Minn. Jan. 20, 2009); *West*, 2006 WL 1892527, at *7, 9; *Ray*, 1996 WL 938231, at *4.

### 3.   LTF did not know, and could not have known, that Plaintiff and Hampton were surreptitiously hiding their work time.

Plaintiff suggests that LTF failed to meet its obligation to accurately track the hours worked by its hair stylist employees.  (*See* Pl.'s Mem. at 6 ("Clearly, LTF was not tracking the correct number of hours worked by its commission paid hairstylists at its Houston, Texas City Centre location and therefore was unable to verify that it was paying its commission paid hairstylists in accordance with the FLSA's Section 7(i) exemption.").)  Because there was no reason why Plaintiff or other hair stylist employees could not follow LTF's unequivocal policies that prohibited off-the-clock work and falsification of time records, however, LTF was entitled to rely upon its employees to adhere to those policies and to assume they were not dishonest.  *See,*

*e.g.*, *Von Friewalde v. Boeing Aerospace Ops., Inc.*, 2009 WL 2391400, at *8 (5th Cir. Aug. 4, 2009) ("[A]n employee has a duty to notify his employer when he is working extra hours . . . . [W]e have expressly rejected the notion that an employer does not have the right to require an employee to adhere to its procedures for claiming overtime." (internal quotation omitted)); *Newton v. City of Henderson*, 47 F.3d 746, 749 (5th Cir. 1995) (rejecting claim for alleged unpaid overtime where the defendant "established specific procedures to be followed in order to receive payment for overtime," and plaintiff "ignored these procedures"); *Millington v. Morrow Cty Bd. of Comm'rs*, 2007 WL 2908817, at *10 (S.D. Ohio Oct. 4, 2007) ("[I]t was reasonable for the employer to rely on the time sheets submitted by the employee for payroll purposes where there was no evidence that the employer encouraged workers to falsely report their hours.").

Plaintiff alleges that LTF knew or should have known that he was not accurately recording his work hours.  (*See* Pl.'s Mem. at 6-9.)  Plaintiff fails, however, to allege any such knowledge on a systemic basis.  As an initial matter, Department Heads are inherently limited in their ability to track the activities of each of the many hair stylist employees under their supervision, particularly while those employees are servicing clients and engaged in a range of other activities throughout the salon.  (*See* Pl. Dep. 49:4-13, 103:4-12; Hampton Dep. 78:13-23.) Of critical import for purposes of this motion, Plaintiff cannot show that the alleged "red flags" that he purports existed in his case also existed for the single opt-in plaintiff here, let alone the full range of stylists in the purported class.  Specifically, Plaintiff alleges that his supervisors saw him working off-the-clock, and that holes in his self-reported work time should have been noticed by corporate payroll services.  (*See* Pl.'s Mem. at 18-19 (providing no supporting evidence or authority).)  Notwithstanding the questionable basis for this claim, Plaintiff does not

suggest that similar evidence or allegations will support claims by any other hair stylist, even the lone opt-in plaintiff, Hampton.

>    **4.      Plaintiff and Hampton are not similarly situated to each other, much less other City Centre hair stylist employees.**

Plaintiff and Hampton variously allege that they were told by supervisors that they need not be concerned with recording all hours worked for payroll purposes.  (*See* Pl. Dep. 88:10-89:3; Hampton Dep. 13:14-15:17.)  Those few allegations – none of which are supported by any extrinsic evidence, and all of which are contrary to LTF's demonstrable policies – are insufficient to establish a basis for conditional certification.  *See Griffith*, 2012 WL 3985093, at *5 ("Although it may be the case that [Plaintiff] felt pressure to perform uncompensated overtime work, there is no indication that [other] loan processors . . . felt a similar pressure."); *Carey*, 2012 WL 4857562, at *2 (whether given manager would violate company overtime policy would require individualized analysis, making certification inappropriate)*; Saleen*, 649 F. Supp. 2d at 941 ("[I]n any large corporation, there are going to be local managers who are ignorant of corporate policies, or who misunderstand corporate policies, or who intentionally violate corporate policies . . . .  Thus the mere fact that a small fraction of employees allege that they did not receive the compensation to which they were entitled provides almost no evidence that the *reason* that these employees were underpaid was because of an unlawful companywide policy." (emphasis in original)).

