**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| PIER NIEDDU, on Behalf of Himself | § | |
| and Others Similarly Situated, | § | |
|     Plaintiff, | § | |
| | § | CIVIL ACTION NO. . 4:12-cv-02726 |
| vs. | § | |
| | § | |
| LIFE TIME FITNESS, INC., LTF CLUB | § | |
| MANAGEMENT CO., LLC, | § | |
| and LTF CLUB OPERATIONS CO., | § | |
| INC., | § | |
|     Defendants. | § | |

---

**AFFIDAVIT OF DOUGLAS R. CHRISTENSEN**

---

I, Douglas Christensen, being first duly sworn under oath, state and depose as follows:

1.    I am an attorney representing Defendants (collectively "Life Time Fitness") in this matter.  I submit this Affidavit in support of Life Time Fitness's Opposition to Plaintiff's Motion for Conditional Certification.

2.    Attached hereto as **Exhibit A** are true and correct copies of excerpts and exhibits from the deposition transcript of Plaintiff Pier Nieddu.

3.    Attached hereto as **Exhibit B** are true and correct copies of excerpts and exhibits from the deposition transcript of opt-in plaintiff Rosalind Hampton.

4.    To date, Life Time Fitness has responded to Plaintiff's document requests and interrogatories made in this matter, and it has produced more than 1,200 pages of documents, including payroll and time entry documents, as well as available scheduling data, for both Plaintiff Pier Nieddu and opt-in plaintiff Rosalind Hampton.

Exhibit 2

5.      Life Time Fitness also produced a corporate representative to be deposed under Federal Rule of Civil Procedure 30(b)(6) and prepared this witness to respond to ten separate topics.  Attached hereto as **Exhibit C** is a true and correct copy of Plaintiff's 30(b)(6) notice to Life Time Fitness.

6.      Attached hereto as **Exhibit D** is Life Time Fitness's alternative proposed notice to potential opt-in class members, in the event the Court considers ordering such notice.

FURTHER AFFIANT SAYETH NOT

_s/Douglas R. Christensen_____
**Douglas R. Christensen**

Subscribed and sworn to before me
this 13th day of May, 2013.

s/Suzanne Robbins_____
    Notary Public

1

1          IN THE UNITED STATES DISTRICT COURT

          FOR THE SOUTHERN DISTRICT OF TEXAS

2                    HOUSTON DIVISION

3    PIER NIEDDU, on Behalf      )

     of Himself and Others       )

4    Similarly Situated,         )

                                 )

5        Plaintiff,              )

                                 )

6    VS.                         )   CIVIL ACTION NO.

                                 )   4:12-CV-02726

7    LIFE TIME FITNESS,          )

     INC., LTF CLUB              )

8    MANAGEMENT CO., LLC,        )

     and LTF CLUB OPERATIONS     )

9    CO., INC.,                  )

                                 )

10       Defendants.             )

11       ********************************

12              ORAL DEPOSITION OF

13                 PIER NIEDDU

14              MARCH 18, 2013

15       ********************************

16

17       ORAL DEPOSITION OF PIER NIEDDU, produced as a witness

18   at the instance of the DEFENDANTS, and duly sworn, was

19   taken in the above-styled and numbered cause on MARCH 18,

20   2013, from 9:45 a.m. to 11:43 a.m., before CYNTHIA E.

21   DODGE BARNETT, CSR, RPR, in and for the State of Texas,

22   reported at the offices of Shellist Lazarz Slobin, 11

23   Greenway Plaza, Suite 1515, Houston, Texas, pursuant to

24   the Federal Rules of Civil Procedure and the provisions

25   stated in the record or attached hereto.

Christensen
Exhibit A

| | | |
|---|---|---|
| 1 | A | I'm not sure -- |
| 2 | Q | Okay. |
| 3 | A | -- who the signature is. |
| 4 | Q | Okay.  And at the very top of the document, you |
| 5 | | see it says "Hire Date" and then do you see |
| 6 | | 4-20-2010? |
| 7 | A | Uh-huh. |
| 8 | Q | Okay.  Might you have been hired as early as |
| 9 | | April 20th, 2010 by Life Time Fitness? |
| 10 | A | Yes. |
| 11 | Q | Okay.  Then would you go back to Exhibit No. 2, |
| 12 | | the interrogatories.  I want you to look at your |
| 13 | | response to interrogatory No. 2.  And in |
| 14 | | interrogatory No. 2, you state that you were |
| 15 | | employed as a hairstylist from May 20th, 2010 |
| 16 | | through on or about March 18th, 2010 -- excuse |
| 17 | | me -- 2012, correct? |
| 18 | A | Correct. |
| 19 | Q | Okay.  And then if you would go back to Exhibit |
| 20 | | No. 3, the new hire form, yes, and would you |
| 21 | | look sort of in the middle of the document.  Do |
| 22 | | you see it says under "Job Information," there's |
| 23 | | a section called "Job Title"? |
| 24 | A | Yes. |
| 25 | Q | And it says "stylist-apprentice"? |

```
 1            explained how the commission work.  And when I
 2            look at my paycheck, number was not heads up, so
 3            I ask what's explanation for detailing in the
 4            paycheck and then I never get an explanation for
 5            it, so that's what I'm...
 6    Q       Who did you ask for an explanation?
 7    A       The manager Francisco Fuentes.
 8    Q       Okay.  Did you ask anybody else other than
 9            Mr. Fuentes?
10    A       No.
11    Q       And do you have any knowledge what Life Time
12            Fitness might or might not have told other
13            hairstylists about how the commission structure
14            would work?
15                    MR. PRIETO:  Objection; calls for
16            speculation.
17    Q       (By Mr. Christensen)  You can answer.
18    A       I don't know.
19    Q       You don't know?
20    A       I -- I don't understand the question.  Can you
21            rephrase the question?
22    Q       Sure.  Do you know -- do you have any knowledge
23            about what Life Time Fitness told other stylists
24            about the commission structure?
25    A       I have no knowledge about it.
```

1    Q    Do you know what Life Time Fitness told other
2         stylists about how shop charges would work?
3              MR. PRIETO:  Objection; speculation.
4    Q    (By Mr. Christensen)   You can answer.
5    A    I'm not sure.
6    Q    You're not sure what Life Time Fitness would
7         have told other stylists?
8    A    I don't know.  I'm not sure.
9    Q    Mr. Nieddu, I just handed you what the court
10        reporter has marked as Exhibit No. 6.  Do you
11        recognize this document as the Life Time Fitness
12        Spa Service Provider Compensation form you
13        received when you began your employment with
14        Life Time Fitness?
15   A    (Reviewing document.)  Yes, I do.
16   Q    And is that your signature down at the bottom of
17        the copy?
18   A    It is.
19   Q    Thank you.  Do you know whether other stylist
20        employees also received the same form?
21   A    Don't know, sir.
22   Q    Okay.  The first -- start over.  That wasn't
23        going to be a very good question.
24              The first sentence under commissions
25        and pay at the very top of the page says:

```
 1              "Service providers earn commissions at the set
 2              commission rate from the gross revenue collected
 3              (excluding applicable sales taxes) for the
 4              services provided"; is that correct?
 5      A       Correct.
 6      Q       Okay.  And then it says:  "For each pay period,
 7              the service provider will be paid at the higher
 8              of:  Commissions earned during the pay period,
 9              or the applicable minimum rate for commissioned
10              employees multiplied by the hours worked in the
11              pay period, also called 'hitting draw'"; is that
12              correct?
13      A       That's correct.
14      Q       Okay.  Did Life Time Fitness provide you with
15              any training or other documents to help you
16              understand what the language in this document
17              meant?
18      A       No, sir.
19      Q       Did you ever attend Life Time University
20              training?
21      A       No, sir.
22      Q       Do you know whether other stylists attended Life
23              Time University training?
24      A       I don't know.
25      Q       Sir, I'm handing you what the court reporter has
```

```
 1              marked as Exhibit No. 7.  Would you let me know

 2              when you've had a chance to look at that

 3              document?

 4      A       (Reviewing document.)

 5      Q       Do you recognize the document marked as Exhibit

 6              No. 7?

 7      A       No, sir.

 8      Q       You don't ever recall seeing it before?

 9      A       No, sir.

10      Q       Would you turn to Page 1107 of that document?

11              It's about the fourth page in or so.

12      A       Page number what?

13      Q       1107.  At the top it says "Very Best Places to

14              Work" and "Best in Class Compensation Plans"; do

15              you see that?

16      A       Yes, sir.

17      Q       Did you receive a document like this set out on

18              Page 1107 or a similar document during your

19              employment with Life Time Fitness?

20      A       No, sir, I don't recall.

21      Q       Okay.  Do you know whether Life Time Fitness

22              would have provided the document that we've

23              marked as Exhibit No. 7 to other stylists?

24      A       Don't know.

25      Q       Sir, I've just handed you what the court
```

