IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHER DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| PIER NIEDDU, on Behalf of | § | |
| Himself and Others Similarly | § | |
| Situated, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| VS. | § | CIVIL ACTION H-12-2726 |
| | § | |
| LIFETIME FITNESS, INC., LTF | § | |
| CLUB MANAGEMENT COMPANY, LLC, LTF | § | |
| CMBS MANAGING MEMBER, INC., AND | § | |
| LTF CLUB OPERATIONS COMPANY, | § | |
| | § | |
| Defendants. | § | |

## OPINION AND ORDER

Pending before the Court in the above referenced, putative collective action, grounded in the Fair Labor Standards Act of 1938 (the "FLSA"), 29 U.S.C. §§ 201-219, and comprised of Defendants' current and former commission-paid hair stylists employed at the Houston, Texas CityCentre location from September 11, 2009 to the present seeking to recover unpaid minimum wage for all hours worked and overtime for hours worked in excess of 40 hours per week, are (1) Plaintiff Pier Nieddu's ("Nieddu's") motion to conditionally certify collective action and authorize notice pursuant to 29 U.S.C. § 216(b), and request for expedited ruling (instrument #33) and (2) motion for emergency ruling (#37).

In his motion Plaintiff initially sought an expedited ruling on his request for conditional class certification and issuance of the class notice, and then subsequently filed the motion for an

emergency ruling, primarily on limitations grounds.  A two-year statute of limitations applies to FLSA wages claims, or, in the case of a "willful violation,"[1] a three-year statute applies.  29 U.S.C. § 255(a)("Any Action . . . to enforce any cause of action for unpaid minimum wages, unpaid overtime compensations, or liquidated damages, under the Fair Labor Standards Act . . . if the cause of action accrues on or after May 14, 1947--may be commenced within two years after the cause of action accrued, and every such action shall be forever barred unless commenced within two years after the cause of action accrued, except that a cause of action arising out of a willful violation may be commenced within three years after the cause of action accrued.").  In a FLSA collective action generally the statute is not tolled for any individual class member who is not named in the complaint until that individual has filed an opt-in notice, i.e., a written consent to join the lawsuit as a party plaintiff.  29 U.S.C. § 256 ("[A]n action is commenced

---

[1] A willful violation of the FLSA can be shown by proof that the defendant "either 'knew or showed reckless disregard for . . . whether its conduct was prohibited by the statute.'"  *Singer v. City of Waco*, 324 F.3d 813, 821 (5th Cir. 2003), *quoting Reich v. Bay, Inc.*, 23 F.3d 110, 117 (5th Cir. 1994).  Courts have found willful violations where the evidence showed "(1) admissions that an employer knew its method of payment violated the FLSA prior to the accrual of the action; (2) continuation of a pay practice without further investigation after being put on notice that the practice violated the FLSA; (3) earlier violations of the FLSA that would put the employer on actual notice of the Requirements of the FLSA; (4) failure to keep accurate or complete records of employment; and (5) prior internal investigations which revealed similar violations."  *Bingham v. Jefferson County, Texas*, No. 1:11-CV-48, 2012 WL 1312563, at *14 (E.D. Tex. March 1, 2013).

. . . in the case of any individual claimant . . . [when] written consent is filed in the court in which the action was commenced.").[2]

Defendants object to the requests for expedited ruling on the grounds that Nieddu waited for over seven months after filing his suit to file his motion for conditional certification, instead electing to engage in more than three months of discovery. They contend that any delay in this case is the result of Nieddu's "own misguided litigation strategy." #38 at p. 2. Because the Court addresses the motion for conditional certification now, the motion for emergency ruling (#37) is mooted by this Opinion and Order.

## Applicable Law

Section 216(b) of the FLSA allows a collective action to be filed by employees against their employer for unpaid minimum wages or unpaid overtime compensation:

> An action . . . may be maintained against any employer . . . by any one or more employees for and in behalf of himself or themselves and other employees similarly situated. No employee shall be a party to any such action unless he gives his consent in writing to become such a party and such consent is filed in the court in which such action is brought.

> Putative class members must "opt-in," i.e., affirmatively

notify the court of their intention to become parties to the

---

[2] If the individual is "specifically named as a party plaintiff in the complaint and his written consent to become a party plaintiff is filed on such date in the court in which the action is brought," his claims are "considered to be commenced on the date when the complaint is filed." 29 U.S.C. § 256.

collective action.  29 U.S.C. § 216(b); *Mooney v. Aramco Servs. Co.*, 54 F.3d 1207, 1212 (5th Cir.1995), *overruled on other grounds by Desert Palace, Inc. v. Costa*, 539 U.S. 90, 91-92 (2003).  Before notice may issue to potential class members, the court must conditionally certify the class as a collective action. Conditional certification "is not tantamount to class certification under Rule 23."[3]  *Genesis Healthcare Corp. v. Symcyk*, 133 S. Ct. 1523, 1532 (2013).  The only effect of a conditional certification is that a court-approved written notice may then be sent to similarly situated putative class members, who then may choose to become parties to a collective action by filing a written consent with the court.  *Id.* at 1530, *citing* 29 U.S.C. § 216(b).  Courts have discretion in determining whether to certify a collective action under the FLSA and to authorize notice to similarly situated employees advising them of their right to join such a collective action.  *Mooney*, 54 F.3d at 1213.

The majority of courts, including those in the Southern District of Texas,[4] apply a two-stage certification process established in *Lusardi v. Xerox Corp.*, 118 F.R.D. 351 (D.N.J.

---

[3] The Fifth Circuit has discussed the fundamental differences between Federal Rule of Civil Procedure 23 class actions and the FLSA collective actions in *LaChapelle v. Owens-Illinois, Inc.*, 513 F.2d 286, 288-89 (5th Cir. 1975), and *Sandoz v. Cingular Wireless LLC*, 553 F.3d 913, 916-18 (5th Cir. 2008).

[4] *See, e.g., Tolentino v. C&J Spec-Rent Servs., Inc.*, 716 F. Supp. 2d 642, 646 (S.D. Tex. 2010)(and cases cited therein).

1987), under 29 U.S.C. § 216(b): (1) the "notice stage," when the Court determines, based on the pleadings and any accompanying affidavits and before the parties have conducted substantive discovery, whether to conditionally certify the class and issue notice to potential class members; followed by (2) the "decertification stage," after the discovery has been largely completed and the defendant has filed a motion to decertify, when the court conducts a fact-intensive review to determine if the claimants are similarly situated. *Mooney*, 54 F.3d at 1213-14; *Sandoz v. Cingular Wireless LLC*, 553 F.3d 913, 916 n.2 (5th Cir. 2008); *Blake v. Hewlett-Packard Co.*, No. 4:11-CV-592, 2013 WL 3753965, at *4 (S.D. Tex. July 11, 2012). If the Court does not conditionally certify the class or if it later grants decertification, it must dismiss the opt-in employees and leave the named plaintiff to pursue his individual claims. *Sandoz*, 553 F.3d at 916 n.2.

At the notice stage the plaintiff "bears the burden of making a preliminary factual showing that other similarly situated individuals exist such that the court should provide notice of the action to putative class members." *White v. Integrated Electronic Technologies, Inc.*, Civ. A. Nos. 11-2186 and 12-359, 2013 WL 2903070, at *3 (E.D. La. June 13, 2012). Usually at the notice stage, because discovery has not yet occurred, courts do not review the underlying merits of the action in deciding whether to

conditionally certify the class.  *Walker v. Honghua America, LLC*,
870 F. Supp. 2d 462, 465 (S.D. Tex. 2012).  Generally courts
require only a minimal showing that (1) there is a reasonable basis
for the plaintiff's allegations, (2) that the aggrieved putative
class members are similarly situated with regard to the claims and
defenses asserted, and (3) that these individuals desire to opt-in
to the suit.  *Id.* at 465-66, *citing Aguirre v. SBC Communications,
Inc. ("Aguirre I")*, No. Civ. A. H-05-3198, 2006 WL 964554, *5 (S.D.
Tex. Apr. 11, 2006).  Some courts do not require the third element,
which is not mentioned in § 216(b).[5]

---

[5] In *Acevedo v. Allsup's Convenience Stores, Inc.*, 600 F.3d
516, 519 (5th Cir. 2010), the Fifth Circuit observed that
although it had "not yet ruled on how district courts should
determine whether plaintiffs are sufficiently 'similarly
situated' to advance their claims together in a single § 216(b)
action," if a court chooses to apply the *Lusardi* approach, it
should proceed as follows:

> First, the court determines whether the putative class
> members' claims are sufficiently similar to merit
> sending notice of the action to possible members of the
> class.  If they are, notice is sent and new plaintiffs
> are permitted to "opt in" to the lawsuit.  Second,
> after discovery is largely complete and more
> information on the case is available, the court makes a
> final determination of whether all plaintiffs are
> sufficiently similarly situated to proceed together in
> a single action.