Given the unique nature of these claims, it is not surprising that Plaintiff cannot identify any LTF employee other than Hampton whom he believes is similarly situated for purposes of this case.  Plaintiff's "evidence," and that of Hampton – which focuses exclusively on their own personal circumstances – cannot demonstrate that other LTF City Centre hair stylist employees are similarly situated.

Furthermore, and significantly, Plaintiff's circumstances are plainly distinguishable from Hampton's here in numerous key respects (*see supra* Section II.D), including the following: First, Plaintiff asserts that he, along with other purportedly similarly situated hair stylist employees, were not paid in compliance with the FLSA's Section 7(i) exemption due to an alleged failure to report all work hours (*see* Pl.'s Mem. at 3); Hampton, on the other hand, asserts that she was not properly paid overtime *as an hourly Apprentice* due to an alleged failure to report all work hours.  (*See* Hampton Dep. 16:9-19.)  Second, Plaintiff asserts that he, along with other purportedly similarly situated hair stylist employees, was a full-time commissioned Stylist who regularly worked a full-time schedule of forty (40) or more hours per week (*see* Pl.'s Mem. at 14); Hampton, in contrast, testified that when she became a commissioned Stylist, she began working a *part-time schedule* of 20 hours per week.  (*See* Hampton Dep. 24:12-25:14.)

Plaintiff and Hampton underscore the lack of cohesive similarity between all the hair stylists at LTF's City Centre location.  Apprentice Stylists are paid hourly and receive Sales Commissions only.  (*See* Shiffman Aff. ¶¶ 5-6.)  Stylists, on the other hand, receive Sales Commissions and Service Commissions, not hourly pay.  (*See id.* ¶¶ 6-8.)  Stylists receive different Service Commission rates based on their own, individualized Pay Schedule.  (*See id.* ¶ 11.)  Hourly pay is provided to Stylists who attend training sessions and meetings, however.  (*See id.* ¶ 7)  Over the relevant period in this suit, hair stylists employees at LTF's City Centre location have received dramatically different compensation, attended different trainings, worked a multitude of different schedules, qualify as hourly Apprentices or commission-based Stylists (and even then pricing services at different experience levels), provided varying services, sold different products, earned different commissions on retail items and services, worked for a plethora of different supervisors, and completed a variety of divergent tasks (from cleaning to

marketing to coloring to cuts).  (*See generally* Shiffman Aff. ¶¶ 5-11; Yanez Aff. ¶¶ 7-11; *supra* Section II.B & II.C.)

In short, the evidence before the Court shows that hair stylists at the City Centre location are not similarly situated for purposes of Plaintiff's FLSA claim.

### 5.    Plaintiff's reliance on LTF's Shop Charges to show that other hair stylists are similarly situated is a red herring.

Plaintiff's assertion that he is similarly situated to other LTF City Centre hair stylist employees because all were subject to "Shop Charges" is a red herring.  As noted previously, he proffers no allegations, let alone any supporting evidence, explaining how such charges purportedly violate the FLSA.  As explained above, contrary to Plaintiff's implications, Shop Charges do not constitute a deduction from hair stylists' earned wages.  (*See* Shiffman Aff. ¶ 10.) Rather, the Shop Charges applicable to each service are automatically calculated at the point of sale, and they are deducted from service charges *prior to* the calculation of Service Commissions.  (*See id.*)  It is well settled that employers are not required to pay commissions strictly based on a percentage of the total end cost to the consumer in order to meet the definition of "commission" under Section 7(i).  *See*, *e.g.*, *Parker v. Nutrisystem, Inc.*, 620 F.3d 274, 283 (3d Cir. 2010).  Because LTF's Shop Charges do not in any way violate the FLSA's Section 7(i) exemption, nor are they in any other way unlawful, LTF's application of such charges cannot suffice to establish that stylists are similarly situated for purposes of conditional certification. *See*, *e.g.*, *Saleen*, 649 F. Supp. 2d at 940 ("[T]he putative class members must be harmed by an *unlawful* companywide policy." (emphasis in original)); *Ray*, 1996 WL 938231, at *4 (noting that plaintiffs must show an "illegal overtime plan" that is carried out through central management).