30

```
 1      A      Don't know.
 2      Q      That Exhibit B that we were just looking at in
 3             Exhibit 8, that document appears to set forth
 4             how commissions are going to be paid at
 5             different levels of sales; is that fair to say?
 6      A      That's what it look like say.
 7      Q      And it looks like it breaks it out separately
 8             for service commissions and then for retail
 9             commissions; is that correct?
10      A      Correct.
11      Q      Did you ever receive information like this, the
12             information contained in Exhibit B, at any point
13             during your employment at Life Time Fitness
14             whether it be in a conversation with somebody or
15             through a document?
16      A      No, I never receive a document like that.
17      Q      And if you look further down toward the middle
18             of the page it suggests that there were two
19             compensation plans and that you fall into one
20             and it sets forth a new talent stylist section
21             and then a stylist section; is that correct?
22      A      Yeah.
23      Q      And under the stylist section, it suggests that
24             service revenue, less shop charges, times the
25             levels commission schedule, correct?
```

| | | |
|---|---|---|
| 1 | A | Correct. |
| 2 | Q | And then it also suggests that commission on |
| 3 | | retail products, correct? |
| 4 | A | Correct. |
| 5 | Q | Did anyone at Life Time Fitness ever explain |
| 6 | | that information to you during your employment |
| 7 | | with Life Time Fitness? |
| 8 | A | No, sir. |
| 9 | Q | Do you know whether that information was |
| 10 | | explained to other stylists? |
| 11 | A | No, sir. |
| 12 | Q | You don't know? |
| 13 | A | I don't know. |
| 14 | Q | Okay.  What is your understanding of how Life |
| 15 | | Time Fitness' shop charges worked?  How did you |
| 16 | | understand those to work? |
| 17 | A | I do not understand how they work. |
| 18 | Q | You don't have any understanding? |
| 19 | A | I just -- if I get paid commission, why should I |
| 20 | | pay shop charge?  That was one.  I don't know |
| 21 | | why I'm paying commission, why you should pay |
| 22 | | shop charge basically. |
| 23 | Q | Could you go back to Exhibit 2, your |
| 24 | | interrogatory responses, please, and I would |
| 25 | | like to talk about your response to |

```
 1      A     Correct, sir.

 2      Q     Okay.  I would like to hand you what the court

 3            reporter has marked as Exhibit No. 10.  Do you

 4            recognize that document, Mr. Nieddu?

 5      A     No, I don't.

 6      Q     Okay.  That document, though, in about the

 7            middle of the page, Exhibit No. 10, actually

 8            about a third of the way down, there's a section

 9            it says "Last Day of Work" and it says

10            3-15-2012, correct?

11      A     I can't find -- oh, okay.  Yes, I see.

12      Q     And that's consistent with your recollection,

13            correct?

14      A     Yes.

15      Q     And was Holly Dodson your manager at the time

16            you were terminated?

17      A     Yes.

18      Q     And then could we go back to Exhibit No. 9, your

19            pay stubs?

20      A     Sure.

21      Q     If we look at the first page of Exhibit No. 9,

22            just above the special information section there

23            are separate sections for "Pre Tax Deductions"

24            and "Post Tax Deductions," correct?

25      A     Yes.
```

```
 1      A    The answer was very, you know, you need to bring

 2           your own client, you need to advertising, you

 3           need to, you know, go get it, so...

 4      Q    And what did that have to do with deductions

 5           from your paycheck?

 6      A    The question of the deduction is look at my

 7           paycheck, it's not meet my needs.  And it said

 8           shop charges, this and that, so I can't -- and I

 9           want to know why the front desk don't give you

10           clientele or even more when your clientele

11           supposed to be with you, they give to somebody

12           else, privileged people that making more income.

13           Then I ask him what the policy is and he

14           couldn't really say that it goes by seniority or

15           whoever makes more money.  So if you're the last

16           person to start, it will be the last person to,

17           you know, to get clientele.

18      Q    So did you have some concerns with the way that

19           Mr. Fuentes distributed clientele to the

20           stylists?

21      A    Yes.

22      Q    And you felt you were treated unfairly in that

23           respect?

24      A    Yes.

25      Q    Did you speak with any of your other managers
```

```
 1              at work?
 2      A       I assume he's got a front desk in charge to see
 3              if somebody come in times.
 4      Q       Would you check in with your supervisor when you
 5              arrived for work?
 6      A       Sometimes yes, sometimes no.  It depends.  If
 7              he's busy doing some things, I can't chase him
 8              around, say, hey, I'm here.
 9      Q       And where was your supervisor during your work
10              shift?  Did he or she typically stay in the spa
11              area, or would they come into the salon area
12              sometimes?
13      A       In and out.
14      Q       In and out, okay.  Could you tell me about your
15              job duties as a hairstylist?  What did you do?
16              What are the responsibilities?
17      A       My responsibility is to be courteous to the
18              client, listen what they need and perform the
19              service, high performance for the client.
20      Q       What sort of services would you provide?
21      A       Color, cut, highlight, corrective color, perm
22              and flatiron, up-dos.  Pretty much everything.
23      Q       Would you do shampooing?
24      A       Shampooing included.
25      Q       Did you have to do cleaning up?
```

53

```
 1              worked.  After somebody had a service with you
 2              and they would go to pay, where would they pay?
 3              Would they have to go back to the front desk, or
 4              is it right in the spa?
 5      A       Front desk.
 6      Q       Okay.
 7      A       Yeah.  I will provide all the information for
 8              the client before I start the service, the cost,
 9              the look that she will receive, the change,
10              pretty much everything and then we'll write a
11              ticket, you know, something that goes to front
12              desk.  And from there the client will pay from
13              the front desk.
14      Q       Okay.  And during the period of time that you
15              worked for Life Time Fitness as a stylist, did
16              you have a typical work schedule?
17      A       Can you rephrase?  Typical?
18      Q       Sure.  Did you have a regular schedule, and I'm
19              just making this up, Monday through Friday 9:00
20              to 5:00?
21      A       Yeah.  Yeah, I would say Sunday, Monday off.  I
22              was working Tuesday through Saturday.
23      Q       And was that your preference, or is that just
24              what you were assigned?
25      A       That was my preference and also accommodation.
```

1    A    No.

2    Q    How did you develop that clientele?

3    A    From Life Time Fitness.

4    Q    I take it you cut hair at other places -- and I

5         shouldn't say cut hair.  You performed hair

6         services at places prior to working at Life Time

7         Fitness; is that right?

8    A    Before, yes.

9    Q    Did any of the clients that you worked with

10        before you came to Life Time Fitness follow you

11        to Life Time Fitness?

12   A    A few.

13   Q    When you would come to work while you were

14        working for Life Time Fitness, how would you get

15        into the building?  Did you have to show some

16        kind of ID or swipe a badge or anything?

17   A    No.  We would come in the front door of the

18        salon.

19   Q    Do you know whether all stylists are required to

20        report to work at the start of their scheduled

21        shift or whether they can report to work when

22        they have their first appointment?  Do you know

23        how the scheduling worked with other stylists?

24   A    No, not particularly.

25   Q    Okay.  Did you -- when you worked for Life Time

```
 1              punch in and out?

 2      A       Yeah.

 3      Q       And you said Mr. Fuentes told you that it really

 4              didn't matter whether you did or didn't?

 5      A       Yeah.

 6      Q       And you don't remember when he told you that?

 7      A       No, I don't remember.

 8      Q       Did anyone else, any of your other managers talk

 9              with you about punching in or punching out?

10      A       No.

11      Q       And when you punched in, the times you punched

12              in, when would you punch in?  Would you punch in

13              when you arrived at work?

14      A       Sometime.  Sometime I do -- sometime I did,

15              sometime I did not.

16      Q       Okay.  When you didn't punch in when you arrived

17              at work, when would you punch in?

18      A       Do not remember.  Since I was remembered that I

19              needed to punch in or punch out, you know, I was

20              doing it.  But it was -- it was not enforcement,

21              so we all forgot.  I forgot all the time punch

22              in and punch out, so...

23      Q       And sometimes you would punch in when you first

24              came to work, other times you --

25      A       Sometime yes, sometime I didn't.
```

```
1    Q    And it would be later in the day that you would
2         punch in?
3    A    Later in the day or maybe when I was going for
4         lunch and come back.
5    Q    When you were leaving, when would you punch out?
6         When you were finished for the day?
7    A    Sometime.
8    Q    And what about the other times?
9    A    Sometime was punching when I was coming in,
10        sometime was punching when I was leaving.  I
11        don't remember exactly.
12   Q    Would you ever punch out and then do work after
13        you punched out?
14   A    Yes.
15   Q    Why would you punch out and then do work after
16        punching out?
17   A    Punch out to go to lunch and then forget to
18        punch out when I come back.
19   Q    Okay.  So you might punch out, go --
20   A    I mean, punch out when you go for lunch, then
21        when you come back, forgot to punch in, so I was
22        working.
23   Q    Any other situations where you would punch out
24        and then do work?
25   A    Rephrase the question.
```

```
 1              system.

 2     Q        So you think Francisco Fuentes put your schedule

 3              into the computer system?

 4     A        I think so.

 5     Q        Okay.  So he would have had in the computer

 6              system that you were working Tuesday through

 7              Saturday 9:00 to 7:00 or 9:00 to 9:00?

 8     A        Correct, to keeping track of the schedule

 9              because every hairdresser had a different time.

10     Q        Did any of the other hairstylists ever tell you

11              what Francisco Fuentes told them about whether

12              they needed to punch in or not?

13     A        No.

14     Q        Would you go back, sir, to Exhibit No. 7 which

15              is -- it's this LifeSpa Stylist guide.

16     A        Okay.

17     Q        And if you would turn to the page we were on

18              before, 1107.  Do you see toward the bottom of

19              the section it says -- there's a sections says

20              "Getting Paid"?

21     A        Yes.

22     Q        And you see it says:  "All team members must

23              punch in and out"?

24     A        Yes.

25     Q        Did anybody ever tell you that?
```

```
 1    Q    Yeah, do you see --

 2    A    -- various time?

 3    Q    Yes.

 4    A    Yes, I see.

 5    Q    Okay.  And it looks -- does it look like under

 6         the column for "In," there's a time entry and

 7         then under the column for "Out" on some dates

 8         there's a time entry as well, correct?

 9    A    Okay.  Let me see.  Yes.

10    Q    Then can we go back, sir, to Exhibit No. 2 which

11         is your interrogatory responses.

12    A    Okay.

13    Q    And I would like to look at the response to

14         No. 5; do you see that?

15    A    Yes.

16    Q    Okay.  Your response there to No. 5 says:  "I

17         regularly worked nine hours per day and up to

18         approximately 54 hours per week," correct?

19    A    Yes.

20    Q    Okay.  Do you know what the schedules that other

21         hairstylists worked were?  Did they regularly

22         work nine hours a day and 54 hours a week, or

23         would that have varied, if you know?

24    A    I don't -- I don't know their schedule.  It's

25         vary.  A lot of people -- I believe they work
```

|    |   |                                                           |
|----|---|-----------------------------------------------------------|
| 1  |   | full-time.  Most of the hairdressers there work           |
| 2  |   | full-time, but different schedules, so...                 |
| 3  | Q | Were or weren't full-time?                                |
| 4  | A | They were full-time, yeah.                                |
| 5  | Q | Were full-time, okay.  I just wanted to make              |
| 6  |   | sure I understood you.                                     |
| 7  | A | Yeah, they work full-time.                                |
| 8  | Q | But different schedules?                                   |
| 9  | A | Different schedule, yes.                                   |
| 10 | Q | And then a little further down in your response           |
| 11 |   | to interrogatory No. 9, you state that your               |
| 12 |   | managers did not enforce a strict clock-in and            |
| 13 |   | clock-out work policy and that managers would             |
| 14 |   | tell you not to worry about clocking in or out            |
| 15 |   | because it did not matter for commission paid             |
| 16 |   | employees like you, correct?                               |
| 17 | A | Correct.                                                   |
| 18 | Q | Okay.  And we talked a little bit about that              |
| 19 |   | earlier today?                                             |
| 20 | A | Yeah.                                                      |
| 21 | Q | Okay.                                                      |
| 22 | A | Because we were on commissions so it wasn't               |
| 23 |   | important or...                                            |
| 24 | Q | And I just want to make sure.  Did any managers           |
| 25 |   | other than Mr. Fuentes say that to you?                   |

1    A    No.

2    Q    It was just Mr. Fuentes?

3    A    Yeah.

4    Q    And I think you told me that you had a couple of

5         conversations with him about that; is that

6         right?