*Id., citing Mooney*, 54 F.3d at 1213-14.  Although *Mooney* dealt
with claims under the Age Discrimination in Employment Act
("ADEA"), it is relevant to a FLSA collective action because the
ADEA expressly incorporates § 216(b) of the FLSA for an opt-in
procedure for class actions.  *Mooney*, 54 F.3d at 1212.

The FLSA allows a plaintiff to bring a collective action on behalf of "similarly situated" employees, but the statute does not define the phrase, "similarly situated." *Barnes v. Abandonment Consulting Services, LLC*, Civ. A. No. 4:12-CV-01399, 2013 WL 3884198, at *2 (S.D. Tex. July 26, 2013). Courts in the Southern District of Texas interpret that phrase to mean workers who are affected by the same "policy, plan, pattern or practice" as the plaintiff. *Id., citing McKnight v. D. Houston, Inc.*, 756 F. Supp. 2d 794, 803 (S.D. Tex. 2012)(and cases cited therein)( Although "similarly situated" is not defined under the FLSA, a number of courts have found that for conditional certification "putative class members need only show that they were affected by a common policy, plan, pattern or practice."). "Even this lenient standard" applied during the initial notice stage under *Lusardi* "appears to require substantial allegations that potential members 'were together the victims of a single decision, policy, or plan . . . .'" *Aguirre I*, 2006 WL 964554 at *5, *citing Sperling v. Hoffman-LaRoche, Inc.*, 118 F.R.D. 392, 407 (D.N.J. 1988). Moreover the class representative and the putative class members must also be "'similarly situated with respect to their job requirements and with regard to their pay provisions"; their "'positions need not be identical but similar.'" *Yaklin v. W-H Energy Servs., Inc.*, No. C-07-422, 2008 WL 1989795, at *2 (S.D. Tex. May 2, 2008), *citing Dybach v. State of Florida Department of Corrections*, 942 F.2d

-7-

1562, 1567-68 (11th Cir. 1991); and *Ryan v. Staff Care, Inc.*, 497 F. Supp. 2d 820, 824-25 (N.D. Tex. 2007).  "A court may deny a plaintiff's right to proceed collectively only if the action arises from circumstances purely personal to the plaintiff and not from any generally applicable rule, policy, or practice."  *Id.*; *Tolentino*, 715 F. Supp. 2d at 647; *McKnight*,756 F. Supp. 2d at 801.

"'Collective actions under the FLSA are generally favored because such allegations reduce litigation costs for individual plaintiffs and create judicial efficiency by resolving in one proceeding [all] 'common issues of law and fact arising from the same activity.''" *Walker*, 870 F. Supp. 2d at 466, *quoting Ryan v. Staff Care, Inc.*, 497 F. Supp. 2d 820, 823 (N.D. Tex.)(*quoting Hoffmann La Roche, Inc. v. Sperling*, 493 U.S. 165, 170 (1989)).

If the court conditionally certifies the class and authorizes notice, the action proceeds as a collective action and the parties conduct discovery. *Mooney*, 54 F.3d at 1214.  At the second stage, usually following completion or near completion of discovery when the defendant files a motion to decertify the collective action, the court makes a factual determination whether the class members are similarly situated. *Lusardi*, 118 F.R.D. at 359.  If it finds they are, the collective action may continue; if not the court decertifies the conditionally certified collective action, dismisses the opt-in plaintiffs without prejudice, and the original plaintiff(s) proceed to prosecute his (their) individual claims.

*McKnight*, 756 F. Supp. 2d at 802, *citing inter alia Mooney*, 54 F.3d at 1214.   The court may not address the merits of the claims at either stage of certification by ruling on factual disputes or making credibility determinations.   *Id.*

A number of courts have held that if substantial discovery occurs before the first, conditional certification stage, the court "may bypass the first stage and proceed directly to the second stage of certification analysis." *Aguirre v. SBC Communications, Inc. ("Aguire II")*, Civ. A. No. H-05-3198, 2007 WL 772756, at *9 (S.D. Tex. Mar. 12, 2007), *citing inter alia England v. New Century Fin. Corp.*, 370 F. Supp. 2d 504, 509 (M.D. La. 2005), and *Basco v. Wal-Mart Stores, Inc.*, No. Civ. A. 00-3184, 2004 WL 1497709, at *4 (E.D. La. July 2, 2004). *See also Blake v. Hewlett-Packard*, 2013 WL 3753965 at *4-6 (and cases cited therein)(in light of the parties' conducting five months of discovery and deposing the representative plaintiff before the motion for conditional certification was filed, the court applied "an intermediate approach: following the two-step process and imposing a heightened evidentiary standard commensurate with the opportunity to conduct discovery"); *Barnes*, 2013 WL 3884198, at *3-4 (when a plaintiff waits until after discovery to request certification, the lenient standard of the first step of *Lusardi* no longer applies, the *Lusardi* two-stage condenses into one, the court considers the evidence submitted, and the plaintiff must satisfy a higher

evidentiary standard).  Although the courts have not established
the exact quantity of evidence the plaintiff must submit, it is
more than the minimal showing of a reasonable basis for the
plaintiff's allegation(s) and "courts have been clear that
something more than the plaintiff's own allegations and
declarations is required." *Barnes*, 2013 WL 3884198, at *4, *citing
Blake*, 2013 WL 3753965, at *8 ("[B]ecause Plaintiffs have been
allowed the opportunity to gather more than just 'minimal
evidence,' they are required to support their motion with more than
minimal evidence."); *see also Valcho v. Dallas County Hosp. Dist.*,
575 F. Supp. 2d 618, 622 (N.D. Tex. 2008)(after three months of
discovery the court may require the plaintiff to produce
evidentiary support beyond the bare allegations in his complaint
and his personal declaration), *citing Harris v. FFE Transp.
Services, Inc.*, No. Civ. A. 3:05CV0077-P, 2006 WL 1994586, at *3
(N.D. Tex. May 15, 2006)(after seven months of discovery the court
applied the second step of the *Lusardi* analysis and imposed a
higher burden upon plaintiff seeking conditional certification),
and *Thiessen v. Gen. Elec. Capital Corp.*, 996 F. Supp. 1071, 1080-
81 (D. Kan. 1998)(holding that after three months of discovery the
plaintiff was beyond the notice stage and subject to a heightened
evidentiary standard); and *Morisky v. Pub. Serv. Elec. & Gas Co.*,
111 F. Supp. 2d 493, 497-98 (D.N.J. 2000)(same).

Because the parties in this case conducted discovery for more

than three months prior to the Plaintiff's filing of the motion for conditional certification and because the evidence submitted with the briefing includes transcripts of the depositions of, or affidavits from, Nieddu, the corporate representative of Lifetime Fitness Liza Shiffman, Lifetime Fitness's National LifeSpa and Salon Manager Alexandra Yanez, Lifetime Fitness's Human Resources Specialist Brianna Weber, and former Lifetime Fitness employee and the only opt-in plaintiff thus far Rosalind Hampton, as well as responses to requests for production, etc., the Court finds this post-notice-stage intermediate standard of review appropriate here.[6]  *See* Affid. of Douglas Christensen, #35, Ex. 2 (detailing the discovery submitted with the motion for conditional certification).  Nevertheless, the Court has also concluded that even under the lenient standard at the notice stage of the *Lusardi* analysis, given the pleadings, depositions excerpts, and affidavits in the record and the applicable law, Nieddu fails to show that the hair stylists at CityCentre during the proposed class period were "similarly situated" or the "victims of a common plan or policy" of Lifetime Fitness that violated the FLSA.  Thus the Court denies the

---

[6] Nieddu even states, "Here, the Plaintiff submits into evidence more than what is normally required by courts in this District to satisfy the first step in conditional class certifications. . . . Nieddu and Opt-in Plaintiff Rosalind Hampton submit testimony under oath and subject to cross examination from their depositions that LTF failed to comply with the FLSA by purposely failing to track all time worked by its hair stylists at LTF's Houston, Texas CityCentre locations."  #33 at p. 18.

motion for conditional certification of the putative class.