**D.**   **Conditional Certification is Further Unwarranted Because Plaintiff Has Not Established Sufficient Interest in this Lawsuit.**

In addition to demonstrating that LTF's City Centre hair stylist employees are "similarly situated," Plaintiff must also establish that sufficient interest exists among other such employees in participating in this case as opt-in plaintiffs.  *See Parker v. Rowland Express, Inc.*, 492 F. Supp. 2d 1159, 1164-65 (D. Minn. 2007); *West*, 2006 WL 1892527, at *2; *see also Dybach*, 942 F.2d at 1567-68; *Horne v. United Servs. Automobile Ass'n*, 279 F. Supp. 2d 1231, 1237 (M.D. Ala. 2003) (discussing Section § 216(b)'s "competing considerations" of the economy of scale and avoiding "stirring up" of litigation through unwarranted solicitation).

Although Plaintiff's counsel demanded broad disclosure of LTF's hair stylist employees, and even after a campaign of soliciting LTF employees lasting nearly seven months, only two LTF employees have joined this case, including Plaintiff.  As noted, neither Plaintiff nor Hampton have knowledge of any other City Centre hair stylist employees' circumstances that would justify an allegation that other employees might have interest or claims.  *See supra* p. 11. Under these circumstances, Plaintiff has not demonstrated sufficient interest in this case to justify conditional certification.  *See Dooling*, 2012 WL 2417591, at *4 (holding the plaintiff failed to provide "competent evidence of similarly situated individuals sufficient to conditionally certify a class"); *see also Rowland Express*, 492 F. Supp. 2d at 1165, n.4 (noting that there is no "precise numerical line delineating" sufficient interest).  The Court should not grant conditional certification and authorize judicial notice to permit Plaintiff's counsel to attempt to stir up additional litigants.  *See  Rowland Express*, 492 F. Supp. 2d at 1166; *Severtson v. Phillips Beverage Co.*, 137 F.R.D. 264, 267 (D. Minn. 1991).

**E.      Collective Litigation in this Case would be Unmanageable.**

Collective litigation in this case would be unmanageable because there is no evidence of a common plan or corporate policy that might make collective treatment more efficient than handling employees' claims individually.  The underlying rationale for collective treatment is to advance judicial economy, and, where a collective action would not serve that interest, plaintiffs should not be permitted to request court-supervised notice as a tool for drumming-up business. *See Robinson v. Dolgencorp., Inc.,* 2006 WL 3360944, at *6 (M.D. Fla. Nov. 13, 2006).

While the Court certainly may be desirous of efficiencies that might be realized by allowing numerous claimants with small claims to proceed together in a collective action under appropriate circumstances, those efficiencies simply cannot be realized in this case.  Based on the facts already available to the Court, it is clear that this case cannot be handled other than through a series of complex individualized inquiries no less burdensome than if the individual claimants were permitted to proceed individually.  That is, the outcome of any individual claimant's claim would turn on facts and defenses unique to each person.

Indeed, as this Court has made clear, Section 7(i) cases involve highly individualized defenses and, in turn, simply are not conducive to collective action.  *See Johnson v. TGF Precision Haircutters, Inc.*, 2005 WL 1994286, at *6 (S.D. Tex. Aug. 17, 2005).  Accordingly, conditional certification is particularly unwarranted here.  As this Court stated in *TGF Precision Haircutters*:

> In one sense the § 7(i) exemption pertains to the opt-in class as a whole, because Defendants assert it broadly. Functionally, however, **§ 7(i) is in fact a highly individualized defense** because its application requires week-by-week and other periodic calculations (*e.g.,* not less than monthly on one part of the formula) specific to each individual Plaintiff and his or her particular circumstances. The "regular rate" of pay, for example, "is a rate per hour, computed for the particular workweek by a mathematical computation in which hours worked are divided into straight time

earnings for such hours to obtain the statutory regular rate." With respect to commissions, § 7(i) also requires the totaling of each particular Plaintiff's commissions over a "representative period" of not less than one month.  This "representative period" is meant to be "a period which typifies the total characteristics of an employee's earning pattern in his current employment situation, with respect to the fluctuations of the proportion of his commission earnings to his total compensation." **<u>The proof required to establish these individualized § 7(i) exemption defenses would become the overwhelming focus of a trial which, to a jury or factfinder, would amount to trials of [numerous] individual cases</u>**.  Thus, the § 7(i) exemption defense weighs heavily in favor of decertification.

2005 WL 1994286, at *6 (citing numerous cases declining to certify class where individualized claims or defenses would predominate (emphasis added)).  The Court should consider these facts in deciding Plaintiff's motion.  *See, e.g., Bowman*, 2010 WL 2837519, at *4-5 (under "intermediate" scrutiny, the Court should consider, among other factors, individualized defenses available to defendant for each plaintiff); *Ray*, 1996 WL 938231, at *4 ("[T]he court must . . . look to specific factual similarities or differences and manageability concerns.").