7    A    Yes.

8    Q    And you don't remember the particulars or

9         specifics?

10   A    Not really.  I don't remember exactly because I

11        was busy and I gotta do this, I gotta do that, I

12        got a meeting and it was just like...

13   Q    Any of the times when he talked with you about

14        the fact that it didn't matter whether you

15        punched in or punched out, were there ever any

16        other employees present for those conversations?

17   A    I don't remember.

18   Q    Did you ever receive a written document that

19        told you you didn't need to punch in or punch

20        out?

21   A    No, I never receive any document specify -- that

22        specify you need to do this or you don't need to

23        do that.

24   Q    And nobody other than Mr. Fuentes told you that

25        you did not need to punch in or punch out?

```
 1      A      Nobody else.  Because he was the manager for a

 2             long period of time, so like almost a year and a

 3             half, so...

 4      Q      Are you aware of any Life Time Fitness policy

 5             that prevented you or stopped you from punching

 6             in or punching out?

 7      A      No.

 8      Q      Are you aware of any Life Time Fitness policy

 9             that said that you should punch out before you

10             finished working for a day?

11      A      No.  I was relying to my manager words so I

12             didn't looking for any.

13      Q      Okay.  Are you aware of any Life Time Fitness

14             policy that said that you should start work

15             before you punched in?

16      A      No.

17      Q      And then on interrogatory No. 5 about two-thirds

18             of the way down, you say:  "In other words, it

19             was known by Life Time Fitness management that

20             we would routinely work off the clock"; you see

21             that?

22      A      Okay.  Response to 5?

23      Q      Yes.  It's about -- and I'm about two-thirds of

24             the way down that response and it says:  "In

25             other words, it was known by Life Time Fitness
```

1             lunch, we were doing it for lunch and not for

2             all the others so we forget all the time.

3    Q    Right.  But if it becomes automatic, why -- and

4             you think you're not being properly paid, why

5             wouldn't you just punch in and punch out?

6    A    Because it didn't matter.  The paycheck even

7             when I was punching time all the time, it won't

8             change it.  The paycheck when I look at it, they

9             all the same.  It didn't matter if you were

10           working 40 hours and punch in, punch out.

11           Matter of fact, there was some paycheck stub

12           that show that you work more than 40 hours or

13           whatever the paycheck and sometime I work more

14           than 40, 50 hours and then I punch in and punch

15           out.  But it didn't matter.  Paycheck was still

16           the same, so I said forget it.  So sometime I

17           was punch in and sometime I was punch out, but

18           it wasn't -- it wasn't a mandatory thing, so I

19           said -- so it doesn't matter.  If you have been

20           told that it's not important for you to punch

21           in, punch out, you know, I won't punch in and

22           punch out.

23    Q    And you don't know how often other stylists

24           would or wouldn't punch in; is that fair?

25    A    No, because, you know -- I don't know that.

1    Q    Could we go back to Exhibit 13?  And that's that

2         time punch document that we were looking at

3         briefly before.

4    A    Yeah.

5    Q    Okay.  On -- would you agree with me that on

6         Page 2 of that document they show punches in and

7         punches out for you?

8    A    Yes.

9    Q    Okay.  And then Page 3 as well?

10   A    Yes.

11   Q    Page 4?

12   A    Yes.

13   Q    Page 5?

14   A    Uh-huh.

15   Q    And then if you go to Page 6 it looks like on

16        that page at least, the punches stop at about

17        December 30th; is that right?

18   A    Yes.

19   Q    Okay.  And then would you continue on and it

20        looks like there are no punches on Pages 7, 8

21        and then all the way over to Page 9 until

22        August 28th, correct?

23   A    Uh-huh.

24   Q    Do you know, was there anything special about

25        that period of time, from December 30th until

```
 1            August 28th that caused you to not punch in or

 2            out at all during that period of time?

 3      A     No, there was no reason.

 4      Q     Okay.

 5      A     It was all blank, so...

 6      Q     Do you know why you would have started punching

 7            back in and out again on August 28th?

 8      A     On August 28th of what year?

 9      Q     I believe it is August 28th, 2011.

10      A     I got no idea.  I don't know.

11      Q     Okay.

12      A     Rather than the week that I missed that I was in

13            Vegas.  They should be the only time that showed

14            that I couldn't even punch in, punch out.

15      Q     Do you know when --

16      A     I don't have a answer for that, sorry.

17      Q     Do you know when Mr. Fuentes stopped serving as

18            your manager?

19      A     No, I don't remember.

20      Q     Let's go back to Exhibit No. 4 if we could.

21            It's the one that -- it's a three-page document,

22            looks like this.  Take your time.  Would you

23            turn to the second page of that document and

24            under the manager history section that we talked

25            about earlier today, do you see the reference to
```

```
 1              weren't sort of tracking or following what you
 2              were doing on a day-to-day basis; is that right?
 3     A        What was the question?
 4     Q        Your supervisors, they were not following you or
 5              tracking what you were doing on a day-to-day
 6              basis; is that right?
 7     A        They weren't tracking anyone, yeah.
 8     Q        They were oftentimes not even in the salon area?
 9     A        In and out, you know, besides the last one.
10              Holly, she was more often at the front desk
11              because they had a lot of problems at the front
12              desk.
13     Q        Okay.
14     A        Not having enough employees in the front desk.
15              It was causing, you know, a chaotic time some,
16              so she had to be there and manage, you know,
17              appointment, the phone calls and all this, all
18              that.
19     Q        Okay.  And if I understood you correctly
20              earlier, the supervisor was not necessarily
21              aware of when you were coming to work or when
22              you were leaving work; is that correct?  If I'm
23              wrong, correct me.
24     A        You're wrong, no.  They know when you leave and
25              when you come back -- when you -- they know it.
```

```
1     A      -- human resources -- if it's connection with

2            human resources or not, but --

3     Q      Okay.  All right.

4                   MR. CHRISTENSEN:  If you could give me

5            about five minutes to look over my notes, I

6            think I'm --

7                   MR. PRIETO:  Sure.

8                   MR. CHRISTENSEN:  -- close to wrapping

9            up.

10                  MR. PRIETO:  No problem.

11                  (A recess was taken.)

12    Q      (By Mr. Christensen)  Would you agree with me

13           that the company policies that we've looked at

14           today during your deposition tell employees that

15           they're supposed to enter time accurately and

16           are supposed to punch in and punch out?  I'm not

17           talking about what you were told by anybody, but

18           the policies that we looked at today?

19    A      The policy you present today, it say so, yeah.

20    Q      Okay.

21                  (Clarification requested by the

22           reporter.)

23    A      The policy that you present today to me does say

24           so.

25    Q      (By Mr. Christensen)  It does say so?
```

# LIFETIME FITNESS

## New Hire / Rehire Form

HIRE DATE: 4 / 20 / 2010     CLUB NAME: HCC

TEAM MEMBER INFORMATION          New Hire: ✓   Rehire: _____ (with hr Approval)

PLEASE PRINT CLEARLY

SOCIAL SECURITY # [Redacted]     BIRTHDATE: 7 / 20 / 1965

LEGAL NAME: Pier          Giorgio          Nieddu
              (First)       (Mid)           (Last)

GENDER: M/F (Circle one)   MARITAL STATUS: Single   CURRENT LTF MEMBER (Y or N): No

ADDRESS: 2118 Pasa Rello Dr.     Houston     77077
         (Street Name and #)      (City)    (State and Zip Code)

HOME PHONE #: 931 653 7769     E-MAIL ADDRESS: Pierg40@ao.com

EMERGENCY CONTACT: Kailon Bablitke   RELATIONSHIP: Fiancee   PHONE #: 832-877-5267

JOB INFORMATION:

FULL TIME _____   PART TIME _____          REQUESTED PHONE EXTENSION: _____

JOB TITLE: Stylist Apprentice   DEPARTMENT: W/oSpa   100

HOURLY RATE $: _____   SALARY $: _____   TARGET INCENTIVE $: _____

HIRING MANAGER: _____ (Print Full Name as it Appears in MMS)

SIGNATURES AND APPROVALS:

1st Level Management _____   Date 4/20/2010

2nd Level Management _____   Date 4-28-10

Recruiting Manager (Dept. Head and Above) _____   Date _____

Compensation Manager (Dept. Head and Above and Exceptions) _____   Date _____

HR Use – Team Member New Hire #: 93858   HRIS Coordinator Initials: _____

RECEIVED
5/11/10


Nieddu/Hampton
EXHIBIT NO. 3
C. Daniel

Confidential                                    LTF00000286



**THE HEALTHY WAY OF LIFE COMPANY***

View Event: Terminate: Pier G.
Nieddu (Terminated) (93858)

02:35 PM
09/14/2012
Page 1 of 1

For: Pier G. Nieddu (Terminated) (93858)
Overall Process: Terminate: Pier G. Nieddu (Terminated) (93858)
Overall Status: Successfully Completed