The Sixth Circuit held in *White v. Baptist Memorial Health Care Corp.*, 699 F.3d 869, 876 (6th Cir. 2012),

> Under the FLSA, if an employer establishes a reasonable process for an employee to report uncompensated work time the employer is not liable for non-payment if the employee fails to follow the established process.  When an employee fails to follow reasonable time reporting procedures she prevents the employer from knowing its obligation to compensate the employee and thwarts the employer's ability to comply with the FLSA.

*Id.,*[7] *citing inter alia Forrester v. Roth's I.G.A. Foodliner, Inc.*, 646 F.2d 413, 414 (9th Cir. 1981)(in a case where employee turned in time sheets that did not include overtime hours and did not show that the employer should have known that the employee worked more hours than those claimed on his time sheets, the Ninth Circuit affirmed the district court's grant of summary judgment in favor of the employer; "where an employer has no knowledge that an employee is engaging in overtime work and that employee fails to notify the employer . . . the employer's failure to pay for the overtime hours

---

[7] In *Wood v. The Mid-America Management Corp.*, 192 Fed. Appx. 378, 380-81 (6th Cir. Aug. 1, 2006)(in case where Plaintiff Wood sometimes reported overtime and sometimes did not and thus his employer "had no reason to suspect that he neglected to report other overtime hours"), the Sixth Circuit opined, "At the end of the day, an employee must show that the employer knew or should have known that he was working overtime or, better yet, he should report the overtime hours himself.  Either way, the employee bears some responsibility for the proper implementation of the FLSA's overtime provisions.  An employer cannot satisfy an obligation that it has no reason to think exists.  And an employee cannot undermine his employer's efforts to comply with the FLSA by consciously omitting overtime hours for which he knew he could be paid.").

is not a violation of § 207."). In accord, *Brennan v. Qwest Communications Intern., Inc.*, 727 F. Supp. 2d 751, 755 (D. Minn. 2010).

The Fifth Circuit has held that where an employer requires employees to complete time sheets, the employer has no reason to investigate whether the employees are filling them out when there is no reason to suspect they are not. *Newton v. City of Henderson*, 47 F.3d 746, 748-49 (5th Cir. 1995)(*citing Forrester v. Roth's I.G.A. Foodliner*). *See also Brumbelow v. Quality Mills, Inc.*, 462 F.2d 1324, 1326-27 (5th Cir. 1972)(affirming directed verdict and holding that where an employer requires an employee to record his hours and where the employer does not know or have reason to know that the employee's reporting is not accurate, the employee is estopped from claiming she worked more hours than she recorded in her time sheets and the employer is not liable for hours not recorded).

### Allegations of Plaintiff's Original Complaint

Pier Nieddu is a hair stylist who was formerly employed by the Lifetime Fitness health facility in Town & Country, Houston, Texas from approximately April 2010 to March 2012.

The Complaint states that Defendants Life Time Fitness, Inc., LTF Club Management Company, LLC, LTF CMBS Managing Member, Inc.,[8]

---

[8] LTF CMBS Managing Member, Inc. was dismissed on 3/06/13 (#32), pursuant to a joint motion from Plaintiff and the other Defendants (#31).

and LTF Club Operations, Inc. (collectively, "Lifetime Fitness")
constitute a nationwide chain of health and fitness facilities
under the control of the corporate office of Lifetime Fitness,
Inc., located in Minnesota, and hold themselves out to the general
public as a "single enterprise,"[9] each liable for the violations of
the others.  They run each location identically with the same kind
of facility and service, they share employees, they have common
management, they pool their resources, they have common ownership
and operate from the same corporate headquarters, they have the
same operating name, they advertise together on the same website,
and they use the same business model.  They operate approximately
105 Lifetime Fitness locations in twenty-one states and twenty-six
major cities and employ approximately 20,000 employees nationwide.

---

[9] "The minimum wage and overtime provisions of the FLSA
apply to employees of 'an enterprise engaged in commerce or in
the production of goods for commerce.'"  *Donovan v. Grim Hotel
Co.*, 747 F.2d 966, 969 (5th Cir. 1984), *quoting* §§ 206 and 207).
The FLSA defines "enterprise" in part as "the related activities
performed (either through unified operation or common control) by
any person or persons for a common business purpose, and includes
all such activities whether performed in one or more
establishments or by one or more corporate or other organization
units including departments of an establishment operated through
leasing arrangements."  29 U.S.C. § 203(r)(1).  Section 203(s)
restricts the definition to "an enterprise whose annual gross
volume sales made or business done is not less than $500,000."
The three main elements of a statutory enterprise, which must be
shown to establish that two entities functioned as a single
enterprise, are related activities, unified operation or common
control, and common business purpose."  *Orozco v. Plackis*, ___
F. Supp. 2d ___, 2013 WL 3306844, at *5 (W.D. Tex. June 13,
2013), *citing Brennan v. Arnheim & Neely, Inc.*, 410 U.S. 512, 518
(1973), and *Reich v. Bay, Inc.*, 23 F.3d 110, 114 (5th Cir. 1994).

Lifetime Fitness employs hair stylists at all of their locations. Alternatively, states the Complaint, the Lifetme Fitness entities operate as joint employers.[10]

---

[10] The FLSA defines an "employer" very broadly as "any person acting directly or indirectly in the interest of an employer in relation to an employee." 29 U.S.C. § 203(d). To determine if an individual or an entity is an "employer" under the statute, applying an "economic reality" test, a court should examine whether he or it "'(1) possessed the power to hire and fire employees; (2) supervised or controlled employee work schedules or conditions of employment; (3) determined the rate or method of payment; and (4) maintained employee records." *Gray v. Powers*, 673 F.3d 352, 355 (5th Cir. 2012), *quoting Williams v. Henagen*, 595 F.3d 610, 620 (5th Cir. 2010). For a *prima facie* case under the FLSA, the employee bears the burden of demonstrating the existence of an employer-employee relationship by a preponderance of the evidence. *Artis v. Asberry*, Civ. A. No. G-10-323, 2012 WL 5031196, at *3 (S.D. Tex. Oct. 16, 2012). Whether a person or an entity is an "employer" under the statute is a question of law. *Beliz v. W.H. McLeod & Sons Packing Co.*, 765 F.2d 1317, 1327 (5th Cir. 1985).

There can be multiple employers under the FLSA and 29 C.F.R. § 791.2(a)("A determination of whether the employment by the employers is to be considered joint employment or separate and distinct employment for purposes of the act depends upon all the facts in the particular case. . . . . [I]f the facts establish that the employee is employed jointly by two or more employers, i.e., that employment by one employer is not completely disassociated from employment by the other employer(s), all of the employee's work for all of the joint employers during the workweek is considered as one employment for purposes of the act. In this event, all joint employers are responsible, both individually and jointly, for compliance with all the applicable provisions of the act, including the overtime provisions, with respect to the entire employment for the particular workweek."). Under 29 C.F.R. § 791.2(b),

Where the employee performs work which simultaneously benefits two or more employers, or works for two or more employers at different times during the workweek, a joint employment relationship generally will be considered to exist in situations such as:

(1) Where there is an arrangement between the

-15-

In the complaint Nieddu seeks conditional certification of a class comprised of Defendants' current and former hair stylists at Lifetime Fitness locations throughout the United States at any time in the three years preceding the filing of this lawsuit (on September 11, 2012) up to the time of trial. Subsequently in his motion for conditional certification, Nieddu substantially limited his class to current and former commission-paid hair stylists employed at the Houston, Texas CityCentre location from September 11, 2009 to the present seeking to recover unpaid minimum wage for all hours worked and overtime for hours worked in excess of 40 hours per week.