Ultimately, courts have refused to certify wage-and-hour collective actions where, as here, the plaintiffs have been unable to propose a workable trial plan that could fairly establish liability and damages across the putative class.  Judge Posner's recent decision in *Espenscheid v. DirectSat USA, LLC,* 705 F.3d 770 (7th Cir. 2013), cogently explains the difficulty that plaintiffs face in this regard.  In that case, the court affirmed the decertification of a "hybrid" collective/class action alleging overtime and meal break claims, finding, among other things, that the plaintiffs' trial plan, which proposed the use of "representative" proof, was infeasible due to variance across individual class members.  Those variations included the individual technicians' tasks performed, whether they were discouraged from recording all of the time they spent working, and the amount of uncompensated time that particular technicians worked – *i.e.*, the same sort of variances that necessarily exist here.

In *Espenscheid*, Judge Posner additionally questioned the entire concept of "representative" proof in class suits, reproaching the plaintiffs' counsel for apparently assuming that they could force settlement when no reasonable trial method had been offered.  *Id.* at 776.  Other courts have found similar impediments to the adjudication of class claims in a single trial when individualized analyses are required.  *See, e.g., Gonzalez v. OfficeMax N. Am.*, 2012 WL 5473764, at *6 (C.D. Cal. Nov. 5, 2012) ("Because the adjudication of the [class members'] claims on a classwide basis would amount to the adjudication of each of their claims on an individual basis, effectively, the Court finds that the class action would be unmanageable."); *Hadjavi v. CVS Pharm., Inc.*, 2011 WL 3240763, at *9 (C.D. Cal. July 25, 2011) ("[D]ue to manageability concerns regarding the number of individual issues involved, the court concludes that class action treatment is inappropriate."); *Gatewood v. Koch Foods of Miss., LLC*, 2009 WL 8642001, at *17 (S.D. Miss. Oct. 20, 2009) (noting collective treatment would "devolve into dozens of mini-trials on just the liability issue," and "[t]hen damages would be an even larger circus of nightmares"); *Reyes v. Texas EZpawn, L.P.*, 2007 WL 101808, at *6 (S.D. Tex. Jan. 8, 2007) (citing *TGF Precision Haircutters, Inc.*, 2005 WL 1994286, at *6-7).

At bottom, any nominally "collective" trial in this case would necessarily "degenerate . . . into multiple lawsuits separately tried."  *Miller v. Hygrade Food Prods. Corp.*, 198 F.R.D. 638, 643 (E.D. Pa. 2001).  Such a trial would be patently unmanageable.  *See, e.g.*, *Burkhart-Deal v. Citifinancial, Inc.*, 2010 WL 457122, at *4 (W.D. Pa. Feb. 4, 2010) ("Where common proof is not available, thus requiring individualized 'mini-trials,' courts have found that the 'staggering problems of logistics thus created' make the case unmanageable as a class action." (citation omitted)); *Zapata v. IBP, Inc*., 167 F.R.D. 147, 169 (D. Kan. 1996) (judicial efficiency and economies of scale were "more than offset by the numerous individualized issues and

manageability problems").  No workable trial plan possibly could exist that could determine, on a collective basis with common evidence, whether and to what extent individual hair stylists chose on a daily basis to work before or after their normal workdays – or at any other time – but not to report that time.  *See, e.g.*, *Espenscheid,* 705 F.3d at 774-75.  Here, as in the recent Supreme Court case *Comcast Corp. v. Behrend*, "[q]uestions of individual damage calculations will inevitably overwhelm questions common to the class."  133 S. Ct. 1426, 1433 (2013).

Rather than creating an unworkable class, the Court simply should permit the handful of individuals who believe they have claims for unpaid work to pursue them individually, with procedures for unified discovery, if necessary.  That is the most efficient way to resolve those inherently unique claims.

### F.      Plaintiff's Proposed Notice is Flawed in Several Respects.

If the Court determines that some form of conditional certification is appropriate, LTF respectfully requests the Court consider modifying Plaintiff's proposed notice in several significant respects.  LTF's alternative proposed notice (the "Notice") is attached as Exhibit D to the Affidavit of Douglas R. Christensen submitted herewith.  In the event the Court orders notice, LTF requests its proposed Notice issue, not Plaintiff's, because it describes Plaintiff's claims in a more balanced and neutral fashion than Plaintiff's proposed notice and provides more information to potential class members regarding the legal effects of opting into (or not opting into) the lawsuit.