**Details**

| | |
|---|---|
| Employee: | Pier G. Nieddu (93858) |
| Position: | LifeSpa-Stylist |
| Termination Date: | 03/15/2012 |
| Reason: | Involuntary > Misconduct/Violation |
| Decrease Headcount: | Yes |

Additional Information

| | |
|---|---|
| Secondary Reasons: | |
| Last Day of Work: | 03/15/2012 |
| Pay Through Date: | 03/15/2012 |
| Resignation Date: | |
| Notify By: | 03/15/2012 |
| Recommended Minimum | |
| Notification Date: | 03/15/2012 |
| Regrettable: | |

Attachments

| | | | |
|---|---|---|---|
| TERMINATION PROCESS QUESTIONNAIRE (2).doc | Termination | e100976 / Holly A. Dodson | 03/26/2012 07:06:32.638 PM |

**Process**
Process History

| Process | | Status | | | | |
|---|---|---|---|---|---|---|
| Termination | Termination | Submitted | 03/26/2012 07:06:32 PM | | Holly A. Dodson (100976) | |
| Termination | Approval by Manager's Manager | Approved | 03/27/2012 09:42:37 AM | | Patrick J. Fricano (95442) (Manager's Manager) | |
| Termination | Approval by Employee Relations | Approved | 03/27/2012 09:46:39 AM | 03/29/2012 | Brianna L. Weber (53296) (Employee Relations) | |
| Termination | Service: Terminate User Account | Step Completed | 03/27/2012 09:46:39 AM | | Workday Service | |
| Termination | Service: Deactivate Worker Payment Elections | Delayed | 07/10/2012 02:00:00 AM | | | |
| Change Benefits for Life Event | Change Benefits for Life Event | Automatic Complete | 03/27/2012 09:46:39 AM | 03/29/2012 | | |
| Termination | Review COBRA Eligibility | Completed | 03/27/2012 02:36:40 PM | | Lisa Boaz (94336) (Benefits Partner) | |
| Termination | Service: Deactivate Worker Payment Elections | Step Completed | 07/10/2012 02:01:29 AM | | Workday Service | |



Nieddu/Hampton
EXHIBIT NO. 10
C. Barrett

Confidential

LTF00000276

## INVOLUNTARY TERMINATION PROCESS QUESTIONNAIRE

Complete the Termination Questionnaire to assist you, your General Manager, Area Director, and Employee Relations in determining whether or not the team member's termination is appropriate and falls within Company guidelines.

**Attach an electronic copy of this questionnaire and all documentation, as stated below in #6, to termination process in Workday.**

1.  Your name: Holly Dodson_____ Title: Spa DH Club: City Centre

2.  Name of team member being terminated: Pier Giorgio Nieddu

3.  What was the final incident that warrants the termination? Provide a detailed account of the final incident: Giorgio was working at another salon, doing booth rental. Stephen ADH and I had a meeting with him,(Wed) and he admitted to working there due to helping a friend out. I showed and gave a copy of his salon agreement letting him know that he could not work for another salon/ spa establishment while maintaining employment with City Centre LifeSpa. He said he would talk to the friend he was working for and let me know his plans that Friday. When He came to work on Thursday I caught him smoking a electronic cigarette in the color bar area. When I told him that he needed to take that outside, he began to argue with me, and ask me " What are you going to do about it" So I spoke with my regional and HR and Frank DH and I pulled him into the office and told him he needed to leave until further notice.

4.  Has this team member been properly trained? YES Provide details of training: Has been with the company almost two years and is very aware of rules and regulations for LTA

5.  Has this team member been previously disciplined? (i.e. employee relations assisted the DH with drafting and delivering a warning report or performance improvement plan) Answer YES or NO and provide details as to when and how the team member has been disciplined: NO

6.  You must submit all documents that support and contradict the termination (i.e. warning reports, performance improvement plans, annual reviews, etc) by attaching them to the termination request in Workday.

7.  Have all options short of termination been exhausted (i.e. appropriate coaching, corrective actions, final warning)? Answer YES or NO and provide details of all previous actions taken: Yes, I spoke with him about his salon agreement and he was fully ware of the consequences of working in another salon.

8.  Who is requesting the termination? (Name and Title) Holly Dodson DH LifeSpa

9.  Will the team member be surprised that s/he is being terminated? Answer YES or NO and explain your answer: NO, He gave his resignation three times when Stephen and I spoke to him about his salon agreement then decided to wait until Friday.

Confidential

LTF00000277

1

```
 1                    IN THE UNITED STATES DISTRICT COURT

                    FOR THE SOUTHERN DISTRICT OF TEXAS

 2                         HOUSTON DIVISION

 3      PIER NIEDDU, on Behalf      )

        of Himself and Others       )

 4      Similarly Situated,         )

                                    )

 5          Plaintiff,              )

                                    )

 6      VS.                         )   CIVIL ACTION NO.

                                    )   4:12-CV-02726

 7      LIFE TIME FITNESS,          )

        INC., LTF CLUB              )

 8      MANAGEMENT CO., LLC,        )

        and LTF CLUB OPERATIONS     )

 9      CO., INC.,                  )

                                    )

10          Defendants.             )

11          *********************************

12                   ORAL DEPOSITION OF

13                   ROSALIND HAMPTON

14                    MARCH 18, 2013

15          *********************************

16

17          ORAL DEPOSITION OF ROSALIND HAMPTON, produced as a

18      witness at the instance of the DEFENDANTS, and duly

19      sworn, was taken in the above-styled and numbered cause

20      on MARCH 18, 2013, from 12:37 p.m. to 3:03 p.m., before

21      CYNTHIA E. DODGE BARNETT, CSR, RPR, in and for the State

22      of Texas, reported at the offices of Shellist Lazarz

23      Slobin, 11 Greenway Plaza, Suite 1515, Houston, Texas,

24      pursuant to the Federal Rules of Civil Procedure and the

25      provisions stated in the record or attached hereto.
```

Christensen
Exhibit B

```
 1     A     No, sir.

 2     Q     Okay.

 3                 MR. CHRISTENSEN:  Could we go off the

 4           record for just one second?

 5                 (A recess was taken.)

 6     Q     (By Mr. Christensen)  And I think I asked you

 7           this question, but if I did I don't remember and

 8           I apologize if I'm repeating.  Have you ever

 9           testified in a trial or other formal proceeding?

10     A     No.

11     Q     Okay.  Did you do anything to get ready for your

12           deposition today?

13     A     Yes.

14     Q     Okay.  What was that?

15     A     I prayed.

16     Q     Okay.  Other than prayer, anything else you did?

17     A     No.

18     Q     Okay.  Did you look over any documents to get

19           ready for today?

20     A     No.

21     Q     Okay.  Are you currently employed?

22     A     No.

23     Q     And when is the last time that you were

24           employed?

25     A     Last time I was employed was at Life Time
```

```
 1              Fitness at City Centre, Houston, Texas, as of
 2              February the 13th.
 3    Q    Okay.  And this was your last day of employment,
 4              February 13th?
 5    A    Yes.
 6    Q    Okay.  And why did you decide to join or opt
 7              into this lawsuit?
 8    A    Because of -- I was working for Life Time
 9              Fitness for four years.  I was a loyal and
10              committed employee and I was very disappointed
11              in the practices and the monies being taken out
12              of my check and also not being paid for overtime
13              and not having enough money to survive.
14    Q    Okay.  And when did you first think about opting
15              into this lawsuit?
16    A    Immediately after I found out what was going on.
17    Q    Okay.  And when you say what you found out was
18              going on, found out what was going on at Life
19              Time Fitness or found out about the lawsuit?
20    A    Found out what was going on at Life Time
21              Fitness.
22    Q    Okay.  And when did you find out what was going
23              on at Life Time Fitness?
24    A    After asking -- trying to get advice from
25              employment and resolutions department and
```

```
 1    A    Why wasn't I getting paid overtime, why wasn't I
 2         reimbursed for products that I bought for my
 3         clients and why don't I have any products for
 4         any clients.  I had ethnic clientele, black
 5         clientele.  Why don't I have products for them
 6         and why wasn't I paid back for those products?
 7         And why am I getting charged on my check for
 8         what they call shop charges --
 9    Q    Okay.
10    A    -- for foils and things I don't use?  And
11         meetings, like mandatory meetings we had on
12         Monday, we didn't get paid for that.  I didn't
13         get paid for mandatory meetings.  I didn't get
14         paid for continuing education classes.  I didn't
15         see those on my check.
16    Q    Okay.
17    A    Several issues, ongoing issues, four years.
18    Q    And did you raise these issues during the whole
19         period of your employment?
20    A    Yes.
21    Q    Did you ever get any satisfaction with respect
22         to any of those issues?
23    A    No, it was always a dead end.
24    Q    Okay.  And when did you first find out about the
25         lawsuit that you're a part of now?
```