Defendants pay their hair stylists on commission, i.e., a set percentage of retail sold to customers and a set percentage for services provided. By doing so, Defendants can satisfy their overtime requirements by paying Plaintiff and putative class

employers to share the employee's services, as, for example, to interchange employees; or

(2) Where one employer is acting directly or indirectly in the interest of the other employer (or employers) in relation to the employee; or

(3) Where the employers are not completely disassociated with respect to the employment of a particular employee, and may be deemed to share control of the employee, directly or indirectly, by reason of the fact that one employer controls, is controlled by, or is under common control with the other employer.

members at least one and one-half times the minimum wage for every hour worked during the weeks when they worked overtime.  The complaint charges that Defendants failed to do so during the weeks when the hair stylists worked more than forty hours a week and therefore Lifetime Fitness violated the FLSA's § 7(i) exemption, which excludes from the FLSA's overtime provisions "any employee of a retail or service establishment . . . if (1) the regular rate of pay[11] of such employee is in excess of one and one-half times the minimum hourly rate applicable to him under [the minimum wage section of the FLSA] and (2) more than half his compensation for a representative period (not less than one month) represents commissions on goods or services."  29 U.S.C. § 207(i).  *See also* 29 C.F.R. § 516.2(a)(6)(ii).

Specifically Nieddu complains that Defendants violated the FLSA by (a) failing to pay at least the minimum wage for hours worked in a workweek where no overtime was worked (29 U.S.C. §§ 206(a)[12] and 207(a)[13]); (b) failing to pay at least one and one-half

_____

[11] The "regular rate of pay" "is a rate per hour, computed for the particular workweek by a mathematical computation in which hours worked are divided into straight time earnings for such hours."  29 C.F.R. § 779.419.

[12] Section 206(a)(1), addressing Minimum Wage, provides in relevant part,

(a) Employees engaged in commerce . . . . Every employer shall pay to each of his employees who in any workweek is engaged in commerce . . . or is employed in an enterprise engaged in commerce . . . wages at the following rates:

times the minimum wage for every hour worked during weeks where the
hair stylist worked over forty hours in a workweek; (c) not
maintaining the required records[14] to comply with the commissioned

---

        (1) except as otherwise provided in this
        section, not less than-

            (A) $5.85 an hour, beginning on the
            60th day after May 25, 2007;
            (B) $6.55 an hour, beginning 12
            months after that 60th day; and
            (c) $7.25 an hour, beginning 24
            months after that 60th day.

[13] Section 207(a), addressing Maximum Hours, provides,
"Except as otherwise provided in this section, no employer shall
employ any of his employees who in any workweek is engaged in
commerce . . . or is employed in an enterprise engaged in
commerce . . . for a workweek longer than forty hours unless such
employee receives compensation for his employment in excess of
the hours above specified at a rate not less than one and one-
half times the regular rate at which he is employed."
       Where an employer is found liable for failure to pay
the specified minimum hourly wage or overtime under §§ 206 and/or
207, the employer must pay the successful plaintiff employees the
amount of unpaid minimum wages or unpaid overtime compensation,
liquidated damages in an amount equal to their awards for minimum
wage and overtime payments under 29 U.S.C. § 216, and reasonable
expenses and attorney's fees. *Jones v. Supermedia, Inc.*, 281
F.R.D. 282, 286-87 (N.D. Tex. 2012).

[14] Under 29 U.S.C. § 211(c) in relevant part,

Every employer subject to any provision of this chapter
or of any order issued under this chapter shall make,
keep, and preserve such records of the persons employed
by him and of the wages, hours, and other conditions
and practices of employment maintained by him, and
shall preserve such records for such periods of time,
and shall make such reports therefrom to the
Administrator as he shall prescribe by regulation or
order as necessary or appropriate for the enforcement
of the provisions of this chapter or the regulations or
orders therein. . . . .

-18-

employee FLSA exemption (section 7(i)[15]); and (d) by passing on business expenses (e.g., for shampoo, hair coloring products, etc.) to its hair stylists, resulting in a denial of minimum wage and/or of overtime at the federally mandated premium rate for overtime worked.

**Plaintiff's Motion to Conditionally Certify Collective Action**

**and Request for Expedited Ruling (#33)**

---

[15] Section 7(i), 29 U.S.C. § 107(i)("Employment by retail or service establishment," provides an exemption from the FLSA's overtime provisions,

> No employer shall be deemed to have violated subsection (a) of this section by employing any employee of a retail or service establishment for a workweek in excess of the applicable workweek specified therein, if (1) the regular rate of pay of such employee is in excess of one and one-half times the minimum hourly rate applicable to him under section 206 of this title, and (2) more than half his compensation for a representative period (not less than one month) represents commissions on goods or services. In determining the proportion of compensation representing commissions, all earnings resulting from the application of a bona fide commission rate shall be deemed commissions on goods or services without regard to whether the computed commissions exceed the draw or guarantee.

Exemptions are narrowly construed under the statute and the employer bears the burden to prove an exemption applies. *Cheatham v. Allstate Ins. Co.*, 465 F.3d 78, 584 (5th Cir. 2006); *Vela v. City of Houston*, 276 F.3d 659, 666 (5th Cir. 2001).
Regarding certain record-keeping requirements related to the § 7(i) exemption, 29 C.F.R. § 516.16 provides in part, "With respect to each employee of a retail or service establishment exempt from the overtime pay requirements of the Act pursuant to the provisions of section 7(i), employers shall maintain and preserve payroll and other records containing all information and data required by § 516.2(a) except paragraphs (a)(6),(8),(9), and (11) . . . ."

Seeking conditional certification of a class defined as "Lifetime Fitness's current and former commission paid hair stylists employed at its Houston, Texas CityCentre location from September 11, 2009 to the present and notice pursuant to 29 U.S.C. § 216(b)," Nieddu claims that although Section 7(i)'s exemption applies to overtime compensation for commissioned-paid employees, at minimum, the statute's mandated minimum wage requirement must be satisfied for those weeks where commissioned employees do not work overtime, i.e., less than 40 hours per week. Conceding that Lifetime Fitness's "commission pay policy is legal as long as it accurately tracks its commission paid hairstylists' hours worked to ensure that commissions/compensation paid satisfies" the FLSA pay rates, Nieddu charges that Lifetime Fitness failed to track accurately the hours worked by its commission-paid hair stylists at the Texas CityCentre location, and thus failed to compensate him and putative class members pursuant to the FLSA's § 7(i) and/or minimum wage requirement. #33 at 2-3. He maintains that although Lifetime Fitness had a tracking program named KRONOS and electronic commission/pay tracking programs known as SpaBiz and Shortcuts that calculated the pay due to its commission-paid hair stylists for compliance with the § 7(i) exemption, Lifetime Fitness's system failed because the management at the CityCentre had a policy/practice of not requiring the hair stylists to log-in, indeed even of instructing its commission-paid hair stylists not to

log-in hours worked (dubbed by Nieddu the "off-the-clock violation"). Ex. B, Nieddu Dep., p. 58, l.25-p.60, l.5. As a result of this policy, the commission-paid hair stylists were not properly compensated under the FLSA for all hours worked at the federally mandated minimum wage rate and/or at the premium overtime rate, depending on the number of hours worked in a week. Instead Lifetime Fitness passed its time-keeping obligations onto the employees, ignored red flags indicating a breakdown of its compensation system, and knowingly and willfully "stuck its head in the sand."[16]

Nieddu claims he is "similarly situated" to other commission-paid hair stylists at the Texas CityCentre facility because

> he shared the same job title, performed the same job duties, was paid on a commission pay structure which included "shop charges" assessed by [Lifetime Fitness] against its commission paid hair stylists for expenses associated with services provided, his pay was calculated using the same pay programs, his hours were tracked using the same tracking system, he was denied overtime pay as required under the FLSA's § 7(i), he was denied minimum wage pay, and worked in the same geographical area (the same location to be exact) as the Class Members. More

---

[16] Nieddu alleges one incident when a manager, Francisco Fuentes, "dropped the ball" and failed to approve his pay for one pay period. Dep. of Liza Shiffman, Corporate Rep. for Lifetime Rep., Ex. A at p.110,ll.1-23. He also mentions an instance where his Time Card for the period of March 1-15 2012 reflected zero hours of work, but his pay stub for the same period reflected 4.45 hours of work and his weekly earnings showed service generating revenue of $264.60. #33 at p. 5. This Court observes that this is the kind of "circumstance purely personal to the plaintiff, and not [resulting] from any generally applicable rule, or policy, or practice" that will not support a plaintiff's right to proceed collectively. *McKnight*, 756 F. Supp. 2d at 801.

> importantly, Plaintiff was subject to the same FLSA "off
> the clock" pay violation as other Class Members [under
> Lifetime Fitness's policy].

#22, pp. 6-7, citing Shiffman Dep. at pp. 49-51.