### 1.      LTF's proposed Notice provides neutral and balanced information regarding the lawsuit.

Because any notice will be sent to potential class members with the imprimatur of the Court, it should be neutral, balanced, and "accurate and informative."  *See Hoffman-LaRoche*, 493 U.S. at 171-72, 174 (noting that court-authorized notices obviate the potential for

"misleading communications" and that "courts must be scrupulous to respect judicial neutrality" when overseeing the "notice-giving process"); *see also Ayers v. SGS Control Servs., Inc.*, 2004 WL 297826, at *2 (S.D.N.Y. Dec. 21, 2004) (noting that the notice in an FLSA collective action must be "fair and balanced"); *Allen v. Marshall Field & Co.*, 93 F.R.D. 438, 443, 446 (N.D. Ill. 1982) (noting that the notice to potential class members should contain a "neutral discussion" and adopting notice that was "more informative, exhibit[ed] greater clarity, and [was] more neutral in tone" (citations omitted)).

Plaintiff's proposed notice begins with the vague and misleading suggestion that potential plaintiffs are owed additional compensation for hours worked over forty, and Plaintiff's notice does not explain the exemption under which LTF has classified its hair stylists.  It also fails to differentiate between the commission paid Stylists at issue in this case, and the hourly paid Apprentice stylists.

LTF's proposed Notice explains the legal context of Plaintiff's allegations, namely that:

> (1) "[g]enerally, the overtime provisions of the FLSA require an employer to provide additional compensation or overtime pay to an employee for all hours over forty (40) hours per week that the employee works, unless that employee is properly classified as 'exempt' from the overtime provisions of the FLSA", (2) that "[t]he FLSA provides that to qualify for exempt status, commissioned employees' earnings for a given pay period must equal at least one and a half times the applicable minimum wage based on the number of hours worked", and (3) that "[t]he Named Plaintiff in this lawsuit claims that LIFE TIME FITNESS inappropriately compensated him under this exemption such that his earnings for a given pay period were less than at least one and a half times the applicable minimum wage based on the number of hours worked."

*See* Christensen Aff. Ex. D.

**2.     LTF's proposed Notice better advises potential plaintiffs regarding the legal effects of joining the lawsuit.**

In addition to providing a more neutral, balanced explanation of Plaintiff's claims, LTF's proposed Notice gives potential plaintiffs more information regarding their legal rights with respect to the opt-in process.  For example, unlike Plaintiff's proposed notice, LTF's Notice correctly advises potential plaintiffs that they are only potentially eligible to participate in the lawsuit, subject to the Court's determination that they are "similarly situated" to Plaintiff under 29 U.S.C. § 216(b).  This appropriately recognizes LTF's right to bring a motion to decertify any class conditionally certified at this early stage of the case.  LTF's proposed Notice appropriately advises potential class members that "[t]he purpose of this Notice of Pendency of FLSA Class Action . . . is to inform you of the existence of a collective action lawsuit in which you are potentially eligible to participate because you may be 'similarly situated' to the Named Plaintiff."  *See* Christensen Aff. Ex. D ¶ I.  LTF's proposed Notice further advises potential class members, accurately, that their "right to participate in this lawsuit may depend upon a later decision by the United States District Court that [they] and the Named Plaintiff are actually 'similarly situated.'"  *See id.* at ¶ III.

Plaintiff's proposed notice, on the other hand, suggests to potential plaintiffs that, if they simply fill out the enclosed form, they "will be a part of the case."  *See* Pl.'s Proposed Notice at ¶ 3.  Nowhere does Plaintiff's proposed notice inform potential class members that the Court will not consider the merits of their claim for wages unless and until it decides that they actually are similarly situated to Plaintiff.  Without this information, potential class members cannot make a completely informed decision as to whether they should opt into the lawsuit or contact their own attorney and possibly pursue an individual claim against LTF.