14

```
 1    Q    And who told you that it didn't matter whether
 2         you clocked in or out?
 3    A    Francisco Fuentes and other people that sat in
 4         his position.
 5    Q    Who specifically other than Mr. Fuentes do you
 6         recall?
 7    A    I have those names wrote down.  They came
 8         through like maybe ten of them, so I don't know
 9         their name.  Their whole names was like -- can I
10         pull that out?
11    Q    Is it one of the documents you submitted --
12    A    No, it was not a document.
13    Q    Oh, you can pull it out, sure.
14    A    I just want to tell you the names.  Okay.  Here
15         are the people that -- Moniquca, she was a
16         standing-in manager.  She was after Francisco
17         Fuentes.  And Robert Shaler, he work alongside.
18         He was Francisco Fuentes' assistant.  Holly
19         Dodson, she transferred from another location.
20         She was a department head.  She stayed there
21         maybe three -- maybe three months.  Christine,
22         Merquis Guzman, Jessica Darby and some corporate
23         guy that was a floater.  His name was Glen, and
24         I'm not sure what location he came from.
25    Q    Okay.
```

```
 1      A     And these all were people within -- from the

 2            time Francisco Fuentes left the company until

 3            now.

 4      Q     And is it your testimony that all of those

 5            individuals told you that it didn't matter

 6            whether you punched in or punched out?

 7      A     Well, they weren't sure either.  I would say the

 8            answer is yes.

 9      Q     Okay.  And why do you say they weren't sure

10            about punching in or punching out?

11      A     They had a lot to learn to replace him.

12      Q     And did any of those people, Moniquca, Robert

13            Shaler, Holly Dodson and the others that you

14            referenced, did any of them tell you that they

15            didn't know whether you should or shouldn't

16            punch in or out?

17      A     Yes.  I would say yes.  The answer is yes.

18      Q     And I think you had mentioned that you were paid

19            on a commissioned basis; is that correct?

20      A     That's correct.

21      Q     Was that throughout your employment with Life

22            Time Fitness?

23      A     No, sir, it wasn't.

24      Q     Okay.  When did you start becoming paid on a

25            commissioned basis?
```

```
 1      A      I would say October, October of 2011.

 2      Q      And prior to becoming employed by Life Time

 3             Fitness on a commissioned basis, how were you

 4             paid?

 5      A      I was paid hourly.

 6      Q      Okay.  And when you were paid on an hourly

 7             basis, did you punch in and punch out?

 8      A      Yes, sir, that's correct.

 9      Q      And when you paid on an hourly basis, did you

10             get paid for all the time that you worked?

11      A      No.  That's for the overtime like the mandatory

12             meetings and the continuing education classes

13             and staying overtime when he needed me to stay.

14      Q      And so why wouldn't you or how didn't you get

15             paid for that time if you were punching in and

16             punching out?

17      A      Because I punched out at my regular time.  He

18             was -- Francisco was very adamant about us doing

19             what he told us to do.

20      Q      I don't want to put words into your mouth, but I

21             want to make sure I understand what you're

22             saying.  Are you saying that Mr. Francisco

23             Franco -- excuse me --

24      A      Fuentes.

25      Q      -- Francisco Fuentes --
```

```
 1    Q    Okay.  And the question I'd like you to answer,
 2         though, is how often did Mr. Fuentes tell you to
 3         clock out, go home and then call you back into
 4         work?
 5    A    I don't -- I don't know.  I can't answer that
 6         question.  I don't know, sir, I don't know.
 7    Q    You don't know?
 8    A    It was just often.  That's the only thing I can
 9         say.
10    Q    But I need a descriptor of "often."  What does
11         often mean?
12    A    Often is more times than once.
13    Q    So maybe as little as twice?
14    A    More than twice.
15    Q    Okay.  Three times?
16    A    I would say -- I'm not sure.  I can't answer
17         that, but it was often.
18    Q    But possibly as little as three times being
19         often?
20    A    Possibly.
21    Q    I'm going to show you, ma'am, what the court
22         reporter has marked as Deposition Exhibit
23         No. 16.  Have you seen this document before?
24    A    Yes, sir.
25    Q    Okay.  And is that your signature on the bottom?
```

```
1     A     Yes, sir.

2     Q     And a November 15th, 2012 date, correct?

3     A     Yes, sir.

4     Q     And that is the document you signed to join this

5           lawsuit, correct?

6     A     Yes, sir.

7     Q     Okay.  And, ma'am, would you look at the

8           document in the pile to your right that's

9           labeled Exhibit No. 1?  There's a number of

10          documents that we used earlier this morning with

11          Mr. Nieddu that I'm going to ask you to look at

12          as well.  The document that's labeled as Exhibit

13          No. 1 is the complaint in the lawsuit that

14          Mr. Nieddu brought against the defendants.  Have

15          you seen the document marked as Exhibit No. 1

16          before?

17    A     When you say document No. 1, you mean this

18          document No. 1 right up at the top of the page

19          here?

20    Q     At the very bottom it says Exhibit 1; do you

21          see --

22    A     Oh, okay.  Yes --

23    Q     -- that?  Yep.

24    A     -- sir, I see it.  Yes, sir, I have seen this

25          before.
```

```
 1                  No. 1.  It's -- I think it's about the third

 2                  page of the document, though they aren't

 3                  numbered.  It's at the top, interrogatory No. 2,

 4                  do you see that, and then --

 5         A        Yes, sir.

 6         Q        -- response?  It says:  "I started working for

 7                  Life Time Fitness on or about May 31st, 2010 and

 8                  am currently employed by Defendants.

 9         A        Yes.

10         Q        Okay.  And at the time you created this

11                  document --

12         A        Yes, I --

13         Q        -- you were still employed at Life Time?

14         A        Yes, I was.

15         Q        Yes.  Okay.  I'm going to hand you what the

16                  court reporter has marked as Deposition Exhibit

17                  No. 18 and would you look that document over

18                  when you have a chance?

19         A        Okay.

20         Q        Okay.  The document that I've handed you that

21                  we've marked as Exhibit No. 18 is entitled New

22                  Hire/Rehire Form, correct?

23         A        Yes.

24         Q        Okay.  And that has your hire date at the top.

25                  It appears to say -- is that -- do you know, is
```

```
 1            that 5-3 or 5-31-2010?
 2    A       That's 5-31 --
 3    Q       Okay.  And --
 4    A       -- the 31st of May --
 5    Q       Okay.  And this doc --
 6    A       -- 2010.
 7    Q       And this reflects that you started Life --
 8            started at Life Time Fitness on or about
 9            May 31st, 2010?
10    A       That's correct.
11    Q       Okay.  And then a little further down on that
12            document about halfway down under the job
13            information section, there's a part that says
14            "Job Title"; do you see that?
15    A       Yes.
16    Q       And it says "stylist/apprentice."  Is that the
17            position into which you were hired as you
18            recall?
19    A       Well, when I started, they had me as a -- I
20            wasn't a stylist.  They had me as a shampoo
21            girl.
22    Q       Okay.  And how long did you remain a shampoo
23            girl, if you recall?
24    A       Well, my positions changed.  As long as he was
25            there.
```

```
 1      A     It was a joke.

 2      Q     Oh, okay.  So there were just two positions

 3            shampoo girl and then commissioned stylist?

 4      A     Yes, sir.

 5      Q     And as a shampoo girl, what were your duties and

 6            responsibilities?

 7      A     Shampooing for all the hairstylists.

 8      Q     Okay.

 9      A     And I was on a commission basis as well.  I was

10            informed that I would get commission for the

11            products that I sold to clients.

12      Q     Okay.  And then when you became a commissioned

13            stylist, did your job duties change?

14      A     Yes.

15      Q     Okay.  And how -- what happened at that point in

16            time?  How did they change?

17      A     At that the point in time I was on 100 percent

18            commission and I got commission for still -- for

19            retail.

20      Q     Okay.

21      A     And my hours were cut dramatically to four hours

22            per day -- yes, four hours per day five days a

23            week.

24      Q     Okay.  And that's when you became a commissioned

25            salesperson that your hours got cut?
```

| | | |
|---|---|---|
| 1 | A | Yes, when my position changed, my hour position |
| 2 | | changed to -- |
| 3 | Q | Okay.  And what were your -- |
| 4 | A | Yeah, a commissioned stylist. |
| 5 | Q | Did you have a typical or standard schedule that |
| 6 | | you worked? |
| 7 | A | Well, initially when I was hired, I was hired to |
| 8 | | work from 9:00 to 6:00. |
| 9 | Q | As a shampoo girl? |
| 10 | A | Yes. |
| 11 | Q | Okay.  And then when you became a commissioned |
| 12 | | stylist and your hours got reduced, what was |
| 13 | | your schedule? |
| 14 | A | 9:00 to 1:00.  9:00 a.m. to 1:00 p.m. |
| 15 | Q | And whose division was it to reduce your hours |
| 16 | | at that time? |
| 17 | A | I have not found that out and I have not found |
| 18 | | out why my hours were cut still to this day. |
| 19 | | That's my reason for not being employed there. |
| 20 | Q | And did anyone -- do you recall anyone |
| 21 | | explaining to you why your hours were cut? |
| 22 | A | No one ever explained anything to me. |
| 23 | Q | Did you ask any questions? |
| 24 | A | Yes, sir. |
| 25 | Q | Do you recall who you asked? |

```
1              And I don't have a lot of questions about the
2              document, but please take your time and look
3              through it.  I just want to ask you if you
4              recognize the documents that compile Exhibit
5              No. 19?
6      A       Yes.  Can I state something right quick?
7      Q       Yes.
8      A       I notice on these documents from the front,
9              there are none of my commissioned sales on here,
10             none, absolutely none.
11     Q       Okay.
12     A       Upon hiring by Mr. Francisco Fuentes, I was
13             supposed to get commissioned sales plus hourly.
14             I'm beginning to see some now.  Yeah, this
15             changed very drastically.  (Reviewing document.)
16             I'm observing here an hourly rate that's not
17             right.
18     Q       And why don't you think an hourly rate is right?
19     A       Because I wasn't getting paid hourly because
20             this is up until current time, right?
21     Q       No.  Actually it appears what this document has,
22             and you can check me if I'm wrong, they are pay
23             stubs from the period of time starting June 1st,
24             2010, which is the very first page, and then
25             they end on October 31st, 2012.  And I believe
```

```
 1              these are pay stubs that reflect the period of

 2              time that you were paid --

 3     A        Paid hourly.

 4     Q        -- hourly?

 5     A        Okay.  But I see a lot of my commissions are not

 6              on there as well, but, you know.

 7     Q        Would you agree with me that some of these pay

 8              stubs reflect that you were being paid retail

 9              commissions in addition to an hourly rate?

10     A        Some of them, but all of them not on there.  But

11              I can't go into explanation on any of that.

12     Q        But you do agree that there is at least

13              references on a number of these --

14     A        There are references --

15     Q        Okay.

16     A        -- yes, there are.

17     Q        And did you also see some references to overtime

18              pay on some of these pay stubs?  Please feel

19              free to look at them again as long as you need

20              to get comfortable with that statement.

21     A        Yeah, I see one reference.

22     Q        Okay.  And did you see some references on there

23              to pay for training time or in-training?

24     A        Let's see, in-training.  That would be...

25     Q        It's not on every stub but it's on some of them.
```

```
 1      Q      Okay.

 2      A      It's below minimum wage.

 3      Q      What's below minimum wage?

 4      A      The shop charges taken out, plus my insurance

 5             taken out and everything else, all the

 6             deductions that were taken out due to the shop

 7             charges.  And also, I don't know if you're

 8             familiar with premium fees that they took out of

 9             the checks as well, and I still don't know what

10             they are.

11      Q      Were shop charges ever deducted from your checks

12             that you were aware of while you were paid on an

13             hourly basis?

14      A      Not that I'm aware of.

15      Q      So --

16      A      I would have to go back through the documents.

17      Q      So shop charges became an issue once you became

18             a commissioned stylist; is that fair?

19      A      Really an issue, yes, really because I was

20             buying my clients' products.  Like I said, I

21             have an ethnic clientele and I was buying my

22             clients' products.  And when I had to get

23             products for my clients, I would have to buy

24             them and when I asked the acting supervisors to

25             get them, they said, "Why are you buying
```

```
 1          products?"
 2               "I'm buying products because I have
 3          clients coming in today.  Can you get a
 4          descriptor?  Can you pay me my monies back for
 5          the items that I have" -- relaxer cost a lot of
 6          money.  I paid for -- I paid a lot of money for
 7          relaxers.  And then when I had them to get the
 8          relaxer, they didn't -- they don't know anything
 9          about relaxers.  So they would buy just the
10          relaxer.
11               With a relax -- when ethnic people get
12          relaxers, you have to have the shampoo, the
13          conditioner, and everything that comes -- it
14          gets in the system.  It's just not one thing.
15          You have to have everything.  Or we have to
16          check the budget.  So I'm not going to sit
17          around and wait for them to get that.  I have to
18          accommodate the clients.
19               So that wasn't always -- that was
20          always an issue, then plus on top of that then
21          I'm getting shop charges taken out and I haven't
22          been reimbursed for what I've bought.
23     Q    And how often would you buy product that you
24          used?
25     A    All the time.  All the time, whether it be some
```