Moreover, he cites to the depositions of corporate representative Shiffman (Ex. A), himself (Ex. B), and opt-in plaintiff Rosalind Hampton (Ex. C) to support his conclusory argument that all the commission-paid hair stylists at CityCentre on a list produced by Lifetime Fitness (Shiffman Dep. Ex. 3) are similarly situated in the following respects (footnotes omitted):

> (1) They are all hair stylists; (2) They are all paid on
> a commission basis; (3) They worked full time schedules
> of forty hours or more per week; (4) They are all paid
> subject to the same corporate commission pay structure,
> which describes how hair stylists are to be paid
> commissions for services provided and retail sold; (5)
> Their commissions are calculated using either SpaBiz or
> Shortcuts, which are pay calculating programs; (6) The
> only exemption that applies to the Plaintiff and Class
> Members, and it applies equally, is the FLSA's 7(i)
> exemption; (7) They are all subject to "shop charges";
> (8) LTF's KRONOS time keeping system is used to track
> their time; (9) All of their hours reported through
> KRONOS were transmitted to LTF's Workday Program; (10)
> All of their commissions earned and recorded through
> either SpaBiz or Shortcuts were uploaded to LTF's Workday
> program--nothing unique as to the tracking of their time
> or calculation of their pay; (11) LTF takes a tip credit
> against all of the commission paid hairstylists' pay;
> (12) All hairstylists have the same job duties:
> haircutting, to provide coloring services, styling
> services, to perform general cleaning, and are entrusted
> by LTF to provide "excellent customer service"; (13) They
> all check-in to the same front desk as soon as they
> arrive to work; (14) LTF's sole determination of when its
> hair stylists' compensable time for pay purposes starts
> and ends is based on "punch in" and "punch out"
> (regardless of other documentation which indicates the
> hairstylists are doing work for LTF); (15) They are all
> required to meet hairstylist certifications, which

requires continuing education courses to be taken; (16)
LTF's management sets the hairstylists' work schedules;
(17) Review of the hairstylists' pay for compliance with
the FLSA's § 7(i) is accomplished by the same corporate
payroll representative overseeing Texas LTF employees;
(18) They are supervised by the same department head,
supervisors, and managers, including Mr. Francisco
Fuentes, whom LTF admits 'dropped the ball' as to
capturing all time worked by commission paid hair
stylists; (19) They were instructed by their managers not
to worry about "clocking in" or "clocking out"' because
they were commission paid employees; (20) They were not
paid for all hours worked even though management knew
that they were performing work "off the clock"--they were
all subject to LTF's illegal "off the clock" pay
policy/practice at the Houston, Texas CityCentre
location; (21) They were not paid for all hours spent in
training or continuing education courses; and (22) LTF
passed its time keeping obligation[17] to all of its
commission paid hair stylists. *[sic]*

#33 at pp. 14-16.

### Defendants' Opposition (#35)

Defendants argue that Nieddu fails to meet his burden to
justify conditional certification of a collective action for his
claims because the factual record and Nieddu's own evidence show
that the hair stylist employees at CityCentre are not similarly
situated in key respects.

As a threshold matter, Defendants insist that Nieddu cannot
show a common Lifetime Fitness decision, policy, or plan that
requires hair stylists to work without appropriate compensation.
There is no corporate policy that prevented employees from

---

[17] Nieddu asserts, "To make matters worse, LTF took the
position that the time keeping obligation under the FLSA lies on
its employees rather than on itself as the employer.  As such it
'washes it *[sic]* hands' of any FLSA obligations."  #33 at p. 19.

reporting time spent on work activities and in turn barred proper payment in accordance with § 7(i) of the FLSA. Nieddu does not allege that Lifetime Fitness's KRONOS reporting system systematically excluded any work time nor that employees were disciplined or chastised for reporting work hours or that supervisors or managers deleted hours from employees' time reports. Instead, unsupported by evidence and contrary to the evidence in the record, Nieddu claims two instances when employees were purportedly instructed by a few supervisors not to report time worked. It is undisputed that Lifetime Fitness requires its commissioned employees to report accurately, and receive proper compensation for, all hours worked, as expressly evidenced in its employment policies. All commissioned employees are instructed that they must be familiar with and comply with these policies. The evidence further proves that employees are authorized to track their own hours and are responsible for self-reporting all compensable work hours. The corporate policy also reiterates that any commissioned employee's failure to report fully all time worked and to complete payroll records accurately may result in discipline, up to and including termination of employment. Because both Nieddu and Hampton concede that they self-reported their own payroll time, they cannot demonstrate a common policy or plan by Lifetime Fitness to deny them proper compensation when Lifetime Fitness undisputedly paid him and Hampton according to the hours

which they self-reported. *See, e.g., Wood v. Mid-America Management Corp.*, 192 Fed. App'x. 378, 380-81 (6th Cir. 2006)("At the end of the day, an employee must show that the employer knew or should have known that he was working overtime or, better yet, he should report the overtime hours himself. Either way, the employee bears some responsibility for the proper implementation of the FLSA's overtime provisions. An employer cannot satisfy an obligation that it has no reason to think exists [because the employee reported only some overtime]. And an employee cannot undermine his employer's efforts to comply with the FLSA by consciously omitting overtime hours for which he knew he could be paid."); *Berger v. Cleveland Clinic Foundation*, No. 1:05 CV 1508, 2007 WL 2902907, *13 (N.D. Ohio Sept. 29, 2007)(where employees were told to mark in a logbook when they missed their entire lunch period because of work so they could be compensated, recovery of compensation is denied where the plaintiff failed to mark them in the logbook), *citing inter alia Forrester v. Roth's I.G.A. Foodliner, Inc.*, 475 F. Supp. 630, 634 (D. Or. 1979)(estopping plaintiff from recovering where he "prevented the [employer] from complying with the Act by failing to report overtime hours accurately"), *aff'd*, 646 F.2d 413, 414-15 (9th Cir. 1981)("An employer must have an opportunity to comply with the provisions of the FLSA. . . . [W]here the acts of an employee prevent an employer from acquiring knowledge, here of alleged uncompensated hours, the

employer cannot be said to have [violated the FLSA].").   Thus Nieddu cannot show that his choice not to report all hours he worked in violation of company policies and procedures was representative of other hair stylists working at differing commission levels with different performance expectations.   Nieddu makes only a few individualized claims that a few employees were told by their supervisors not to "worry about 'clocking in' or 'clocking out" because they were commission-paid employees, but provides no evidence suggesting that Lifetime Fitness knew or should have known about Plaintiff's and Hampton's alleged unrecorded work time, much less on a class-wide basis or pursuant to a single policy, plan or practice.   Nieddu's Dep., #35, Ex. 2, Ex. A, 49:4-13, 103:4-12 (noting supervisors were "in and out" and not "tracking" the hair stylists); *id.*, 90:4-16, 109:12-19 (noting that no Lifetime Fitness policies prevented Plaintiff from accurately reporting his time worked); Hampton Dep., *id.*, Ex. B, 78:13-23 (noting that supervisors were in their office and not in hair stylists' workspace unless there was an issue at the salon front desk).

Lifetime Fitness also points out that after nearly a year, only one potential class member has opted in and that person was solicited by Nieddu's attorney.   It appears there is insufficient interest to justify conditional certification and notice to a class.