Further, in FLSA collective actions, courts routinely approve notices, which, like LTF's proposed Notice, advise plaintiffs that their continued participation in the lawsuit may depend upon a determination by the Court that they and the class representative are "similarly situated" within the meaning of the law.  *See, e.g.*, *Maynor v. Dow Chem. Co.*, 671 F. Supp. 2d 902, 911 (S.D. Tex. 2009) (notice issued to putative class members stated, "If you choose to join the lawsuit, your continued right to participate in the lawsuit may depend on a later decision by the court that you and the Plaintiffs are 'similarly situated' employees in accordance with federal law."); *Updite v. Delta Beverage Group, Inc.*, 2006 WL 3718229, at *7 (W.D. La. Dec. 15, 2006) (approving notice:  "The purpose of this Notice is to inform you of the existence of a lawsuit in which you are potentially 'similarly situated' to the named plaintiffs . . . ."); *Vogt v. Tex. Instruments, Inc.*, 2006 WL 4660134, at *5 (N.D. Tex. Sept. 19, 2006) (approving notice: "Your right to participate in this suit may depend upon a later decision by the United States District Court that you and the representative Plaintiffs are actually 'similarly situated.'"); *Ponce v. Tim's Time, Inc.*, 2004 WL 1921038, at *3 (N.D. Ill. July 8, 2004) (authorizing notice that advised potential plaintiffs that their "continued right to participate in the lawsuit may depend upon a later decision by the District Court that [they] and other Plaintiffs are actually 'similarly situated' in accordance with federal law"); *Gjurovich v. Emmanuel's Marketplace, Inc.*, 282 F. Supp. 2d 101, 106 (S.D.N.Y. 2003) (approving the following notice language:  "The purpose of this Notice is to inform you on the existence of a collective action lawsuit in which you potentially are 'similarly situated' to the named Plaintiff . . . ."); *Belt v. Emcare, Inc.*, 299 F. Supp. 2d 664, 671 (E.D. Tex. 2003) (ordering notice:  "Your right to participate in this suit may depend upon a later decision by the United States District Court that you and the representative Plaintiff are actually 'similarly situated.'").

Plaintiff's proposed notice also fails to explain the fee agreement between the potential class members and the attorneys for the class, and the fact that, by opting into the lawsuit, they will have authorized Plaintiff to make decisions on their behalf concerning the attorneys' fee agreement and the lawsuit generally.  In fact, Plaintiff's proposed notice is completely silent regarding fees and costs.  LTF assumes Plaintiff has entered into some kind of contingency fee agreement with his counsel, and that potential class members will not be responsible for any attorneys' fees if they do not prevail in the lawsuit or receive a monetary settlement from LTF. However, Plaintiff's proposed notice fails to inform potential class members that the attorneys for the class will be paid their fees as part of any judgment or settlement entered in favor of the class.

LTF's proposed Notice, on the other hand, advises potential plaintiffs how the attorneys for the class will be paid, and informs them that, by opting into the lawsuit, they will have authorized Plaintiff to enter into "an agreement with the Named Plaintiff's counsel concerning attorneys' fees and costs, and all other matters pertaining to this lawsuit," and that such "decisions and agreements made and entered into by the Named Plaintiff will be binding on you if you join this lawsuit."  *See* Christensen Aff. Ex. D at ¶ V.  Because potential class members give up the right to make such decisions if they opt into this lawsuit, they should be advised of that fact in the Notice.

### 3.  LTF's proposed Notice accurately informs potential plaintiffs that, if they choose to opt-in and become parties to the lawsuit, they may be required to participate in discovery and/or testify at trial

Any notice should provide potential class members with sufficient information to allow them to make an informed decision about whether to affirmatively join the lawsuit.  As the Court is aware, in contrast to Rule 23 class actions, "every plaintiff who opts in to [an FLSA] collective action has party status, whereas unnamed class members in Rule 23 class actions do not."  *See*

7B Charles Alan Wright & Arthur B. Miller, *Federal Practice & Procedure* § 1807.  Because

they are parties, all opt-in plaintiffs are subject to the discovery obligations which normally

govern parties to a lawsuit, including the obligations to appear for properly-noticed depositions,

answer written interrogatories, requests for productions of documents, and requests for

admission.  *See, e.g.*, Fed. R. Civ. P. 33 (noting that "a party may serve [interrogatories] on any

other party"); Fed. R. Civ. P. 34 (same regarding requests for production of documents); Fed. R.

Civ. P. 36 (same regarding requests for admission); *see also* Fed. R. Civ. P. 37 (authorizing a

party to move for an order compelling disclosure or discovery by an adverse party, and

authorizing sanctions for failure to comply with such an order).