| 1 | Q | No, no, hourly rate's gone. |
|---|---|---|
| 2 | A | -- I was going baby, that's gone bye-bye by |
| 3 | | then. |
| 4 | Q | When you become commissioned, you were no longer |
| 5 | | paid an hourly rate? |
| 6 | A | No. |
| 7 | Q | Okay.  But your schedule also was changed to be |
| 8 | | only 9:00 to 1:00 five days a week; is that |
| 9 | | right? |
| 10 | A | Yes.  And then I wanted to add that when I was |
| 11 | | working those hours, I was the only one working |
| 12 | | those hours.  That's why I kept asking and |
| 13 | | asking and asking because when you're on a |
| 14 | | commission basis, they tell me when you're on a |
| 15 | | commission basis, you get to pick your hours. |
| 16 | | You get to choose your hours as an independent |
| 17 | | contractor.  And that wasn't true because I |
| 18 | | continued to work up until February the 13th the |
| 19 | | same time, the same hours. |
| 20 | Q | Okay.  So you continued to work 9:00 to 1:00 the |
| 21 | | entire time until your termination? |
| 22 | A | Uh-huh. |
| 23 | Q | And did I understand you right that you were the |
| 24 | | only stylist working those hours? |
| 25 | A | Yes. |

```
 1      Q      So there was nobody else in the spa?

 2      A      Nobody else was working those hours.  Everybody

 3             else picked and chose their hours.  Everybody

 4             else worked from 9:00 to 6:00.  They had

 5             rotating hours.

 6      Q      Okay.  When you say no one else was working

 7             those hours, you mean other people were there

 8             when you were there, but they just --

 9      A      Right.

10      Q      Okay.

11      A      It was just like I was leaving early.  But I

12             know the -- I just smiled and kept going because

13             they was like you lucky, but they didn't know.

14      Q      Would you take a quick look at the document that

15             we marked as Exhibit No. 11 in the pile to your

16             right?  Should be a copy of the employee

17             handbook.

18      A      Okay.

19      Q      Do you recognize the document that was marked as

20             Exhibit No. 11?

21      A      This goes along with -- very vaguely.

22      Q      Okay.  Do you think you received a copy --

23      A      You know why I don't know it?  Because I didn't

24             get a copy of it.  It was online.

25      Q      There was a copy of it available online?
```

```
1      Q     Okay.

2      A     But I went into part-time mode when I did my

3            transition --

4      Q     All right.  Okay.

5      A     -- when my hours got cut.

6      Q     Okay.

7      A     That should have been done.  So I'm getting shop

8            charges taken out, my insurance taken out and so

9            my check is like (indicating).

10     Q     Okay.  Do you have an understanding of how the

11           tip credit system at Life Time Fitness worked?

12     A     We don't want to even talk about that.  Tips?

13     Q     Tips.  Did you ever receive tips?

14     A     Some of them.

15     Q     Okay.  And do you have any understanding of how

16           the tip credit system worked at Life Time --

17     A     No.

18     Q     Okay.  Do you have any --

19     A     Can you reiterate that?

20     Q     Do you have any dispute with Life Time Fitness

21           over the way it handled your tips?

22     A     Oh, yes, of course, my tips and my commission.

23     Q     Okay.  And what's --

24     A     I want to add this to the record.  My

25           commissions -- some of my commission, my
```

```
1              co-workers knew how to work the SpaBiz software

2              and they would go in and take my sales of my

3              commission away because they knew how to work

4              the software.  Those were taken away from me.

5       Q      Who do you believe took away sales from you?

6       A      Marisol Campos and Jessica Krause.

7       Q      And why do you believe that?

8       A      I believe that because when I was a shampoo

9              assistant, I shampooed for their clients and I

10             sold them products, I sold their clients

11             products.  So they didn't feel like it was fair

12             and they told Mr. Francisco Fuentes -- you put

13             his name down there, too -- Francisco Fuentes

14             about it and he would go in and change it.  So

15             I'm keeping record of what I'm doing when I'm

16             shampooing -- keep in mind I'm shampooing for

17             like nine people.  So the majority of them were

18             from these young ladies.  And when I would sell

19             at the end of the day, they would go into the --

20             it wasn't SpaBiz then, I'm sorry.  It's SpaBiz

21             now.  Shortcuts.

22      Q      Okay.  And you think that they took sales that

23             were made to customers that you think you made

24             and gave themselves credit for it?

25      A      Exactly.  That's exactly what they did.
```

```
 1    Q    Okay.  And did clients ever just hand you money
 2         rather than putting it on the credit card?  Say
 3         you finish doing my hair --
 4    A    If they were allowed.  If they were allowed,
 5         yeah.
 6    Q    So there's --
 7    A    If not, they would leave it at the front --
 8    Q    Okay.
 9    A    -- and we should get them at the end of the day.
10         But there's been several times that I did not
11         get my tips.
12    Q    Do you know what happened to the tips?
13    A    I don't know what happened to them.
14    Q    I mean, is it the company not paying them to
15         you?  Is it other people taking -- other
16         employees taking tips that were really yours?
17    A    They're a part of the company -- if they're --
18         if they're employed by the company, that's the
19         company, right?
20    Q    I suppose one could quibble about that.  But I'm
21         just trying to understand from your perspective,
22         is it the company keeping it and never paying it
23         out to you, or is it put on the counter and
24         somebody's taking it?
25    A    I would say -- I can't answer that question.  I
```

```
 1      A     On the massage side --

 2      Q     Okay.

 3      A     -- yes.

 4      Q     Okay.  And so they -- if they were in their

 5            office, the supervisors on the spa side, they

 6            wouldn't necessarily see employees coming and

 7            leaving from the salon side?

 8      A     No.

 9      Q     Okay.  How often were the supervisors over on

10            the salon side?  Were they --

11      A     You almost made me say something.  Okay.  How

12            could I answer that question?  Repeat it again.

13      Q     Yeah, I guess I'm -- I'm just trying to get a

14            feel for how much interaction the stylists would

15            have during the day with their supervisor.  Was

16            the supervisor pretty regularly or consistently

17            over in the salon, or rarely in there?

18      A     Periodically.

19      Q     Okay.  Okay.

20      A     They were there either when there was a problem

21            in the front desk or if there was nobody to work

22            the front desk.  But any other time they would

23            be in the office.

24      Q     Okay.  Were job duties as a commissioned

25            hairstylists the same, in your opinion, as the
```

```
 1              job duties of the other commissioned

 2              hairstylists in the City Centre --

 3    A    Oh, no.  They had me cleaning up all the time

 4              like I was a maid.  No.

 5    Q    Okay.  So you had different duties than the

 6              other hairstylists?

 7    A    Yes.

 8    Q    Okay.  When you were a hairstylist, how busy

 9              were your workdays?

10    A    How busy -- as far --

11    Q    I know you said you were there --

12    A    -- as productivity?

13    Q    Yeah, exactly.  I think you said you were --

14              when you became a commissioned stylist, you were

15              typically there from 9:00 to 1:00 five days a

16              week.  Were you fully occupied during those

17              hours?

18    A    I tried my best to be.  If I wasn't there, I was

19              out marketing trying to get somebody to come in

20              to see me because they would -- the clients

21              would call and they would tell them that I

22              didn't work there anymore -- either they'd tell

23              them that, "She's not here.  Can I put you with

24              somebody else?"  It was always something.

25    Q    Okay.
```

1    A    So when I wasn't in there, I was marketing.

2    Q    Okay.  And would you always arrive for work at

3         the start of your scheduled work hours?  So --

4         and by that, I mean if you're scheduled to work

5         from 9:00 to 1:00, would you arrive at 9:00

6         whether you had an appointment then or not?

7    A    Yes.

8    Q    Okay.

9    A    Yes.

10   Q    And did you always stay until 1:00 whether you

11        had an appointment or not?

12   A    Yes.

13   Q    And I think you told me earlier other

14        hairstylists had different start times and

15        different end times, and other hairstylists,

16        some of them worked longer schedules than you

17        did?

18   A    Yes.

19   Q    Other than actually working on customers and

20        doing marketing-type work, what other kind of

21        work would you do when you weren't doing one of

22        those two things but were at the workplace?