Addressing the issue of whether Lifetime Fitness hairstylists are similarly situated, Lifetime Fitness, supported by Liza Shiffman's affidavit (#35, Ex. 3, ¶¶ 4-8), states that its hair stylists receive different pay depending on their job classification, skill level, and a variety of other factors. Generally they are classified as either "Apprentices" or "Stylists," with the latter category divided into a number of different skill levels and areas of expertise. *Id.* at ¶¶ 5,7; Affidavit of Alexandra Yanez, Ex. 1, ¶ 8.   Usually a hair stylist begins employment as an Apprentice, a program serving to develop experience and build a client base.  Hampton remained an Apprentice while obtaining a required state cosmetology license that would permit him to perform full hair styling services.  Shiffman Affid., Ex. 3, ¶ 5.  Apprentices are paid on an hourly, non-exempt basis for all time spent on work-related activities.  The hourly rate varies, however, depending on such factors as background and experience, as does the length of the Apprenticeship.  *Id.*

In addition to this hourly rate, including any applicable overtime premium based on federal or state law, Apprentices and Stylists are entitled to sales commissions on salon products and other retail goods that they sell to customers; thus these "Sales Commissions" vary depending on the sales volume and the commission plan.  *Id.* at ¶¶ 6,8. Under the 2012 stylist commission structure, Sales Commissions are calculated at a rate of 15% of the product

retail sale price for total sales per client of $7 to $13.99, and at a rate of 18% of product retail sales priced for total sales per client of $14 or more. *Id.* They may receive these commissions even if the actual transaction is finalized on a day when the employee is not scheduled to work. *Id.*

After an employee successfully completes the Apprentice program, he becomes a Stylist and is compensated mainly on a commission-based pay structure, not hourly pay, and continues to receive Sales Commissions as described. *Id.* at ¶¶ 7,8. Unlike Apprentices, Stylists also receive commissions on part of the price charged to clients for each salon service they provide ("Service Commissions"), with the price charged based on the particular service and on the Stylist performing that service. *Id.* Each Stylist, in coordination with his supervisor, sets his service rates based on factors such as his skill level, tenure in the industry, and experience. *Id.* After a Stylist's rate is established, "Shop Charges" (discussed in detail *infra*) and any applicable promotional or other discounts are deducted from the price of the service performed. *Id.* Service Commissions are computed from this final service charge. *Id.* Furthermore, Stylists have different Service Commission rates based on their individual "Pay Schedule," which also varies according to a number of factors including his skill set, revenue generation, and retention rate. *Id.* at ¶ 11.

Lifetime Fitness, from September 11, 2009-March 2013, employed at its CityCentre salon, approximately 27 Apprentices and Stylists, with different levels of skill and expertise.  Yanez Affid, Ex. 1., ¶¶ 6,8; Ex. B.

Lifetime Fitness further shows that hair stylists have very different schedules and job duties.  At each location Apprentices and Stylists report to a "Department Head," i.e., supervisor, and during their employment they may report to different supervisors because of the rapid turnover rate of these supervisors.  Yanez Affid., Ex. 1 at ¶¶ 4,7.[18]  Furthermore each Department Head manages and operates his LifeSpa location as he chooses, based on day-to-day business needs, and determines the workday schedules and duties in his area, while taking into account each hair stylist's skill

---

[18] Lifetime Fitness represents that Plaintiff reported to at least six individual Department Heads during his employment at CityCentre:  (1) Francisco Fuentes from April 20, 2010-July 31, 2011 when he was terminated for misconduct; (2) Patrick J. Fricano, General Manager and interim Department Head from August 1, 2011-September 7, 2011; (2) Moniquca McKinney as interim Department Head/Front Desk Coordinator from September 15-18, 2011; (4) Greg Walden, interim Department Head from September 19-October 31, 2011; (5) Merquiz Guzman, interim Department Head/Front Desk Coordinator for the month of November 2011; and (6) Holly Dodson, Department Head since December 1, 2011.  *Id.* at ¶ 7.  Plaintiff was terminated by Dodson in March 2012 for misconduct, including working for a competitor in violation of both a salon agreement he entered when he began his employment and breach of his general duty of loyalty to Lifetime Fitness. *Id.* at ¶ 12.

Hampton, the only opt-in class member thus far, also reported to a number of managers, including those who became Department Heads following Plaintiff's discharge.  *Id.* at ¶ 7, identifying those who supervised Hampton.

and availability. *Id.* at ¶¶ 7-11. Each location has its own budget, schedule, service offerings, retail line, hours of operation, and prices. *Id.* While hair stylists are expected to reach daily, weekly, and monthly goals and to satisfy a standard retail sales minimum, their individual goals vary based on many factors including experience levels and individual service prices. *Id.* at ¶ 11. Some hair stylists specialize in a particular service area, such as color, cuts, ethnic hair, up-dos and/or bridal hair, and hair extensions. *Id.* at ¶ 8. Depending on experience and skill, hair stylists occupy positions from Apprentice to Master. *Id.* at ¶ 8.

Furthermore because hair stylists vary in their productivity, Department Heads may assign them different duties. *Id.* at ¶ 10. Productive stylists may have clients regularly scheduled for services throughout their assigned shifts, while less productive hair stylists may be assigned cleaning tasks or promoting their services in the club, or even permitted to "clock out" and leave. *Id.*

Hair stylists have a variety of different work schedules and duties, depending on their availability and/or scheduled work hours. *Id.* at ¶ 9.

Lifetime Fitness also points to differences between Nieddu and Hampton to demonstrate that these two are not similarly situated, in addition to the lack of a similarly situated class in this suit.

Nieddu complains that he and other allegedly similarly situated Stylists were not paid in compliance with § 7(i)'s exemption because of an alleged failure to report all work hours, while Hampton complains that as an hourly Apprentice she was not properly paid overtime because of a failure to report all work hours. Hampton Dep. #35. Ex. 2 (Affid. of Douglas Christensen), Ex. B, 15:24-16:5, 29:21-30:16.  Plaintiff asserts that he was a full-time commissioned Stylist who regularly worked a schedule of forty or more hours per week, while Hamilton testified that once she became a commission-paid Stylist she worked only a part-time schedule of twenty hours per week. *Id.* at 24:12-25:14. 54:4-25.  Hampton also testified that she was the only stylist working those hours. *Id.* at 54:23-55:0.  Nieddu worked Tuesday-Saturday at full-time hours. #35, Ex. 2 (Christensen Affid.), Ex. A (Nieddu Dep.), 53:18-22. Hampton was also absent for medical reasons during her employment. *Id.,* Ex. B, 106:2-16.  Suggesting that she was not a very productive employee, Hampton further testified that she was assigned "cleaning up all the time like I was a maid," that she did inventory, towels, laundry, stocking, dusting, mopping, tasks that the other hair stylists did not do. *Id*. at 78:24-81:7.  Unlike Plaintiff, Hampton regularly clocked in and clocked out for work when she was an hourly Apprentice. *Id*. at 111:1-20; *cf*. Nieddu Dep., Ex. A at 60:11-61:22; 90:4-16; 96:1-97:16; and 109:12-20. Nieddu and Hampton have different complaints against Lifetime

Fitness.  Unlike Nieddu's, Hampton's main grievances are that she was not reimbursed for products that she bought elsewhere for use on her Lifetime Fitness clients (Hampton Dep., Ex. B at 12:1-16, 47:17-18:22), she was not paid correctly when she was an hourly Apprentice (*id.* at 16:9-19), other employees misappropriated her commission sales (*id.* at 61:24-62:6), and she did not always receive her tips (*id.* at 67:9-13).

Lifetime Fitness further points to Nieddu's own testimony that Nieddu conceded that he did not know the key circumstances about other hair stylists at CityCentre.  Nieddu Dep., Ex. A at 25:22-26:8; 78:10-13; 95:23-25; 27:6-24; 28:21-24; 30:23-31:13; 58:19-24; 87:20-88:9.

Lifetime Fitness argues that its time reporting and compensation policies and practices comply with the FLSA.  It met the requirement in § 7(i) that to qualify for exempt status, commissioned employees' earnings for a given pay period must equal at least one and one-half time the applicable minimum wage based on the number of hours worked by giving commissioned Stylists a "draw" or "minimum wage adjustment" where their earnings in a given pay period was insufficient.  Shiffman Affid., Ex. 3, ¶ 12 (a draw "is a payment which, along with any commissions earned during the pay period in question, will render the employee's pay equal to the applicable minimum rate multiplied by the hours worked in the pay period, minus an available tip credit authorized under federal and

applicable state law."; in Houston the applicable minimum rate to satisfy the exemption is $10.88 per hour).