LTF's proposed Notice contains language informing potential opt-in plaintiffs that

"[w]hile this suit is proceeding, [they] may be required to respond to written questions, sit for

depositions and/or testify in court."  *See* Christensen Aff. Ex. D at ¶ V.  This language accurately

and unambiguously informs potential plaintiffs of their obligations should they choose to

affirmatively opt into and become parties to the lawsuit.

Under the Federal Rules of Civil Procedure, LTF may compel opt-in plaintiffs to

participate in discovery.  LTF likely will seek individual information through written discovery

and/or deposition testimony from most (if not all) eventual opt-ins.  Thus, whereas the ambiguity

of Plaintiff's notice fails to alert potential plaintiffs that they may be required to actively

participate in the suit, LTF's proposed provision regarding discovery obligations fully discloses

to potential plaintiffs their potential obligations.

Indeed, many courts have approved FLSA class notices that inform potential plaintiffs

that they may be required to respond to written questions, sit for depositions and/or testify in

court.  *See, e.g.*, *Maynor*, 671 F. Supp. 2d at 911 (explaining that notice stated:  "While the

-40-

lawsuit is proceeding, you may be required to respond to written questions, produce documents, give a deposition and/or testify in Court."); *Updite*, 2006 WL 3718229, at *8 (approving notice stating: "While this suit is proceeding, you may be required to respond to written questions, sit for depositions and/or testify in court."); *Davis v. Novastar Mortgage, Inc*., 2005 WL 3662438, at *3 (W.D. Mo. Dec. 13, 2005) (approving notice provision which stated, "[w]hile this suit is pending, you may be required to respond to written questions, produce documents, sit for depositions and/or testify in court"); *Veliz v. Cintas Corp*., 2004 WL 2623909, at *6 (N.D. Cal. Nov. 12, 2004) (approving notice provision that stated "[w]hile this lawsuit is proceeding, you may be required to respond under oath to written questions and/or to testify"); *Ponce*, 2004 WL 1921038, at *3 (approving notice that informed potential opt-in plaintiffs that they "will be required to participate in discovery proceedings, including providing information and appearing for a deposition if such is requested of you" and "may also be required to appear and testify at the trial of this case"); *Bontempo v. Westwood One Broad. Servs., Inc*., 2002 WL 1925911, at *4 (N.D. Ill. May 3, 2002) (proposing, on the court's own motion, that the FLSA notice should include a sentence to inform plaintiffs that "[w]hile this suit is proceeding, you may be required to respond to written question, sit for depositions, testify in court, or any combination of those things").

In short, Plaintiff's notice proposal is flawed in several significant respects, but none of those flaws need to be addressed by the Court if conditional certification is denied, as it should be here. If the Court nonetheless conditionally certifies the class Plaintiff seeks, LTF respectfully requests that its proposed Notice issue to potential opt-in plaintiffs.

### III.  CONCLUSION

For the reasons elaborated above, Plaintiff's motion for conditional certification should

be denied.  A proposed order to that effect is attached hereto as Exhibit 5.

Dated:  May 13, 2013                                         Respectfully submitted,


                                                            By: s/Douglas R. Christensen
                                                                Douglas R. Christensen (MN #192594)
                                                                   (Admitted *pro hac vice*)
                                                                50 South Sixth Street, Suite 1500
                                                                Minneapolis, MN 55402-1498
                                                                Telephone:  (612) 340-2600
                                                                Email:  christensen.doug@dorsey.com

**OF COUNSEL FOR DEFENDANTS**                               **ATTORNEY IN CHARGE FOR**
                                                            **DEFENDANTS**

DORSEY & WHITNEY LLP

Marilyn Clark (MN #386615)
    (Admitted *pro hac vice*)
Sarabeth Ackerman (MN #389608)
    (Admitted *pro hac vice*)
DORSEY & WHITNEY LLP
50 South Sixth Street, Suite 1500
Minneapolis, MN 55402-1498
Telephone:  (612) 340-2600
Email:  clark.marilyn@dorsey.com
Email:  ackerman.sarabeth@dorsey.com

Scott M. Nelson
Texas Bar No.: 00797154
S.D. Bar No.: 20499
Emily Harbison
Texas Bar No.: 24059892
S.D.  Bar No.: 902584
BAKER & McKENZIE LLP
711 Louisiana, Suite 3400
Houston, TX 77002
Telephone: (713) 427-5000
Facsimile: (713) 427-5099
Email:  scott.nelson@bakermckenzie.com
E-mail: emily.harbison@bakermckenzie.com