23   A    Cleaning up behind them.

24   Q    Okay.  Did you ever have to do any work with

25        products or anything like that?

| | | |
|---|---|---|
| 1 | A | Yeah.  I was the one put them up. |
| 2 | Q | Okay. |
| 3 | A | I did the inventory, I did the towels, I did the |
| 4 | | laundry, I did the stocking, I did sweeping, |
| 5 | | dusting, mopping, everything. |
| 6 | Q | Did other hairstylists do those things? |
| 7 | A | No. |
| 8 | Q | And do you know how it worked in the other |
| 9 | | clubs, the division of duties -- |
| 10 | A | I wish I did. |
| 11 | Q | Okay.  But you don't? |
| 12 | A | But the answer is no. |
| 13 | Q | Okay.  And I think you told me that there was |
| 14 | | some occasions that you were told to go home |
| 15 | | before the end of your shift and then were |
| 16 | | called back to work? |
| 17 | A | Uh-huh. |
| 18 | Q | Okay.  And did that happen when you were a |
| 19 | | commissioned hairstylist? |
| 20 | A | No. |
| 21 | Q | Okay.  It happened when you were a shampoo girl? |
| 22 | A | Yes. |
| 23 | Q | Okay.  And you would get sent home? |
| 24 | A | But I did get sent home -- well, after they cut |
| 25 | | my hours, they didn't have to send me home. |

| | | |
|---|---|---|
| 1 | | machine? |
| 2 | Q | Okay.  Did you receive any vacation or paid time |
| 3 | | off while you were working for Life Time |
| 4 | | Fitness?  Did you get a certain number of days |
| 5 | | of vacation a year, I don't know, two weeks, |
| 6 | | three weeks, none? |
| 7 | A | I remember I got majority of my PTO when I had |
| 8 | | my surgery.  When I came back from my surgery, |
| 9 | | that's when they cut my hours to four. |
| 10 | Q | Okay.  When -- when were you out for surgery? |
| 11 | A | That was 2011, October. |
| 12 | Q | October of '11? |
| 13 | A | Uh-huh. |
| 14 | Q | And how long were you out of work? |
| 15 | A | I was out I think possibly five to six weeks -- |
| 16 | | four to -- I would say four to six weeks. |
| 17 | Q | Okay. |
| 18 | A | And also I was told -- I had like over 50 hours |
| 19 | | of PTO and I was told I could not use them. |
| 20 | | That's when the letter -- when I told you about |
| 21 | | the letter from Mark Savage that said as of |
| 22 | | January 31st -- |
| 23 | Q | About -- |
| 24 | A | -- about PTO. |
| 25 | Q | -- COBRA I thought you said? |

```
 1     Q     All right.  While you were employed by Life Time
 2           Fitness on an hourly basis, a noncommission
 3           basis, did you punch in to work each day when
 4           you came to work?
 5     A     Yes.
 6     Q     Okay.  And how would you do that?  Did you enter
 7           an employee ID number?
 8     A     Yes.
 9     Q     Okay.  You didn't do a fingerprint swipe or
10           anything?
11     A     No.
12     Q     Okay.  And when you were leaving at the end of
13           the day, did you punch out each day when you
14           were employed on an hourly basis?
15     A     Yes.  My recollection, yes.
16     Q     Okay.
17     A     And for lunch, too, in and out punch.
18     Q     Okay.  And you'd punch in and out for lunch as
19           well?
20     A     Yes.
21     Q     Okay.  Do you know how the other -- do you know
22           how stylists handled reporting in and reporting
23           out?  Do you know whether other stylists would
24           punch in or punch out?
25     A     I know they were confused about punching in and
```

```
 1              correct?
 2    A    Yes, because as a resource, once I -- I was very
 3              in the dark when I transitioned over, so I would
 4              look to my peers.
 5    Q    And your peers being the other commissioned
 6              hairstylists?
 7    A    Yes.
 8    Q    Okay.  And they had told you that they weren't
 9              sure whether they needed to punch in or punch
10              out?
11    A    Yes.
12    Q    Okay.  Once you were a commissioned hairstylist,
13              did anyone ever tell you that you needed to
14              punch in and punch out, that it was required?
15    A    Like I stated earlier, it was like it didn't
16              matter if you did or not because you're
17              commission.  So it was like you get paid for
18              your work.  Whatever you do, that's what you
19              get.
20    Q    Okay.  Did anyone ever show you a document or a
21              policy that said it didn't matter if you punched
22              in or punched out when you were a commissioned
23              salesperson?
24    A    No, because anytime you asked a question -- what
25              I would say, in my opinion, when I tried to get
```

## CONSENT TO BECOME A PARTY PLAINTIFF TO
## LIFETIME FITNESS FLSA LAWSUIT

Name: _Hampton, Rosalind_

1. I consent and agree to pursue my claims of unpaid overtime and/or minimum wage through the lawsuit filed against my employer.

2. I understand that this lawsuit is brought under the Fair Labor Standards Act. I hereby consent, agree and opt-in to become a plaintiff herein and be bound by any judgment by the Court or any settlement of this action.

3. I intend to pursue my claim individually, unless and until the court certifies this case as a collective or class action. I agree to serve as the class representative if the court approves. If someone else serves as the class representative, then I designate the class representatives as my agents to make decisions on my behalf concerning the litigation, the method and manner of conducting the litigation, the entering of an agreement with the plaintiffs' counsel concerning attorney's fees and costs, and all other matters pertaining to this lawsuit.

4. In the event the case is certified and then decertified, I authorize Plaintiffs' counsel to use this Consent Form to re-file my claims in a separate or related action against my employer.

(Signature) _____ (Date Signed) _11/15/2012_



EXHIBIT
A

**LIFETIME** ~~FITNESS~~

## New Hire / Rehire Form

HIRE DATE: _5/13/2010_   CLUB NAME: _HCC_

Confidential

TEAM MEMBER INFORMATION:   New Hire: ✓   Rehire: _____ (with HR Approval)

**PLEASE PRINT CLEARLY**

SOCIAL SECURITY #: [Redacted]   BIRTHDATE: _11 / 04 / 70_

LEGAL NAME: _Rosalind_ _L._ _Hampton_
                (First)        (MI)        (Last)

GENDER: M or (F) (circle one)   MARITAL STATUS: _Single_   CURRENT LTF MEMBER (Y or N): _N/A_

ADDRESS: _5900 North Braeswood Blvd #227   Houston   TX 77074_
          (Street Name and #)                (City)        (State and Zip code)

HOME PHONE #: _713-771-6999_   E MAIL ADDRESS: _N/A_

EMERGENCY CONTACT: _Dorothy Hampton_ RELATIONSHIP: _Mother_   PHONE #: _(601) 278-9254_
                                                                          _(601) 371-0937_

**JOB INFORMATION:**

FULL TIME: ✓   PART TIME: _____   REQUESTED PHONE EXTENSION: _____

JOB TITLE: _Stylist / Apprentice_   DEPARTMENT: _Lif Spa_

HOURLY RATE: $ _11_   SALARY: $ _____   TARGET INCENTIVE: $ _____

HIRING MANAGER: _[signature]_   _Fransisco Fanj_
                (Print Full Name as it Appears in MMS)

**SIGNATURES AND APPROVALS:**

_[signature]_                                              _5/31/2010_
1st Level Management                                    Date

2nd Level Management                                    Date

Recruiting Manager (Dept. Head and Above)              Date

Compensation Manager (Dept. Head and Above and Exceptions)   Date

HR Use – Team Member New Hire #: _95406_   HRIS Coordinator Initials: _JJ_

RECEIVED
06/07/10

Nieder / Hampton
EXHIBIT NO. _18_
C. Barrett

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| PIER NIEDDU, on Behalf of Himself and Others Similarly Situated | § § § | CIVIL ACTION NO. 4:12-CV-02726 |
| Plaintiff, | § § § | JURY TRIAL DEMANDED |
| V. | § § § | |
| LIFETIME FITNESS, INC., et al. | § § § § | |
| Defendants. | § | |

---

PLAINTIFF'S NOTICE OF FRCP 30(b)(6)
CORPORATE REPRESENTATIVE DEPOSITION
TO DEFENDANT LIFETIME FITNESS, INC.

---

TO:   Defendant LIFETIME FITNESS, INC., through its counsel of record, Douglas Christensen of DORSEY & WHITNEY LLP, 50 South Sixth Street, Suite 1500, Minneapolis, MN 55402-1498.

Pursuant to FRCP 30(b)(6), Plaintiff hereby notices the deposition of the person or persons most knowledgeable of the following topics:

1.   The number of hair stylists employed by Lifetime Fitness nationwide;

2.   All nationwide locations at which Lifetime Fitness hair stylists work;

3.   The general job duties performed by Lifetime Fitness hair stylists nationwide;

4.   Lifetime Fitness's commission pay system for hair stylists nationwide, including commissions paid for both services and retail, tips received, and deductions including "shop charges";

Christensen
Exhibit C

5. The system(s) in place, if any, to comply with the Fair Labor Standards Act for commission paid hairstylists, including how long it has been in place and what changes have been made to it, if any, during the last five years;

6. Scheduling of hair stylists' work hours and the system in place for the reporting of the hair stylists' hours nationwide;

7. Paperwork that is created and maintained by Lifetime Fitness related to the hair stylists' commissions earned and paid for services and retail provided, their compensation, generally, and hours worked;

8. Lifetime Fitness's policy on paying minimum wage and overtime to its hair stylists;

9. To the extent Lifetime Fitness raises the affirmative defense of good faith, the witness should have detailed knowledge regarding Defendants' efforts to comply with the Fair Labor Standards Act;

10. Lifetime Fitness's general practices and policies on retaining payroll records such as time sheets and pay checks; and

11. Lifetime Fitness's denials and admissions to the averments in Plaintiff's Complaint, including any amendments, and responses and objections to Plaintiff's discovery requests.

The 30(b)(6) deposition will take place on March 21, 2013 beginning at 9:00 a.m. at the offices of Dorsey & Whitney LLP, Suite 1500, 50 South Sixth Street, Minneapolis, Minnesota 55402 and will continue from day to day until complete. The deposition will be recorded by a certified Shorthand reporter and may be videotaped.

You are welcome to examine the witness.