Lifetime Fitness has a number of policies and has adopted various systems and practices designed to be certain that all commissioned Stylists receive a draw and other appropriate compensation. *Id.* at ¶ 13. For example its "Timekeeping" policy, included in the Team Member Handbook[19] which new employees must review during orientation and then sign an acknowledgment that they have read and understood the materials, requires that hourly and commissioned employees must accurately and completely record all hours worked in KRONOS, the electric time keeping system. *Id.;* Affid. of Brianna Weber, Lifetime Fitness's Human Resources specialist, Ex. 4, ¶ 5 and its Ex. A (Timekeeping policy, stating *inter alia* that "[f]ederal and state laws require an accurate record of time worked by hourly and commissioned [employees] in order to properly calculate pay and benefits."). The policy requires all hourly and commissioned employees to keep accurate records of the time they begin or end work, including the beginning and end of any split shifts, departures from work for personal reason, or unpaid meal breaks, by punching in and out on the appropriate time clock. *Id.* at ¶ 6. It makes clear that "time

---

[19] The Handbook is given out to employees during orientation and is also available on an electronic format on Lifetime Fitness's intranet site. A copy of the Timekeeping Policy is attached as Exhibit A to Brianna Weber's Affidavit (#35, Ex. 4, Ex. A).

worked" includes all time spent performing job-related duties, as well as any paid breaks. *Id.* at ¶ 8. It also provides that employees are responsible for accurate time records and that if any time was not entered accurately or modifications are needed, the employee must immediately notify his Department Head. *Id.* at ¶ 9. If he forgets to punch in or out as required by the policy, he must immediately fill out a KRONOS Missed Punch form and give it to his Department Head for processing. *Id.*

Lifetime Fitness also has a "KRONOS Missed Punches/Editing Punches" policy (#35, Weber Affid., Ex. 4 at ¶ 10, and its Ex. B) that delineates the Department Head's responsibilities with respect to timekeeping. The Department Head must review time entries in KRONOS for all of his direct reports at least every other day and look for any discrepancies, errors, and inaccuracies. If he finds a discrepancy, he must confer with the employee and make sure the entries are accurate. If changes need to be made, the Department Head must make sure that the employee completes a KRONOS Exception Sheet. After an employee verifies the number of hours he worked and signs the KRONOS Exception Sheet, the Department Head may edit the employee's time entries in the KRONOS System. The Department Head may not edit any employee's punches without the employee agreeing that the changes accurately reflect his hours worked by completing the KRONOS Exception Sheet; if he violates this policy, he is subject to discipline, up to and including termination.

Employees are also subject to discipline if they alter or falsify their time records or fail to present accurate timekeeping information.

Another company policy, "Accuracy of Records," *id.* at ¶ 11, *and* Ex. C ("Recording false, accurate or incorrect information or data is grounds for discipline, up to and including termination."), requires employees to make certain that all data included in company records is complete and accurate.

Last, Lifetime Fitness also sends reminders to employees from time to time about the importance of accurate timekeeping, as when an employee's weekly hours average falls below the minimum requirement to maintain employee benefits. *Id.* at ¶ 12, and Ex. D.

Thus the evidence shows that Lifetime Fitness had appropriate formal policies and put them into practice. Where there is evidence that employers have, and enforce, appropriate pay policies, that evidence weighs strongly against conditional certification. *Griffith v. Wells Fargo Bank, N.A.*, No. 4:11-CV-1440, 2012 WL 3985093 (S.D. Tex. Sept. 12, 2012); *Saleen v. Waste Management, Inc.*, 649 F. Supp. 2d 937, 940-41 (D. Minn. 2009); *Thompson v. Speedway SuperAmerica LLC*, No. 08-CV-1107(PJS/RLE), 2009 WL 130069, at *1, 9, 12 (D. Minn. Jan. 20, 2009); *West v. Border Foods, Inc.*, Civ. No. 05-2525 (DWF/RLE), 2006 WL 1892527, at *7, 9 (D. Minn. June 12, 2006); *Ray v. Motel 6 Operating, Ltd. Partnership*, No. 3-95-828, 1996 WL 938231, at *4 (D. Minn. Mar. 18,

1996).

The hours entered into KRONOS by the hair stylists and commission data gathered through an electronic program known as SpaBiz (or its previous version called ShortCuts) are transmitted to a program called Workday, which then automatically calculates whether any of the commissioned Stylists must be paid a draw for the pay period in question.  Shiffman Affid., Ex. 3 at ¶ 13-14. The result varies from one Stylist to another, as well as from one pay period to another.  Some commissioned Stylists regularly hit draw, while others never do because they generate services and sales sufficient to render their earnings adequate to meet § 7(i)'s requirements.  *Id.*

"Shop Charges" are not unlawful deductions from wages.  They are deducted from the price of each service before a Stylist's Service Commission is calculated.  Shop Charges are meant to cover a range of costs involved in providing various salon services to customers, e.g., the cost of using salon products and linens, and they vary with the particular service. *Id.* at ¶ 9.  Furthermore Shop Charges are not a deduction from the hair stylists' earned wages;  instead they are automatically calculated at the point of sale and are deducted from service charges (through the SpaBiz or ShortCuts Point-of-Sale systems) *before* the calculation of Service Commissions.  *Id.* at ¶ 10.  Nieddu's claim that he is similarly situated with other hair stylists at CityCentre because they were

all subject to Shop Charges lacks merit and he provides no evidence to show that these charges violate the FLSA.  In addition to Shop Charges, any promotional or other applicable discount offered to clients for the cost of services is also deducted prior to the calculation of Service Commissions.  *Id.*  Moreover after these costs are deducted, but still before calculation of the Service Commissions, SpaBiz or Shortcuts automatically calculates the service commission rate due to the particular Stylist based on the cumulative resulting service revenue in the given pay period (and the Stylists Pay Schedule, explained *supra*).  This commission rate is then multiplied by the service revenue amount minus Shop Charges and applicable discounts, resulting in the actual Service Commission dollars owed to the Stylist for that pay period.

Lifetime Fitness reiterates that Plaintiff cannot establish that its CityCentre hair stylists are similarly situated with his claims for alleged minimum wage and/or overtime violations.  Nieddu and Hampton both admit that they self-reported their own payroll time and that they chose not to or simply forgot to report all of their work hours in the KRONOS time reporting system.  Nieddu produces no evidence of a common illegal policy or plan that prohibited hair stylist employees from accurately recording their time or from being paid properly or that Lifetime Fitness's time-reporting system systematically excluded any work time or did not allow employees to accurately capture their hours worked or to

accurately calculate commissions or draws due to the hair stylists. Because there is no reason why the hair stylists could not follow Lifetime Fitness's express and clear policy that prohibited off-the-clock work and falsifying time records, Lifetime Fitness was entitled to rely upon its employees to comply with those policies and assume they were honest. *Von Friewalde v. Boeing Aerospace Ops., Inc.*, No. 08-50313, 339 Fed. Appx. 448, 459 (5th Cir. Aug. 4, 2009)("While an employer may not 'stand idly by' without paying an employee he knows or should know is working overtime, an employee has a duty to notify his employer when he is working extra hours. Further, it is undisputed that all of Boeing's employees were aware of its policy prohibiting overtime work without authorization, and we have expressly rejected the notion that an employer does 'not have the right to require an employee to adhere to its procedures for claiming overtime.'"), *citing Newton*, 47 F.3d at 748, 749.

Lifetime Fitness cites two cases where conditional certification was denied because the employer's undisputed policy required employees to self-report hours worked accurately and the payroll system automatically correctly paid the employees for the time they self-reported. *Griffith*, 2012 WL 3985093, at *2-5 (observing that collective certification is inappropriate where an employee's choice to deviate from policy and inaccurately self-report work time is based on individual circumstances and "office-specific experiences relating to the actions of office or division

supervisors"); *Carey v. 24 Hour Fitness USA, Inc.*, Civ. A. No. H-10-2009, 2012 WL 4857562, *2 (S.D. Tex. Oct. 11, 2012)(denying conditional certification because an inquiry whether managers did not want employees to record accurate hours would "require extensive individualized analysis" and because "[w]hether a Club Manager would be willing to violate the 24 Hour Fitness's written company policy against 'off-the-clock' work also requires an inquiry into the motivation and ethics of each Club Manager.").

**Nieddu's Reply (#36)**

Nieddu maintains that only the lenient standard at the notice stage under *Lusardi* applies here because discovery is not largely complete nor is the suit ready for trial. *Mooney*, 54 F.3d at 1214; *McKnight*, 756 F. Supp. 2d at 802; *Wells Fargo Wage & Hour Employment Practices Lit.*, 2012 WL 3308880, at *20No. H-11-2266, (S.D. Tex. Aug. 10, 2012). He insists that the "overwhelming evidence" shows that the hairstylists at Lifetime Fitness's CityCentre location are similarly if not identically situated and are subject to the same illegal FLSA "off-the-clock" violation. Moreover many courts do not require a showing that other aggrieved individuals desire to "opt-in" to the lawsuit nor the submission of affidavits from other potential class members.

**Court's Decision**

As noted, when a court applies an intermediate standard of review after substantive discovery has been taken, "something more

-39-

than the plaintiff's own allegations and declarations is required" to warrant conditional certification of a class. *See, e.g., Barnes*, 2013 WL 3884198, at *4; *Blake*, 2013 WL 3753965, at *8; *Valco*, 575 F. Supp. 2d at 622.