2

Respectfully submitted,

SHELLIST LAZARZ SLOBIN, LLP

By:   /s/ *Martin A. Shellist*
      Martin A. Shellist
      Texas Bar No.: 00786487
      Federal Bar No: 16456
      Email: mshellist@eeoc.net
      Ricardo J. Prieto
      Texas Bar No.: 24062947
      Federal Bar No: 1001658
      E-mail: rprieto@eeoc.net
      11 Greenway, Suite 1515
      Houston, TX 77406
      Telephone: (713) 621-2277
      Facsimile: (713) 621-0993

      ATTORNEYS FOR PLAINTIFF
      & CLASS MEMBERS

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of the foregoing was served on all opposing parties pursuant to the Federal Rules of Civil Procedure on March 6, 2013 via the following.

*Via Facsimile: (612) 486-9191 and Via Email:*
*clark.marilyn@dorsey.com and christensen.doug@dorsey.com*
Douglas Christensen &
Marilyn Clark
DORSEY & WHITNEY LLP
50 South Sixth Street, Suite 1500
Minneapolis, MN 55402-1498
ATTORNEYS FOR DEFENDANTS

                              /s/ *Ricardo J. Prieto*
                              Ricardo J. Prieto

3

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| PIER NIEDDU, on Behalf of Himself and Others Similarly Situated,<br>            Plaintiff,<br><br>vs.<br><br>LIFE TIME FITNESS, INC., LTF CLUB MANAGEMENT CO., LLC, and LTF CLUB OPERATIONS CO., INC.,<br>            Defendants. | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | CIVIL ACTION NO. 4:12-cv-02726 |

---

### NOTICE OF PENDENCY OF FLSA CLASS ACTION

---

### PLEASE READ THIS NOTICE CAREFULLY -
### IT MAY AFFECT YOUR LEGAL RIGHTS

TO:    [NAME]
       [LAST KNOWN ADDRESS]

RE:    Fair Labor Standards Act Lawsuit Filed Against LIFE TIME FITNESS, Inc.

**I.    Why Have I Received This Notice?**

The purpose of this Notice of Pendency of FLSA Class Action ("Notice") is to inform you of the existence of a collective action lawsuit in which you are potentially eligible to participate because you may be "similarly situated" to the Named Plaintiff, Pier Nieddu (the "Named Plaintiff"). This Notice is also intended to advise you of how your rights under the Fair Labor Standards Act ("FLSA") may be affected by this lawsuit, and to instruct you on the procedure for participating in this lawsuit, should you decide that it is appropriate and should you choose to do so.

**II.   What Is The Lawsuit About?**

On September 11, 2012, the Named Plaintiff brought this lawsuit against Defendants LIFE TIME FITNESS, INC., LTF CLUB MANAGEMENT CO., LLC, and LTF CLUB OPERATIONS CO., INC., ("LIFE TIME FITNESS") on behalf of himself and other "similarly situated" employees. The lawsuit alleges that LIFE TIME FITNESS failed to pay compensation to these employees as required by the FLSA. Generally, the provisions of the FLSA require an employer to provide an employee a required minimum wage and additional compensation or

Christensen
Exhibit D

overtime pay to an employee for all hours over forty (40) hours per week that the employee works, unless that employee is properly classified as "exempt" from the overtime provisions of the FLSA.  The FLSA provides that to qualify for exempt status, commissioned employees' earnings for a given pay period must equal at least one and a half times the applicable minimum wage based on the number of hours worked.  The Named Plaintiff in this lawsuit claims that LIFE TIME FITNESS inappropriately compensated him under this exemption such that his earnings for a given pay period were less than at least one and a half times the applicable minimum wage based on the number of hours worked.

The Named Plaintiff brought this lawsuit in the United States District Court for the Southern District of Texas, Houston Division.  The Named Plaintiff is suing to recover unpaid compensation for the period after September 11, 2009.  This lawsuit is currently in the early pretrial stage.

LIFE TIME FITNESS has denied the Named Plaintiff's allegations that it engaged in this or any other inappropriate practice under the FLSA.  Further, LIFE TIME FITNESS maintains that it exercised good faith in its application of the FLSA to its employees.

**III.**   **Who May Participate In This Lawsuit?**

The Named Plaintiff seeks to sue on behalf of himself and also on behalf of other employees with whom he is similarly situated.  Specifically, the Named Plaintiff seeks to sue on behalf of any and all LIFE TIME FITNESS hair stylists paid on commission (and not paid an hourly wage), who, at any time between September 11, 2009, and the present have not been paid earnings for a given pay period sufficient to equal at least one and a half times the applicable minimum wage based on the number of hours worked.  Such individuals are Potential Members of the Collective Action.

This Notice is only for the purpose of determining the identity of those persons who wish to be involved in this case and has no other purpose.  Your right to participate in this lawsuit may depend upon a later decision by the United States District Court that you and the Named Plaintiff actually are "similarly situated."

**IV.**   **How Do I Participate In This Lawsuit?**

If you fit the definition set forth in Paragraph III above, you may choose to participate in this lawsuit.  Enclosed with this Notice you will find a "Consent to Become a Party Plaintiff" form.  If you choose to join this lawsuit, and thus participate in any recovery that may result from this lawsuit, you may join this lawsuit (that is, you may "opt in") by mailing, in the addressed and postage paid envelope enclosed for your convenience, the "Consent to Become a Party Plaintiff" form to the Clerk of the United States Court of the Southern District of Texas ("Clerk of Court") at the following address:  David J. Bradley, Clerk of the United States Court of the Southern District of Texas, Houston Division, P.O. Box 61010, Houston, TX 77208.

The form must be received by the Clerk of Court before 4:30 p.m. on **[30 days from date of mailing]**.  Please note that regardless of when the form is mailed, it must be received by the Clerk of Court on or before the date indicated above.

**V.      What Effect Does Joining This Lawsuit Have On My Legal Rights?**

If you choose to join in the suit, you will be bound by the Judgment of the Court, whether it is favorable or unfavorable.  You also will be bound by, and will be given your appropriate share of, any settlement that may be reached on behalf of the members of the collective action.

You will not be required to pay attorneys' fees directly.  The attorneys for the members of the collective action are being paid on a contingency fee basis, which means that if there is no recovery, there will be no attorneys' fees chargeable to you.  If there is a recovery, the attorneys for the members of the collective action will receive a part of any settlement obtained or money judgment entered in favor of all members of the collective action.

If you choose to join in the suit, you will not be required to pay any court costs and fees directly.  The attorneys for the members of the collective action have agreed to pay for all court costs and fees incurred by the members of the collective action, including costs and fees that may be assessed against the members of the collective action if LIFE TIME FITNESS prevails in this lawsuit.

By joining this lawsuit, you designate the Named Plaintiff as your agent to make decisions on your behalf concerning the litigation, the method and manner of conducting this litigation, the entering of an agreement with the Named Plaintiff's counsel concerning attorneys' fees and costs, and all other matters pertaining to this lawsuit.  These decisions and agreements made and entered into by the Named Plaintiff will be binding on you if you join this lawsuit.

While this suit is proceeding, you may be required to respond to written questions, sit for depositions and/or testify in court.

Federal law prohibits LIFE TIME FITNESS from discharging or in any other manner discriminating against or disciplining you because you have exercised your rights under the FLSA.

**VI.      What Effect Does Not Joining This Lawsuit Have On My Legal Rights?**

If you choose not to join this suit, you will not be affected by any judgment or settlement rendered in this case, whether favorable or unfavorable to the members of the collective action.  If you choose not to join this lawsuit, you are free to file your own lawsuit, subject to any defenses that might be asserted.  The pendency of this suit will not stop the running of the statute of limitations as to any claims you might have until you opt into it or file your own lawsuit.

**VII.      Who Are The Attorneys For The Members Of The Collective Action?**

If you choose to join this suit, your interests will be represented by the Named Plaintiff through his attorneys, as counsel for the members of the collective action.  Counsel for the members of the collective action are:  Martin A. Shellist, Esq. and Ricardo J. Prieto, Esq., Shellist Lazarz Slobin LLP, 11 Greenway Plaza, Ste. 1515, Houston, TX 77006, Tel. (713) 621-2277.

Further information about this Notice or questions concerning this lawsuit may be obtained by writing or telephoning the Named Plaintiff's counsel at the address and telephone number stated above.

**VIII.    <u>Who Are The Attorneys For LIFE TIME FITNESS?</u>**

The attorneys for the Defendant LIFE TIME FITNESS are Douglas R. Christensen, Esq., Marilyn Clark, Esq., and Sarabeth Ackerman, Esq., Dorsey & Whitney LLP, 50 South Sixth Street, Suite 1500, Minneapolis, MN 55402-1498, and Scott M. Nelson, Esq. and Emily Harbison, Esq., Baker & McKenzie LLP, 711 Louisiana, Ste. 3400, Houston, TX 77002.

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| PIER NIEDDU, on Behalf of Himself and Others Similarly Situated, | § § § | |
| Plaintiff, | § | CIVIL ACTION NO. 4:12-cv-02726 |
| | § | |
| vs. | § § | |
| LIFE TIME FITNESS, INC., LTF CLUB MANAGEMENT CO., LLC, and LTF CLUB OPERATIONS CO., INC., | § § § § | |
| Defendants. | § | |

## CONSENT TO BECOME A PARTY PLAINTIFF

By my signature below, I represent to the Court that I meet the definition contained in Paragraph III of the accompanying Notice of Pendency of FLSA Class Action describing "Potential Members of the Collective Action."

I hereby authorize the filing and prosecution of the above-styled FLSA action in my name.  Further, I designate the Named Plaintiff as my agent to make decisions on my behalf concerning the litigation, the method and manner of conducting this litigation, the entering of an agreement with the Named Plaintiff's counsel concerning attorneys' fees and costs, and all other matters pertaining to this lawsuit.

SIGNATURE (Sign your name)      _____

(Print your name)      _____

(Street Address)      _____

(City, State, Zip)      _____

(Telephone number)      _____

(Social Security number)      _____

**Please return this form on or before 4:30 p.m. on [30 days from date of mailing] to:**

Clerk of the United States Court of the Southern District of Texas, Houston Division
David J. Bradley, P.O. Box 61010, Houston, TX 77208