The Court finds that Nieddu has failed to meet his burden to show that he and putative class members are similarly situated or "the victims of a single decision, policy, or plan" to warrant conditional certification of his proposed class. *McKnight*, 756 F. Supp. 2d at 801. Thus there would be no efficiency gained by certifying a class.

Lifetime Fitness, with supporting evidence, has shown in great detail that the purported class is not similarly situated, nor are Nieddu and Hampton by themselves. Not only is there the basic division between Apprentice and Stylist with respect to pay and commissions as has been demonstrated, but in almost every way there are distinctions based on experience, expertise, schedule, job duties, products sold, services, hours worked, etc.

Lifetime Fitness has also established that it has clear, written policies mandating that employees record all hours worked and that Department Heads review those individual reports to ensure the employees receive proper payment under the FLSA (the Timekeeping Policy, Accuracy of Records policy, and "KRONOS Missed Punches/Editing Punches" policy concerning compensation), regarding which Lifetime Fitness instructs all new hair stylist employees and

required them to sign a statement that they have been informed about them and makes them available on line for anyone seeking to review them.

Nieddu has failed to show that Lifetime Fitness had a common illegal policy or plan that barred its hairstylists from reporting all hours worked or denied them proper compensation under the FLSA's § 7(i).  He has not shown the he or Hampton, nor any other hair stylist at CityCentre, was not paid in accordance with the hours that he or she self-reported.  Nor has he alleged any errors in Lifetime Fitness's KRONOS, SpaBiz, ShortCuts or Workday systems in accurately reporting hours worked.

Nieddu and Hampton come closest to raising an issue about a common policy in their allegation that they were instructed by one or more of their supervisors not to "worry about 'clocking in' or 'clocking out' because they were commission paid employees."  They do not allege facts or provide evidence showing that Lifetime Fitness knew, actually or constructively, or that it should have known by watching hair stylists in the workplace, about Nieddu's and Hampton's alleged unrecorded work time, much less unreported work hours on a class-wide basis or pursuant to a single policy, plan or decision.  For example, Nieddu testified during his deposition that the *only* manager that ever told him not to worry about clocking in and out was Francisco Fuentes (#32, Ex. B, pp. 88-90).  Attempting to show that Lifetime Fitness's management knew

-41-

about this "policy," Nieddu further stated that a management employee at the front desk would know that he was routinely working off the clock but qualified, or, more precisely, he waffled when questioned further (Ex. B at p. 81:4--p. 92:11 [*sic*]:

> Q. . . . Did any Life Time Fitness management other than
> Mr. Fuentes know that you were routinely working off the
> clock?
> A.  Yes.
> Q.  Okay.  Who?
> A. The front desk.
> Q.  And who would that be?
> A. I never got the name.  I don't remember the name, but
> front desk is always change like every three to six
> months or . . .
> Q. Okay.  And how would the front desk know that you were
> working off the clock?
> A.  Look in the schedule they have in the computer. and
> then they'll ask you if you want to take a client before
> you clock out, you know. . . .
> Q. . . . And how would they know whether you had punched
> in or punched out at that point?
> A.  They wouldn't know it.
> Q.  They wouldn't know that?
> A.  Because they didn't have time to looking for this and
> that.
> Q.  Okay.  So they —and they wouldn't know whether you
> did or didn't ?
> A.  Right.

Moreover regarding Francisco Fuentes, Nieddu testified, *id*. at p. 92:18-23 [*sic*]:  "Francisco Fuentes was leaving during the day, was come for the morning, and after a certain hour was leaving.  So he wasn't there all the time until 8:00 o'clock or 7:00 o'clock or 5:00."  When questioned further, he made clear that his supervisors were at the front desk sporadically and their attention often diverted (*Id*. at p. 103:4-p. 104:25 [*sic*]:

> Q.  Your supervisors, they were not following you or

-42-

tracking what you were doing on a day-to-day basis:  is
that right?
A.  They weren't tracking anyone.  yeah.
Q.  They were oftentimes not even in the salon area?
A.  In and out, you know, besides the last one.  Holly,
she was more often at the front desk because they had a
lot of problems at the front desk.
Q.  Okay.
A.  Not having enough employees in the front desk.  It
was causing, you know, a chaotic time some, so she had to
be there and manage, you know, appointment, the phone
calls, and all this, all that.
. . . .
A.  [The supervisors would know when you are coming in
and out of the office] because they've been there all the
time, yeah.
Q.  Okay.  And somebody is sitting at the front desk and
you would have to walk by it to get to your workstation?
A.  Of course, always.
Q.  Okay.  But the supervisor wouldn't necessarily see
you coming in in the morning?
A.  No.
Q.  Okay.  Sometimes maybe yes.  sometimes maybe no?
A.  No.
Q.  Same thing with going home?
A.  Yeah.
Q.  Okay.
A.  Sometimes yes, sometimes no.
Q.  And sometimes the supervisor wouldn't even be there
at the exact same hours you worked because he or she
worked different hours?
A.  Correct.

These sporadic sightings are the only "red flags" Nieddu claims

should have alerted Lifetime Fitness to his failure to follow the

written company policy of clocking in and out to accurately reflect

hours worked.  Not only are they insufficient to establish that

Lifetime Fitness even constructively knew he was not doing so, but

the times he, himself, might have been seen by a manager are

personal claims, not class-wide occurrences.  Moreover, as Lifetime

Fitness points out, and as supported by Nieddu's own testimony,

"Department Heads are inherently limited in their ability to track the activities of each of the many hair stylist employees under their supervision while those employees are servicing clients and engaged in a range of other activities throughout the salon."  #35 at p. 27, citing Nieddu's Dep. 103:4-12.

On the other hand, without any corroboration from anyone else, Hampton testified that not only Fuentes,[20] but "other people that sat in his position" after he left told her that it did not matter whether she clocked in or out; she then read seven other names off a list, most of them among the rapid succession of managers who replaced Fuentes, that she had prepared while explaining that "they weren't sure either" and they "had a lot to learn to replace him." #35, Ex. C at p. 14:1-p. 15:11.  Even though they worked in a single location and even though there were only 27 hairstylists employed during the class period at Lifetime Fitness's CityCentre location, neither Nieddu nor Hampton provides any corroboration that any of these supervisors instructed any other employee(s) not to bother clocking in and out.[21]

---

[20] At the same time without explanation, Hampton testified that before she became a commission-paid employee in October 2011, she always punched in and out because "Francisco was very adamant about us doing what he told us."  *Id.* at p. 16:6-19.

[21] Lifetime Fitness appropriately cites *Griffith*, 2012 WL 3985093, at *2-5 (collective certification is not appropriate where an employee's choice to deviate from policy and not accurately self-report time worked based on individual circumstances and "office specific experiences relating to the actions of . . . division supervisors"); *Carey*, 2012 WL 4857562,

While usually a small, single location with a limited number of employees who are all involved in the same job, such as styling hair for club members, would serve to support a collective action, here the very restricted size and location of the putative class highlight the fact that Nieddu fails even to name any other putative class member no less submit proof, and indeed even concedes that he does not know key facts about other hair stylists at CityCentre, and that no one other than Hampton has opted in, despite the fact that this case has been pending for a year.

Accordingly, for the reasons stated above, the Court

ORDERS that Nieddu's motion for conditional class certification (#33) is DENIED and that opt-in putative class member Rosalind Hampton is DISMISSED without prejudice from this suit. The Court further

---

at *2 (whether given manager would violate company policy would require extensive individualized analysis, making certification inappropriate."); and *Saleen*, 649 F. Supp. 2d at 941 ("[I]n any large corporation, there are going to be local managers who are ignorant of corporate policies, or who misunderstand corporate policies, or who intentionally violate corporate policies, or who intentionally violate corporate policies in order to make their own performance look better. Thus the mere fact that a small fraction of employees allege that they did not receive the compensation to which they were entitled provides almost no evidence that the *reason* that these employees were underpaid was because of an unlawful companywide policy [emphasis in original].").

ORDERS that Nieddu's request for emergency ruling (#37) is MOOT.

**SIGNED** at Houston, Texas, this  30th  day of  September , 2013.

_____
MELINDA HARMON
UNITED STATES DISTRICT JUDGE